UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
DANIEL FERRIE,                          )
                                        )
            *Plaintiff,*                )
                                        )      Civil Action No: 04-12068 (JLT)
v.                                      )
                                        )
KMART CORPORATION,                      )
                                        )
            *Defendant.*                )
                                        )

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, Kmart Corporation ("Kmart"), hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment seeking judgment in its favor on all counts in the above-captioned complaint of plaintiff, Daniel Ferrie ("Ferrie").

For the reasons below, Kmart's Motion should be granted.

## INTRODUCTION

Kmart terminated Ferrie's employment effective March 2, 2004. Ferrie was the Store Manager of Kmart's store in Braintree, Massachusetts at the time of his termination. The reason for Ferrie's termination was that, after an internal investigation by Kmart's audit department, Kmart's management concluded that Ferrie had been engaged in improper manipulation of Kmart's Smart Plan program -- a program for sale of a product warranty on eligible Kmart merchandise.

For purposes of Ferrie's claims, it does not matter if Ferrie disagrees about whether he was engaged in Smart Plan manipulation. To prove the claims set forth in his complaint, Ferrie needs to come forth with *evidence* – and not conclusory allegations or speculation – which show

that Kmart's stated reason for his termination was not actually Kmart's real reason. Ferrie must show that Kmart had an ulterior, unlawful motive.

Counts I and III of Ferrie's complaint suggests that the unlawful reason for his termination was age discrimination and/or retaliation for his opposition to supposed age discrimination under federal and Massachusetts law.[1] Ferrie has *no evidence* of this whatsoever, and certainly no evidence that creates a triable issue of fact as to whether the "cause" of Ferrie's termination was age discrimination or to retaliate against him for exercising his rights under the Age Discrimination in Employment Act ("ADEA") and/or M.G.L. c. 151B.

Alternatively, in Counts II and IV of Ferrie's complaint, he suggests that, if not age discrimination, Kmart's unlawful motive for terminating him was to retaliate against him for taking a qualifying leave under the Family Medical Leave Act ("FMLA") (Count II) and/or for exercising his workers' compensation rights (Count IV). Ferrie's own admissions establish that he did not have any FMLA rights. Notwithstanding that, Ferrie's only evidence in support of both of these claims is that his employment was terminated the day he attempted to return to work. Standing alone, Massachusetts and federal law are clear that this is insufficient to create a triable issue of fact on either of these retaliation claims. In any event, the undisputed evidence demonstrates that Kmart waited for Ferrie to return to work in order to get his side of the story about the Smart Plan situation. Kmart did not make the decision to terminate Ferrie's employment until after it had the opportunity to take, and review, his statement.

As detailed more fully below, there is no genuine dispute of material fact regarding

---

[1]     Ferrie's Complaint in this action also appears to raise claims that, before his termination, he was not promoted in alleged retaliation for complaining about discrimination. The deficiencies in these claims are addressed <u>infra</u> as well. (*See Argument, Part II.A.1.a*)

Kmart's motive for Ferrie's termination. Judgment should enter in favor of Kmart on all counts in Ferrie's complaint.

## SUMMARY OF FACTS

### Background

Kmart hired Ferrie on July 16, 1998 as a Pacesetter Manager in training which, in essence, was a fast track position to becoming a Store Manager. Ferrie spent six weeks in that position, working in Kmart's store #3879 in Braintree, Massachusetts. (*See Defendant's Rule 56.1 Statement in Support Of Defendant's Motion for Summary Judgment, ¶¶ 1-2*)

Effective August 27, 1998, Ferrie transferred to Store # 7605 at the South Bay shopping plaza in Dorchester, Massachusetts, where he remained for approximately two years. At South Bay, Ferrie first worked as the Assistant Soft Lines Manager (i.e., responsible for all categories of clothing), was promoted to be the Hard Lines Manager (i.e., responsible for health and beauty aids, tools, toys and equipment), was further promoted to be the Replenishment Manager (i.e., responsible for operational logistics) and again was further promoted into a Store Manager *pro tem* position (i.e., a Store Manager "in waiting"). (*Id.* ¶ 3) David Napier ("Napier") was the District Manager responsible for Kmart's South Bay store during Ferrie's time there. (*Id.*)

Effective October 1, 2000, Ferrie transferred to Store #3486 in Somerville, where he served as the Store Manager through May, 2001. (*Id.* ¶ 4) There, Ferrie reported to District Manager Jon Swank ("Swank"). (*Id.*) From Somerville, Ferrie became the Store Manager of Store #3401 in Fall River, Massachusetts. (*Id.* ¶ 5) Ferrie remained at Store #3401 in Fall River through September 2001. (*Id.*) There, he reported to District Manager Carleton (Chuck) James ("James"). (*Id.*)

3

Effective September 27, 2001, Ferrie transferred back to Store #3879 in Braintree as Store Manager where, again, Ferrie reported to Swank. (*Id.* ¶ 6)  Ferrie worked as the Store Manager in Braintree until Kmart terminated his employment effective March 2, 2004. (*Id.* ¶ 7)

**Events Leading To Ferrie's Termination**

As a Manager at Kmart, Ferrie agreed he was obligated to "maintain honest operation in every managerial responsibility assigned to the Manager." (*Id.* ¶ 8)  Ferrie's employment was terminated for his improper actions in connection with the sales of Kmart "Smart Plans." (*Id.* ¶ 9)  As Kmart's Rule 30(b)(6) witness testified, the reason for Ferrie's termination was his "manipulation of Smart Plans." (*Id.*)

The Kmart Smart Plan is a warranty plan, whereby a customer buying a certain type of product (*e.g.*, an electronic product) has the opportunity to purchase a warranty on the product. (*Id.* ¶ 10)  Kmart's Smart Plan policy states as follows:  "It is the responsibility of the Store Manager/Director to ensure that all associates understand that the *Smart Plan* must be offered to every customer properly every time an eligible item is purchased." (*Id.* ¶ *11 (italicized emphasis in original)*)  Tips on how to offer the Smart Plan properly are provided in the policy. (*Id.*)

Ferrie testified that Kmart strives for its stores to maintain a Smart Plan conversion rate of approximately 16%, meaning that customers buy a Smart Plan for 16% of the items that are sold that can be covered by the Smart Plan warranty. (*Id.* ¶ 12)  According to Ferrie, an acceptable Smart Plan conversion rate is 10%. (*Id.* )

On Sunday, November 30, 2003, Kmart Loss Prevention Manager Nicholas Macomber ("Macomber") discovered suspicious purchases on two Kmart Cash Cards. (*Id.* ¶ 13)  A Kmart Cash Card is a plastic card on which a pre-paid amount of money is credited. (*Id.*)  Macomber

4

traced the two Cash Cards to a Kmart store in Nashua, New Hampshire where they had been

purchased with a stolen credit card. (*Id.* ¶ *14*)

> As Macomber wrote in a statement:

>> I then informed Store Manager Daniel Ferrie of all the above information, suggested the elimination of the remaining balances on the Kmart cash cards in question to which **Dan Ferrie responded by suggesting the purchase of Smart Plans to reduce said card balances** and relayed such information to Front End Manager Michael Hedlund.

(*Id.* ¶ *15*)

> As Hedlund wrote in a statement:

>> On Monday 12/1/03 I was advised by Nick (LPM) [Macomber] of 2 stolen cash cards. Where we had remaining balances left on them, once it was confirmed that the card were bought with a stolen credit card. I asked Dan [Ferrie] about "killing" the receipts that were bought with the stolen k-cash card. **Dan said to refund them and buy as many 2.99 smart plan that I could with it, because of the store poor compliance. This wasn't what I had planned to do;** (Planned to refund then resale so that original receipt would decline if tried to be refunded) **but Dan being store manager and having been adamant about having smart plans above 10% I did what he told me even though I knew this was wrong because Dan had threatened job in the past when I haven't followed his instructions.**
>> The week before this happen I was told by John (Image manager) that Dan told him to tell me if smart plan sales weren't above 10% I would be fired.

>> *     *     *

>> [I] found discounted, cheap watches that a smart plan would ask when UPC was scanned. Did not use anything but watch UPC that was discounted so that it wouldn't affect non-discounted merchandise, and so the sales wouldn't all be manual.
>> Then each day, I would check smart plan sales and that every number short by to make ten % I would sale to reg[ister]. I would go to a number of reg[isters] and sell smart plans to get number above 10%. . . .

(*Id.* ¶ *16*)

The statements from Macomber and Hedlund were among those taken in connection with

Kmart's audit of Store #3879 in Braintree "to review suspicious Kmart Cash card activity

relating to the purchase of Smart Plan Warranties from December 1-12, 2003." (*Id.* ¶ *17*)

The Treasury Department at Kmart's Resource Center ("KRC") had picked up on the suspicious Smart Plan purchases and requested Donna Mastroeni ("Mastroeni") from Kmart's Audit Services Department to review the purchases. (*Id.* ¶ *18*) Tracking Store #3879's Smart Plan conversion rate showed the following data:

| WEEK | DATES | CONV RATE |
|------|-------|-----------|
| 32 | September 10 – 16 | 7.49 |
| 33 | September 17 – 23 | 7.86 |
| 34 | September 24 – 30 | 7.65 |
| 35 | October 1 – 7 | 7.02 |
| 36 | October 8 – 14 | 7.70 |
| 37 | October 15 - 21 | 8.38 |
| 38 | October 22 – 28 | 7.53 |
| 39 | October 29 - November 4 | 5.19 |
| 40 | November 5 – 11 | 6.64 |
| 41 | November 12 – 18 | 7.32 |
| 42 | November 19 – 25 | 9.85 |
| 43 | November 26 - December 2 | 9.32 |
| **44** | **December 3 – 9** | **11.59** |
| **45** | **December 10 – 16** | **11.43** |

(*Id.* ¶ *19*)[2]

On December 12, 2003, Mastroeni contacted Swank and asked him to meet her at the store in Braintree on December 18, 2003 to review her findings. (*Id.* ¶ *20*)

---

[2]     Further, after this period of time, Store # 3879's Smart Plan data was as follows:

| | |
|--|--|
| December 17 – 23 | 6.58 |
| December 24 – 30 | 6.20 |
| December 31 - January 6 | 4.72 |
| January 7 – 13 | 4.83 |
| January 14 – 20 | 4.73 |
| January 21 – 28 | 4.84 |
| January 29 – February 5 | 7.22 |

(*See Kmart Rule 56.1 Statement,* ¶ *19*)

BOST_169934.1

Ferrie fell at work on December 17, 2003. (*Id.* ¶ *21*)  He was not available for Mastroeni

to interview on her visit. (*Id.*)  Ferrie testified that he has been incapable of working since his

December 17th fall. (*Id.* ¶ *22*)

In her December 18, 2003 Memorandum, Mastroeni wrote:

> At the request of the Treasurer's Department at KRC, I reviewed Kmart
> Cash/Smart Plan activity for Kmart Cash Card #6006490300774118626.  Using
> Electronic Journal detail, I discovered that it was used to purchase 106 watches
> with selling prices ranging from $1.90 to $10 and 135 Smart Plans for $2.99 from
> December 1-12, 2003.  The purchases were made in multiple transactions at a
> number of registers within a short time period.  As the $2.99 Smart Plan
> warranties purchased cover replacement cost only and the warranty itself cost
> more than the watch, it is unlikely that a customer would make such a purchase.
> The purchases occurred during the Smart Plan Double Commission Period,
> although double commissions would not be paid for these transactions as the
> warranties registered were less than $7.99.  Although the store did not reach its
> conversion goal for week ending 11/26, the required conversion rate was met in
> weeks ending 12/3 and 12/10, the period in which these suspicious transactions
> occurred.  Based on my preliminary findings, I contacted District Manager Swank
> on December 12, 2003 and requested he meet me at the store on December 18,
> 2003 to review my findings.

(*Id.* ¶ *23*)

Mastroeni further wrote:

> [I]t appears Front End Manager Mike Hedlund used a Kmart Cash card to
> purchase 135 Smart Plan Warranties after Store Manager Dan Ferrie indicated
> warranty sales needed to increase to meet the store's conversion rate goal.

(*Id.* ¶ *24*)

Loss Prevention District Manager, Jon Reeves ("Reeves"), was also involved in the

investigation, and he detailed the findings from his investigation in a memorandum dated

December 20, 2003. (*Id.* ¶ *25*)  As Reeves wrote:

> After interviewing the remaining 5 witnesses it was also discovered that Dan
> [Ferrie] instructed the cashiers to automatically ring in a smart plans for
> customer's transactions when prompted and not notify the customer unless they
> questioned the purchase.  Several of the cashiers with the exception of one did as
> instructed by Dan.  All cashiers were afraid to question Dan due to Dan making

7

threats to them of being "fired" (see attached statements B, C, D, E, & F). The information was consistent with all associates interviewed.

(*Id.*)

One statement provided:

> Dan has made general comments about just ringing Smart Plan for customers and if they do not want them they can return them. He has made commits (sic) about firing anyone who does not sale (sic) Smart Plans.

(*Id.* ¶ 26)

Another statement provided:

> I, Rosa Rivera, was asked by the Store Manger to increase the amount of Smart Plans sales. He joked about "punch them in" even if the customers didn't want them. I asked him if he was serious about it. He said he was and never talked about anymore. He only asked how the sales are going.

(*Id.* ¶ 27)

Another statement provided:

> I, Susan Jones, had a conversation with Dan Ferrie in regard to Smart Plans. I was told my job depended upon me selling Smart Plans. I was told to just sign them up. I told him I couldn't do that. He asked if I ever rang one up by mistake and what I did about it. I told him I took it out of the sale. He then said that I was assuming that the customer didn't want it. I said I had already asked the customer and they didn't want it. . . .

(*Id.* ¶ 28)

Another statement provided:

> I, Lea South, was told by Dan Ferrie to just ring in Smart Plans without customers request to purchase them. I told him I would not do that because it was wrong. The next day he told me I disappointed by not doing what he asked me to do. My job position was not threatened by him. But I know of him threatening other people with their positions.

(*Id.* ¶ 29)

On December 21, 2003, Mastroeni faxed all of these statements, together with the statements of Macomber and Hedlund (and others) to Regional Vice President, David Hughes

8

("Hughes"). (_Id._ ¶ 30)  Hughes reviewed the matters at-issue in Mastroeni's investigation with

Regional Vice President, Mary Jo Duffy ("Duffy"). (_Id._ ¶ 31)  Kmart could not conclude its

investigation until Ferrie returned to work to discuss the findings, however. (_Id._ ¶ 32)

Swank transferred to New York in January/February 2004 and a new District Manager,

Mike Hawd ("Hawd"), took over Swank's responsibility for Braintree. (_Id._ ¶ 33)  Hughes spoke

to Hawd about the investigation, and he asked Hawd to take a statement from Ferrie when he

returned. (_Id._ ¶ 34)

Ferrie returned to work on March 1, 2004. (_Id._ ¶ 35)  He hand-wrote a statement, but

Hughes could not read Ferrie's handwriting, so he asked that the statement be typed. (_Id._)  Ferrie

then typed the statement he wrote. (_Id._)

Hughes and Duffy reviewed Ferrie's statement and then they re-reviewed all of the

statements received in Mastroeni's investigation. (_Id._ ¶ 36)  Hughes and Duffy then made the

decision to terminate Ferrie's employment. (_Id._)  As Hughes testified about his discussion with

Duffy:

> [T]he code of conduct in K Mart is very high.  We do not tolerate people that
> manipulate or cheat for their benefit.  We have a very high standard when it
> comes to how a store manager should conduct themselves as a store manager, and
> we felt through this investigation that Mr. Ferrie did not conduct himself in an
> appropriate manner, and we decided to separate him for manipulation of Smart
> plan sales.

(_Id._ ¶ 37)

## ARGUMENT

### I.    Standard For Summary Judgment

As plaintiff, Ferrie has the ultimate burden of proving his case. See Thomas v. Eastman

Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999); see also Lipsett v. University of Puerto Rico, 864

F.2d 881, 899 (1st Cir. 1988).  Faced with Kmart's motion for summary judgment and its

9

evidence as to why there is no dispute of material fact for trial, Ferrie must "set forth *specific facts* showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e) (emphasis added). Ferrie cannot meet his burden with "bare assertions and conclusions regarding his [personal] understandings, beliefs, and assumptions." Key Capital Corp. v. M&S Liquidating Corp., 27 Mass. App. Ct. 721, 728 (1989); see also Morrissey v. Boston Five Cents Savings Bank, FSB, 866 F. Supp. 643, 645 (D. Mass. 1994). He cannot "rest upon mere allegations or denials." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "An issue is genuine 'if the evidence is such that a reasonable jury could return a verdict for [Ferrie].'" Oliver v. Digital Equipment Corp., 846 F.2d 103, 105 (1st Cir. 1988) (quoting, Anderson, 477 U.S. at 248).

## II.    Applying The Burden-Shifting Paradigm Of *McDonnell-Douglas* To Ferrie's Claims

All of Ferrie's claims herein must be examined under the three-stage framework of employment discrimination cases enunciated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and adopted by Massachusetts for claims under Chapter 151B in Wheelock College v. Mass. Commn. Against Discrim, 371 Mass. 130, 138-39 (1976). See also Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 141 (2000) (applying framework to ADEA); Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) (applying framework to FMLA); Fallon v. Federal Express Corp., No. 200000367, 2002 WL 31677216, at *5 (Mass. Super. Oct. 11, 2002) (applying, and collecting authorities applying, framework to workers' compensation retaliation claim).[3]

---

[3]    As only the Westlaw citation is available, for the convenience of the Court, a copy of the Superior Court's opinion in Fallon, also cited infra, is attached hereto at Tab A.

10

Under McDonnell Douglas, each of Ferrie's claims require him to present essentially the same *prima facie* case. For all of Ferrie's retaliation claims -- whether based on the ADEA, Chapter 151B, the FMLA or the Massachusetts workers' compensation act -- Ferrie must make four showings:

> (1) he engaged in a protected activity; (2) Kmart was aware of the protected activity; (3) thereafter, Ferrie experienced an adverse action; and (4) there was a causal connection between the protected activity and the adverse employment action.

See Mesnick v. General Electric Co., 950 F.2d 816, 827 (1st Cir. 1991) (analyzing ADEA retaliation claim); MacCormack v. Boston Edison Co., 423 Mass. 652, 672 N.E.2d 1, 8 (1996) (151B); Hodgens, 144 F.3d at 161 (FMLA); Fallon, 2002 WL 31677216, at *6 (workers' compensation).

For Ferrie's age discrimination claims, his *prima facie* case is slightly different. He must make the following four showings:

> (1) he was at least forty years of age, (2) he met [Kmart's] legitimate job performance expectations, (3) he experienced adverse employment action, and (4) he was replaced by a person with roughly equivalent job qualifications.

Hidalgo v. Overseas Condado Ins. Agencies, Inc., 120 F.3d 328, 332 (1st Cir. 1997) (ADEA); see also Knight v. Avon Products, inc., 438 Mass. 413, 420-21 (2003). As for the last element of Ferrie's *prima facie* case of age discrimination, the person that replaces Ferrie must be "substantially younger." Knight, 438 Mass. at 423 (quoting and following O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311-12 (1996)).

If Ferrie is able to prove a *prima facie* case for any one (or more) of his claims, under the McDonnell-Douglas framework, Kmart must then articulate a legitimate reason for its action. Here, Kmart has done so. ***Kmart terminated Ferrie's employment because, after an internal investigation by Kmart's audit department, and receipt of statements from several people,***

11

*including Ferrie, Kmart concluded that that Ferrie had been engaged in manipulation of his store's Smart Plan sales.* (*See* Kmart Rule 56.1 Statement, ¶¶ *9, 15-20, 23-32, 35*)

Faced with Kmart's explanation, any presumption of unlawful conduct that may have been created by Ferrie's *prima facie* case "disappears." See Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); Keeler v. Putnam Fiduciary Trust Co., 238 F.3d 5, 9 (1st Cir. 2001). Ferrie must then show that Kmart's explanation was a pretext – which means "false" or a "sham." See McDonnell Douglas, 411 U.S. at 802-804, 807; Thomas v. Eastman Kodak Co., 183 F.3d 38, 56 (1st Cir. 1999); Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 13 (1st Cir. 1998).

Ferrie's mere disagreement with Kmart's reason for its action is insufficient to show pretext. See Kumar v. Board of Trustees, University of Massachusetts, 774 F.2d 1, 18 (1st Cir. 1985) ("I do not think that an inference of pretext, which is tantamount to a finding of bad faith, can be derived simply from run-of-the-mill disagreement with the way the university's decision-makers tell their story and defend their views.") (Campbell, J., concurring), cert denied, 475 U.S. 1097 (1986); Benham v. Lenox Sav. Bank, 118 F. Supp. 2d 132, 145 (D. Mass. 2000) ("plaintiff's mere personal disagreement with her employer's opinions about her job performance is not sufficiently probative to avoid summary judgment"); Williams v. Frank, 757 F. Supp. 112, 121, (D. Mass. 1991), aff'd, 959 F.2d 230 (1st Cir. 1992) (attempted showing of pretext which rested "solely" on plaintiff's disagreement with the defendant's reason for discharging him insufficient).

To show pretext, Ferrie must have some evidence of an ***unlawful motive***, and the standard of proof required for Ferrie to make this showing is stated slightly differently for Ferrie's different claims. Below, for each of Ferrie's claims, Kmart demonstrates why Ferrie

12

cannot make out a *prima facie* case and/or there is no material dispute of fact as to why Kmart's

reason for terminating him was pretextual.

## A.    None Of Ferrie's Retaliation Claims Should Be Tried

In his Complaint, Ferrie alleges retaliation in various ways.  Summary judgment should

be granted dismissing each of these claims.

### 1.    Summary Judgment Should Be Granted Dismissing Ferrie's Claims That Kmart Retaliated Against Him For Complaining About Age Discrimination

Ferrie's claims that Kmart retaliated against him for complaining about age

discrimination are deficient in several ways.

#### a.    Ferrie Cannot Establish A *Prima Facie* Case That He Was Not Promoted For Complaining About Retaliation

Ferrie alleges in his complaint that he engaged in "protected activity" in the Spring of

1999 when, while working for Napier at the South Bay Kmart, he complained to Napier that

younger persons were being promoted ahead of him. (*See Ferrie Complaint, ¶ 9*)  After this

complaint, Ferrie claims that he experienced retaliation because he was "subsequently passed

over for numerous promotions, including Store Manager and, later, District Manager." (*Id. ¶ 10*)

The only example Ferrie gives of having been passed over for a District Manager job allegedly

occurred in "late 2001." (*Id. ¶¶ 12-13*)

As for not being promoted to Store Manager, Ferrie's *prima facie* case fails because there

was no adverse action in this alleged retaliation.  It is undisputed that, while working for Napier,

Ferrie was on the "fast track" to becoming a Store Manager, and that he received four

consecutive internal promotions to become a Store Manager "in waiting." (*See Kmart Rule 56.1

Statement, ¶ 3*)  On October 1, 2000, Ferrie officially became a Store Manager at Kmart's store

in Somerville. (*Id.* ¶ 4)  As such, there is no dispute of fact that Ferrie did not experience an adverse action by not being promoted to Store Manager.  He was so promoted.

**b.    Any Claim By Ferrie That He Was Not
Promoted To Store Manager Would Be Time-Barred**

Even if, somehow, Ferrie could establish a *prima facie* case of retaliation for not being promoted to Store Manager sooner than he was, such claims would be time-barred.  It is undisputed that, at worst, Ferrie was promoted to Store Manager on October 1, 2000. (*See Kmart Rule 56.1 Statement,* ¶ 4)  As such, any claim that he was wrongfully not promoted to Store Manager would pre-date October 1, 2000.

Yet, Ferrie did not file an agency charge until June 15, 2004 (*see Supporting Materials, Tab 13 thereto*), nearly four years after he was promoted to Store Manager.  For this reason, Ferrie's claim about not being promoted to Store Manager would be time-barred under both the ADEA and Chapter 151B. See 29 U.S.C. § 626(d) (300 days to file charge); see M.G.L. c. 151B, § 5 (same; as amended November 5, 2002); see National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002) (under federal law, claim of discriminatory failure-to-promote triggers statute of limitations upon alleged failure-to-promote); Ocean Spray Cranberries, Inc. v. MCAD, 441 Mass. 632, 641 (2004) (same under state law).

**c.    Any Claim By Ferrie That He Was Not
Promoted To District Manager Would Also Be Time-Barred**

The same statute of limitations issue bars Ferrie's claims that he was not promoted to District Manager.  Indeed, at his deposition, Ferrie further articulated his claim about not having been promoted to District Manager by suggesting that Chuck James (to whom Ferrie reported in Fall River), David Bennett ("Bennett") and Daniel Nicolini ("Nicolini") were promoted to

14

District Manager ahead of him. (*see Supporting Materials, Tab 2, Ferrie Dep. at 186-91*)

However:

    a.    James became a District Manager on July 15, 2001;

    b.    Nicolini became a District Manager on July 26, 2001; and

    c.    Bennett became a District Manager on December 17, 2001.

(*See Supporting Materials, Tab 14 thereto*)  Because Ferrie's charge was not filed for well over

two years later, any claim by Ferrie that he was passed over for a promotion in favor of James,

Bennett and/or Nicoloini would also be time-barred under federal and Massachusetts law.

### d.    Any Claim By Ferrie That His Employment Was Terminated For Complaining To Napier Would Fail

To the extent Ferrie attempts to suggest that his complaint to Napier in the Spring of 1999

resulted in his termination by Hughes and Duffy on March 1, 2004, any such claim of retaliation

fails as a matter of law.  Ferrie has no evidence to establish that there was a "causal connection"

between the two events, and it would be pure speculation to suggest that his complaint to Napier

played any role in his termination.  As set forth above, Rule 56(e) requires Ferrie to come forth

with *evidence*, not speculation.

In any event, the five years that passed between the two events is far too long a period of

time to establish the "causal connection" element of Ferrie's *prima facie* case of retaliation. See

Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (20 month interval between

protected activity and adverse action suggests "no causality at all").

Summary judgment should be granted dismissing Ferrie's claims in Counts I and III of

his complaint that he was not promoted and/or terminated in retaliation for complaining about

age discrimination.

15

2.    **Summary Judgment Should Also Be Granted Dismissing**
      **Ferrie's Alternative Claims Of Retaliation For Taking FMLA**
      **Qualifying Leave and/or Exercising Workers' Compensation Rights**

Summary judgment should also be granted dismissing Ferrie's alternative claims that

Kmart terminated his employment in retaliation for taking a supposed FMLA qualifying leave

and/or exercising his workers' compensation rights.

As for Ferrie's FMLA claim, it appears from his complaint that he is claiming both denial

of his FMLA rights and retaliation for exercising his FMLA rights. (*See Complaint, ¶¶ 34-35*)

Ferrie's admission at his deposition that he has been incapable of working since his December

17, 2003 fall (*see Rule 56.1 Statement, ¶ 22*) prevents him from having any FMLA rights,

however. See 29 C.F.R. §§ 825.214(b) (employee who cannot return to work has no FMLA

rights). As such, there is no dispute of fact on his argument that his FMLA rights (which did not

exist) were denied.

At most, the FMLA permitted Ferrie to take 12 unpaid weeks of leave for his "serious

health condition." See 29 U.S.C. § 2612. The FMLA further gave Ferrie employment and

benefits protection upon his return from that leave. Id. § 2614. However, the fact that Ferrie

admittedly has been incapable of working since his December 17, 2003 injury takes him out of

the category of persons covered by the FMLA. See 29 C.F.R. §§ 825.214(b); see also Cehrs v.

Northeast Ohio Alzheimer's Research Center, 155 F.3d 775, 784-85 (6th Cir. 1998) (because

employee was undisputably unable to return to work within twelve weeks employee could not

show a violation of the FMLA). For this reason, Ferrie's claim the Kmart violated his FMLA

rights in any way (i.e., whether it be alleged discrimination and/or retaliation) fails.

16

Even if Ferrie had FMLA rights, he does not have sufficient evidence to establish the "causation" element of a claim of retaliation under the FMLA. The same issue plagues Ferrie's claim of retaliation for his exercise of his rights under the workers' compensation act.

In a retaliation case, proof of a "causal connection" between the protected activity and the adverse action is required on two levels. As set forth in the legal discussion in Part II above, Ferrie must initially establish "causal connection" as the third element of his *prima facie* case. Next, once Kmart articulates its nondiscriminatory reason for terminating Ferrie's employment, any presumption created by Ferrie's *prima facie* case "disappears." Once any presumption from Ferrie's *prima facie* case disappears, he must come forth with "causation" evidence again; i.e., that Kmart's reason for its action was a pretext, and retaliation was the "cause" of his termination.

As such, for Ferrie's claim of retaliation under the FMLA to survive Kmart's motion for summary judgment, he must show that Kmart's "stated reason for terminating him was in fact a pretext for retaliating against him *for having taken protected FMLA leave*." Hodgens, 144 F.3d at 161 (emphasis added). For Ferrie's claim of retaliation under the Massachusetts workers' compensation act, Ferrie's case should not proceed to trial unless he will be able to present sufficient evidence for a fact-finder to conclude that retaliation for taking a workers' compensation leave was the "determinative cause" for his termination. See Lipchitz v. Raytheon Co., 434 Mass. 493, 504-05, & n.19 (2001) (liability can only attach when an adverse action is taken "because of" discrimination); see also Fallon, 2002 WL 31677216, at *6 ("fatal flaw in [plaintiff's] workers' compensation retaliation claim is her failure to put forth sufficient facts such that a jury could reasonably find that but for her filing a workers' compensation claim, the defendants would not have denied her benefits and terminated her employment").

17

Both state and federal law are clear that, standing alone, the proximity of an adverse action to an employee's protected activity are insufficient to warrant a trial on "causation." As the Supreme Judicial Court has stated in analyzing a claim of retaliation under Chapter 151B: "[t]he mere fact that one event followed another is not sufficient to make out a causal link." MacCormack, 423 Mass. 652, 662 n.11; see also Fallon, 2002 WL 31677216, at *6 (citing MacCormack and dismissing retaliation claim under workers' compensation act). As the First Circuit has recognized, "temporal proximity" evidence may establish the "causal connection" evidence for a plaintiff's *prima facie* case, but it is not among the "specific facts that would demonstrate any sham or pretext intended to cover up [a] retaliatory motive." Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004); Randlett v. Shalala, 118 F.3d 857, 863 (1st Cir. 1997) (summary judgment granted where no evidence that defendant acted out of a retaliatory motive).

Here, Kmart terminated Ferrie for its belief that he was engaged in manipulation of Smart Plan sales. This belief was amply supported by Kmart's internal audit, and the statements received in connection therewith. Ferrie has no evidence to suggest that this reason is a "sham" and certainly no evidence of Kmart's "retaliatory mindset" to suggest that the "real reason" for Kmart's action was to retaliate against him for taking an FMLA qualifying leave or receiving workers' compensation benefits.

For these reasons, summary judgment should be granted dismissing Counts II and IV of Ferrie's Complaint.

### B.    Summary Judgment Should Be Granted Dismissing Ferrie's Claim Of Age Discrimination

Ferrie's claim under federal and/or state law that his termination was an act of age discrimination also has no merit.

18

Case 1:04-cv-12068-JLT     Document 24     Filed 09/19/2005     Page 19 of 29


Ferrie's claim of age discrimination has no merit because he cannot prove that Kmart's reason for terminating him was a "pretext." Under federal law, to find "pretext," this Court should "focus on whether [Ferrie] adduced sufficient evidence from which a rational factfinder could have inferred **both** that [Kmart's] articulated reason was a pretext, i.e., 'obviously or manifestly unsupported,' [] and that its real reason for [terminating Ferrie] was an age-based animus." Shorette, 155 F.3d at 15 (emphasis added). Under state law, again, Ferrie's age discrimination case should not be tried unless this Court believes that Ferrie's has presented sufficient evidence that Kmart's reason for terminating him was not its real reason and, at trial, a jury could draw a "reasonable inference" of age discrimination. See Knight, 438 Mass. at 425-26.

Ferrie simply has no evidence of pretext. He suggests that "on numerous occasions during his employment up to and including December 2003," District Manager Swank referred to him as "old bastard" and "old and fat." (*See Complaint, ¶ 15*) Swank did not make the decision to terminate Ferrie's employment, however, nor was he even Ferrie's District Manager when that decision was made. (*See Kmart Rule 56.1 Statement, ¶¶ 33, 36*) As set forth above, the decision to terminate Ferrie was made by Hughes and Duffy and after review of statements from Macomber, Hedlund, several other store employees, and Ferrie himself. (*Id.*) Hawd was Ferrie's District Manager at the time. (*Id. ¶ 33*) But regardless of what Ferrie alleges Swank said to him -- and Swank denies ever doing so (*see Supporting Materials, Tab 15, Deposition of Jon Swank at 52-54*)[4] -- such allegations do not constitute evidence of pretext because Ferrie cannot

---

[4]     As Swank testified, it was Ferrie who use to jokingly refer to himself this way. (*See Supporting Materials, Tab 15 at 52-54*)

BOST_169934.1

show that they had any relevance to the events leading to Kmart's decision to terminate his employment.

For these reasons, summary judgment should be granted dismissing Ferrie's claims of age discrimination in Counts I and III of his complaint.

### CONCLUSION

As a matter of law, this Court should dismiss all counts in Ferrie's Complaint and enter judgment in favor of Kmart.

Respectfully Submitted,

KMART CORPORATION

By its attorneys,

David S. Rubin, Esq. BBO# 546213
Jeffrey M. Rosin, Esq. BBO #629216
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Dated: September 19, 2005

20

# TAB A

Not Reported in N.E.2d
Not Reported in N.E.2d, 2002 WL 31677216 (Mass.Super.)
(Cite as: 2002 WL 31677216 (Mass.Super.))

**Page 1**

c

Only the Westlaw citation is currently available.

Superior Court of Massachusetts.
Kathleen **FALLON**,
v.
**FEDERAL EXPRESS** CORPORATION, INC. et al.
[FN1]

FN1. Mark Ridge.

No. 200000367.

Oct. 11, 2002.

*MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT*

CHRISTOPHER J. MUSE, Justice.

**\*1** Plaintiff Kathleen Fallon brought this action to recover damages arising out of the alleged discriminatory conduct of the defendants. Specifically, the plaintiff advances two theories of recovery: workers' compensation retaliation and sex discrimination. This matter is before the Court on the defendants' motion for summary judgment. For the reasons set forth below, the defendants' motion is allowed.

I. *BACKGROUND*

Pursuant to the summary judgment record, the undisputed material facts and the disputed facts viewed in the light most favorable to the non-moving party are as follows.

A. Facts Relevant to the Workers' Compensation Retaliation Claim

The plaintiff, Kathleen Fallon ("Fallon") first began working for the defendant Federal Express Corporation, Inc. ("FedEx") in December of 1983 as a temporary employee. Six to nine months later, Fallon became a courier with FedEx. The defendant Mark Ridge ("Ridge") was Fallon's supervisor from September 1986 until October or November of 1989. In April of 1992, Ridge became the Human Capital Manager (then known as a Disability Manager) for FedEx's Boston District. In his position as a Human Capital Manager, Ridge managed employees that were out on leaves of absence, such as medical leave,

workers' compensation leave, or short/long term disability leave.

In July of 1992, Fallon was again placed under Ridge's supervision, since she was on workers' compensation leave at that time due to a back injury. Fallon returned to work in a temporary capacity at the Newton/Wellesley FedEx office in October 1992. In February of 1993, Fallon began work as a secretary for Brian McDonald ("McDonald") in FedEx's Boston office. On December 29, 1993 Fallon was cleaning out McDonald's office desk when she injured her neck. As a result of this injury, Fallon has been diagnosed as suffering from thoracic outlet syndrome and reflex sympathetic dystrophy, or RSD. These two conditions limit the extent to which she can use her arms for work.

Fallon has not returned to work since December 29, 1993, the date she injured her neck. When Fallon began to receive short term disability benefits under the FedEx Short Term Disability Plan, Ridge once again became her Disability Manager. After receiving six months of short term disability benefits, Fallon was transitioned to the FedEx Long Term Disability Plan ("LTD Plan"), pursuant to which she began receiving long term disability benefits. The terms of the LTD Plan provide for the payment of LTD benefits for two years, so long as the recipient is disabled from his/her own job ("Occupational Disability"). After two years, the recipient must demonstrate that he/she is totally disabled as to all occupations ("Total Disability") in order to continue receiving LTD benefits.

On February 2, 1996, Shona Spry ("Spry"), a Disability Claims Analyst with John Hancock Managed Care Group ("Hancock"), sent Fallon a letter explaining the terms of the LTD Plan. Hancock was the Claims Paying Administrator for the FedEx LTD Plan, and it was conducting a periodic investigation of Fallon's claim for benefits. After laying out the distinction between Occupational Disability and Total Disability, the letter states:

**\*2** Your Occupational Disability benefits began on 7/24/94. This disability definition is in effect for you through 7/24/96. At that time, the Plan's definition of Total Disability will be in effect.

In order for us to continue LTD benefits under the Plan beyond 7/24/96 you must provide substantiation of Total Disability as defined above. Substantiation of disability according to the Plan will require significant objective findings by which an impairment can be determined. Significant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
(Cite as: 2002 WL 31672216, *2 (Mass.Super.))

objective findings are defined as "signs which are noted on a test or medical exam and which are considered significant ... abnormalities that can be observed" by a practitioner apart from your description of your symptoms ...

Please note that John Hancock is not the Plan Administrator, and does not insure benefits under the Plan. Your employer is solely responsible for the determination of amounts due under the Plan. Please contact your manager regarding your leave of absence status. Refer to the Federal Express *Your Employee Benefits* book for additional information.

On August 9, 1996, Hancock sent Fallon an Explanation of Benefits for the period of 7/1/96-7/23/96. The Explanation stated, "Your own occupation disability period ends 7/23/96. To qualify for ongoing total disability benefits, (see your employee benefits handbook) there must be clinical provided to support total disability. Our efforts to obtain this information have failed and benefits will be suspended until received."

Additionally, on August 9, 1996, Dr. Hanberry of the Hancock Managed Care Group reviewed Fallon's file and determined that her LTD benefits should be suspended as of July 23, 1996. The reason for this determination was that Fallon had failed to provide "significant clinical information of a degree to enable adequate definition change date adjudication." In a peer review dated August 20, 1996, Dr. Rathburn of the Hancock Managed Care Group concurred with Dr. Hanberry's determination, as well as the grounds therefor. Finally, on August 30, 1996, Dr. Grudem, Hancock's medical director, reviewed Fallon's file and noted that denial of LTD could be implemented on medical grounds if "physician to physician contact of adequate quality occurs and the medical information fails to support total disability any [sic] occupation."

The Hancock doctors then attempted to contact Fallon's treating physician, Dr. Mahoney, to ascertain whether Fallon could support her claim for Total Disability. On September 12, 1996. Dr. Mahoney's office informed Hancock Claims Analyst Shona Spry that Hancock should speak with Dr. Ralph Bueno, a thoracic surgeon whom Fallon had consulted. On September 13, 1996, a Hancock employee left a message for Dr. Bueno, stating that Fallon's benefits had been denied as of July 24th, and that substantive objective findings were needed to support her claim.

On September 23, 1996, Dr. Bueno called and left a

message for Dr. Hanberry in which he stated that Fallon exhibited symptoms of thoracic outlet syndrome, and that she had undergone an MRI of her upper extremities. Based on this information from Dr. Bueno, Dr. Hanberry recommended overturning his previous determination that LTD benefits should be denied. Dr. Hanberry also recommended the authorization of LTD benefits through October 31, 1996. However, Dr. Hanberry noted at that time that he wanted to obtain Fallon's current clinical information from Dr. Bueno, including the results of the MRI. According to Dr. Hanberry's notes, "If the diagnostic studies are negative or even equivocal, [the] claim will then be in [the] same status regarding [the] presence of supporting clinical as when denial was recently given, and most likely will need denial again."

**\*3** On the recommendation of the defendant Mark Ridge, Fallon filed a workers' compensation claim on October 4, 1996. On October 17, 1996, Mary Reece Boivin, a representative from Alexsis, FedEx's workers' compensation administrator, called Hancock to request a copy of Fallon's file. The following day, Dr. Grudem, Hancock's medical director, instructed the Hancock staff to "hold on any change in case status from the suspension as of definition change date on July 23, 1996 until further notice from myself or the team manager."

On October 21, 1996, Spry called Ridge to advise him of the status of Fallon's claim, and Spry acknowledges that she "must have" had a discussion with Ridge before making a final determination about Fallon's benefits. Later that same day, Spry mailed Fallon a zero-benefits letter, in which she told Fallon that if Hancock did not receive medical documentation within ten days, Fallon would be at risk of denial of LTD benefits. On November 1, 1996, Spry received clinical information from Drs. Mahoney and Bueno, including x-rays, radiology reports, and an MRI. On November 22, 1996, Spry mailed Fallon an ERISA denial letter, although Fallon testified that she never actually received this letter. Three days later, Dr. Hanberry reviewed the clinical information provided by Drs. Mahoney and Bueno and noted:

> Previous authorization through 10/31 in error, since claimant then had not made a prima facie case for any occupation disability. Above clinical information does not substantiate the diagnosis of Thoracic Outlet Syndrome. In fact, it indicates the findings are present in a large number of normal studies/asymptomatic individuals. Per communication with disability claims analyst Spry I have been informed that [the] claim has not been

Not Reported in N.E.2d
(Cite as: 2002 WL 31677216, *3 (Mass.Super.))

paid past definition change date. I agree with this determination on clinical grounds, since claimant has not made a supportable case for being totally disabled [as to] any occupation. [FN2]

> FN2. Fallon denies that this review by Dr. Hanberry occurred as stated. Instead, Fallon asserts that this is an "after-the-fact entry intended to cover the doctors' earlier capitulation to their FedEx client."

Dr. Hanberry never actually examined Fallon; his determinations were based on the electronic versions of medical reports submitted by Drs. Mahoney and Bueno. According to Annie Lu Crowder, a FedEx Benefits Department Manager at that time, it was "not a terribly uncommon thing" for Hancock to originally authorize benefits and then retroactively revise that decision.

Pursuant to FedEx policy, once the Claims Paying Administrator denies total disability benefits under the FedEx LTD Plan, the Disability Manager notifies an employee who has been out on leave for longer than thirty months that he/she has ninety days to find another position within the company. Even if the employee has a pending workers' compensation claim, FedEx policy dictates that the Disability Manager commence the ninety-day period. On February 12, 1997, FedEx Disability Manager Mark Ridge sent Fallon a "90 day letter" explaining the terms of this policy. The letter noted that Fallon would be terminated if, at the end of the 90 day period, she had failed to find a position for which she could meet the minimum specifications and perform the essential functions. Although not required to do so under FedEx policy, Ridge sent letters on March 12, 1997, April 8, 1997, and May 13, 1997, advising Fallon of various positions that had been posted in the FedEx Career Opportunities Bulletin. Fallon did not respond to these letters, and at the end of the 90 day period she had not secured another position within FedEx. On June 13, 1997, Ridge terminated Fallon from her employment with FedEx.

**\*4** On December 3, 1997, the Massachusetts Department of Industrial Accidents approved a settlement agreement between Fallon and FedEx in the amount of $65,000. The settlement applied to the workers' compensation claims that Fallon had initiated on October 4, 1996.

B. Facts Relevant to the Sex Discrimination Claim

While Fallon was working as a courier under Ridge's

supervision between 1986 and 1989, Ridge paid a lot of attention towards her. For example, Ridge visited Fallon when she was in the hospital for a back injury in 1989. Additionally, Ridge visited Fallon's apartment and brought her various small gifts while she was recuperating from this injury. When Fallon was working in the FedEx Boston office in 1993, Ridge called her frequently regarding a recommendation letter that he had asked her to write for him. Fallon's co-workers would tease her about these conversations, and Fallon felt uncomfortable as a result. Occasionally, Ridge would ask Fallon to go out for drinks on a Friday night; sometimes Ridge mentioned that a group of FedEx employees would be going out, while other times Ridge did not mention whether others would be joining them. However, Ridge never sexually propositioned Fallon, nor did he ever use sexual language in her presence.

In July of 1994, while Fallon was out on leave due to her neck injury, Ridge's tone towards Fallon changed to one of hostility. Ridge accompanied Fallon to an appointment with a FedEx doctor, and after the exam Fallon told Ridge that the doctor had suggested physical therapy. According to Fallon, Ridge reacted with a look of shock or disappointment, and subsequent to the doctor's visit Ridge was no longer the "overly nice or overly attentive Mark." Fallon started to get short answers from Ridge when she sought his help. For example, while Fallon was away in Florida, Hancock stopped paying her benefits. While it was Fallon's responsibility to provide Hancock with medical information, since she was in Florida and did not have access to her papers, she called Ridge and asked him to send Hancock a copy of her doctor's report. Ridge refused to send the report to Hancock, and Fallon was forced to return home.

In September of 1995, Ridge called Fallon and offered to find a surgeon to operate on her neck if Fallon would provide Ridge with original copies of her medical records. Fallon declined Ridge's request, because she didn't want Ridge to have access to her private medical information. The last time Fallon spoke with Ridge was sometime in 1996. When Ridge began sending Fallon the "90 day" letters in February 1997, Fallon felt threatened and confused. She could not understand why she was receiving these letters from Ridge, since he knew that her workers' compensation claim was still pending.

On December 8, 1997, Fallon filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD"). In her Charge,

Not Reported in N.E.2d
(Cite as: 2002 WL 31677216, *4 (Mass.Super.))

Fallon checked off the boxes for "Retaliation" and "Other" as the causes of her discrimination, and she specified "Disability" as the "Other" cause of discrimination. Fallon, who was represented by counsel at the time of filing, did not check the box for discrimination based on sex, nor did she specifically allege that she had been discriminated based on sex. In a six-page Statement filed along with the Charge, Fallon stated that the alleged discriminatory treatment was "based on [her] disabilities" and "in retaliation for [her] seeking the protection of the law covering persons with disabilities and the workers' compensation law ." However, in Paragraph 30 of the Statement, Fallon stated, "The company [FedEx] did not change its position despite my requests, however, and Mr. Ridge (incidentally, whose romantic overtures I had declined when we had worked together during earlier years) continued sending me jobs he claimed I was qualified for."

## C. Procedural History of the Present Action

**\*5** In January of 2000, Fallon filed this action, alleging violation of the federal Employee Retirement Income Security Act (ERISA), as well as state law claims of discrimination, retaliation, and interference with advantageous business relations. The defendants subsequently removed this case to the United States District Court for the District of Massachusetts, whereupon Fallon filed a motion to remand back to the Superior Court. On August 31, 2000, the District Court (Wolf, J.) remanded Count III of the Complaint (workers' compensation retaliation) as well as the portion of Count IV relating to sex discrimination. Judge Wolf denied the motion to remand Counts I and II (the ERISA claims), and he dismissed the remaining portion of Count IV (discrimination and retaliation for filing an MCAD claim)    [FN3] and Count V (intentional interference with advantageous business relations) on the grounds that these claims were preempted by ERISA. The federal claims have been settled, and the defendants have now moved for summary judgment as to the remaining state law claims, workers' compensation retaliation and sex discrimination.

FN3. Fallon filed a motion to reconsider Judge Wolf's dismissal of this claim, which was mooted out by virtue of the parties' settlement. Despite the fact that Judge Wolf dismissed this claim with prejudice, Fallon now argues before this Court that his ruling as to ERISA preemption was "erroneous, [has] no precedential value, and is not binding on this Court." This Court declines Fallon's

invitation to second-guess the binding determination made by Judge Wolf that the MCAD discrimination and retaliation claim is preempted under ERISA.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate where there are no issues of genuine material fact, and the moving party is entitled to judgment as a matter of law. *Ng Bros. Constr., Inc. v. Cranney,* 436 Mass. 638, 643-44 (2002); Mass.R.Civ.P. 56(c), citing *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 711 (1991). The moving party bears the burden of affirmatively demonstrating that there is no triable issue of material fact. *Pederson v. Time, Inc.,* 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the non-moving party's case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. *Kourouvacilis,* 410 Mass. at 716. When the non-moving party bears the burden of proof on an issue for which summary judgment is sought, that party must oppose the motion with admissible evidence on the issue in order to defeat the summary judgment motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). When presented with a motion for summary judgment, the court must consider the evidence in the light most favorable to the non-moving party. *Beal v. Board of Selectmen of Hingham,* 419 Mass. 535, 539 (1995).

### B. The Workers' Compensation Retaliation Claim

In Count III of her Complaint, Fallon alleges that the defendants retaliated against her after she filed a workers' compensation claim on October 4, 1996. The Massachusetts Workers' Compensation Act, G.L.c. 152, § 75B(2), provides that "no employer ... shall discharge, refuse to hire, or in any other manner discriminate against an employee because the employee has exercised a right afforded by [the Workers' Compensation Act]." While no "distinct test" for evaluating a retaliatory discharge claim under § 75B(2) has emerged, various Superior Court decisions have applied the standard used to analyze claims brought under the anti-retaliation provision of the Massachusetts Fair Employment Practices Act, G.L.c. 151B. *Diaz v. Henry Lee Willis Community Center, Inc.,* Civil No. 97-1045 A (Worcester Super.Ct. Oct.

Not Reported in N.E.2d
(Cite as: 2002 WL 31677216, *5 (Mass.Super.))

14, 1998) (*Doerfer,* J.) (9 Mass. L. Rptr. 169); see also *Nicosia v. Moynihan-North Reading Lumber, Inc.,* Civil No. 94-4971 (Middlesex Super.Ct. Aug. 8, 1995) (*Brassard,* J.) (4 Mass. L. Rptr. 81).

*6 Under the G.L.c. 151B standard, Fallon bears the initial burden of establishing the prima facie case for employment discrimination. *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 128 (1997) (internal citations omitted). Fallon must therefore demonstrate (1) that she engaged in an activity protected by the Workers' Compensation Act; (2) that the defendants were aware of the protected activity; (3) that the defendants thereafter engaged in an adverse employment action against her; and (4) that but for her engagement in the protected activity, the defendants would not have taken the adverse employment action. *See id.* It is evident that filing a workers' compensation claim is an activity that is protected by the Workers' Compensation Act. Likewise, the defendants do not dispute that they knew that Fallon had filed a workers' compensation claim; indeed, it was Ridge who initially suggested to Fallon that she file a claim. Loss of disability benefits and subsequent termination from employment would clearly fall under the rubric of "adverse employment action."

However, the fatal flaw in Fallon's workers' compensation retaliation claim is her failure to put forth sufficient facts such that a jury could reasonably find that but for her filing a workers' compensation claim, the defendants would not have denied her benefits and terminated her employment. Fallon's argument is premised upon the closeness in time between her filing a workers' compensation claim and the denial of her LTD benefits and subsequent termination. In support of this argument, Fallon points out that on September 23, 1996, Dr. Hanberry recommended overturning the previous denial of benefits based on preliminary clinical information he received from Dr. Bueno. Then on October 17, 1996, eleven days after Fallon filed her workers' compensation claim, Mary Reece Boivin, a representative from Alexsis, FedEx's workers' compensation administrator, called Hancock to request a copy of Fallon's file. The following day, Dr. Grudem, Hancock's medical director, instructed the Hancock staff to "hold on any change in case status from the suspension as of definition change date on July 23, 1996 until further notice from myself or the team manager." On October 21, 1996, the same day Spry spoke with Ridge, Spry mailed Fallon a zero-benefits letter, in which she told Fallon that if Hancock did not receive medical documentation within ten days, Fallon would be at risk of denial of LTD benefits.

Similarly, in *Diaz, supra,* the plaintiff relied upon the closeness in time between his filing a workers' compensation claim and his termination. In granting the defendant employer's motion for summary judgment, Judge Doerfer noted that such evidence, standing alone, is "insufficient to establish the required causation." *Diaz,* Civil No. 97-1045-A, 9 Mass. L. Rptr. 169 (Worcester Super.Ct. Oct. 14, 1998) ( *Doerfer,* J.), citing *MacCormack v. Boston Edison Co.,* 423 Mass. 652, 662 n. 11 (1996). In support of its motion for summary judgment, the defendant in *Diaz* presented evidence that two months prior to the termination, it was planning an "immediate overhaul" of the plaintiff's department. Since the defendant had "produced evidence of substantial quantity and quality to demonstrate that Diaz was terminated due to the restructuring of the outpatient department, and not due to his workers' compensation claim," Judge Doerfer concluded that no issue of material fact existed with regard to the reason for the plaintiff's termination. *Diaz, supra.*

*7 In this case, the defendants have likewise produced substantial evidence demonstrating that Fallon was terminated because she failed to find another job at FedEx within 90 days of the denial of her LTD, as was required under FedEx policy. As early as February 1996 (eight months prior to the workers' compensation claim), Hancock informed Fallon that it was her responsibility to provide substantiation of total disability in order to continue receiving LTD. When Dr. Hanberry decided, on September 23, 1996, to authorize benefits through the end of October, he specifically noted that if the additional clinical information was negative or equivocal, Fallon's claim "most likely will need denial again." Given the uncertainty regarding Fallon's physical condition, the mere fact that Dr. Grudem placed a hold on Fallon's LTD claim status the day after the FedEx workers' compensation carrier called Hancock to request Fallon's file is insufficient to support the inference of discriminatory animus. Likewise Fallon's reliance on the fact that Ridge and Spry communicated prior to the denial of Fallon's LTD benefits [FN4] is insufficient to support an inference of retaliation, since it is undisputed that Ridge recommended that Fallon file a workers' compensation claim.

> FN4. There appears to be a dispute as to the role the defendants played in the decision to deny Fallon's LTD benefits. While FedEx and Ridge assert that they played no role in this decision, Fallon points to specific instances of

Not Reported in N.E.2d
(Cite as: 2002 WL 31677216, *7 (Mass.Super.))

correspondence between Spry and Ridge, as well as Spry's testimony that she "must have" had a discussion with Ridge prior to the decision to deny benefits. Viewing this factual dispute in the light most favorable to the nonmoving party, even if Ridge did contact Hancock regarding Fallon, in and of itself this communication does not support an inference of discriminatory retaliation. Ridge was Fallon's Disability Manager, and according to Hancock's materials, FedEx was solely responsible for the determination of amounts due under the LTD Plan. The nature of the Hancock/FedEx relationship therefore presumes that there will be contact between the two companies, and therefore the mere fact that Ridge communicated with Spry regarding Fallon's claim does not create a material issue of fact.

Finally, Fallon offers no tangible evidence to show that FedEx's decision to terminate her at the end of the 90-day period was in retaliation for her filing a workers' compensation claim. The commencement of the 90-day period after the denial of LTD benefits, even where there is a pending workers' compensation claim, is in accordance with FedEx policy. FedEx notified Fallon of this policy, it informed her of various job openings during the 90-day period, and when Fallon failed to respond to these letters, FedEx terminated her. While summary judgment is generally disfavored where an employer's state of mind is at issue, *Finney v. Madico, Inc.,* 42 Mass.App.Ct. 46, 49 (1997), in this case Fallon has failed to establish sufficient facts such that a jury could reasonably find that but for her filing a workers' compensation claim, the defendants would not have denied her benefits and terminated her employment. Therefore, the defendants' motion for summary judgment as to Fallon's workers' compensation retaliation claim is hereby allowed.

C. *The Sex Discrimination Claim*

Count IV of Fallon's complaint alleges that the defendants discriminated against her on the basis of sex, in violation of G.L.c. 151B, § 4. [FN5] The defendants argue, *inter alia,* that Fallon has failed to exhaust her administrative remedies by not stating a claim of sex discrimination in her initial MCAD complaint, and that therefore they are entitled to judgment as a matter of law.

FN5. Fallon has made it clear that Count IV "is based on sexual discrimination, to wit, disparate treatment in the terms and conditions of employment, rather than upon

sexual harassment or a hostile [work] environment." (Plaintiff's Memorandum in Opposition to Defendant's Statement of Legal Elements Relating to Summary Judgment at p. 11.)

Prior to pursuing a discrimination claim in Superior Court under G.L.c. 151B, the plaintiff must first submit a complaint to the MCAD within six months of the alleged unlawful conduct. G.L.c. 151B, § 5. Additionally, the MCAD complaint must set forth the particulars of the alleged discriminatory conduct. *Id.* Massachusetts courts have strictly construed these provisions, and it is well settled that failure to satisfy the requirements of G.L.c. 151B necessitates the dismissal of the complaint. *Charland v. Muzi Motors,* 417 Mass. 580, 586 (1994); see also *Andrews v. Arkwright Mut. Ins. Co.,* 423 Mass. 1021, 1022 (1996). The rationale behind G.L.c. 151B's notice requirements is to prevent an employee from alleging one thing in an administrative action, and then alleging something entirely different in a subsequent civil proceeding. *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 464 (1st Cir.1996).

*8 Fallon concedes that she did not explicitly state a claim for sex discrimination in the MCAD complaint, but she advances three distinct theories upon which, she asserts, this Court may allow her otherwise untimely sex discrimination claim to proceed to trial. The first of these theories is the "reasonable relation" doctrine. A regulation promulgated by MCAD provides:

A complaint or any part thereof may be amended to cure technical defects or omissions, including failure to swear to the complaint, or to clarify and amplify allegations made therein. An amendment alleging additional acts constituting unlawful discriminatory practices related to or arising out of the subject matter of the original complaint may be made by Order of the Commissioner. Amendments shall relate back to the original filing date.

804 Code Mass. Regs. § 1.10(6)(a). "An amendment arises out of the same subject matter as a timely-filed charge 'where the protected categories are related' or 'where the predicate facts underlying each claim are the same.' " *Davis v. Lucent Technologies, Inc.,* 251 F.3d 227, 233 (1st Cir.2001), quoting *Conroy v. Boston Edison Co.,* 758 F.Supp. 54, 58 (D.Mass.1991).

While Fallon does not argue that the protected categories (disability discrimination and sex discrimination) are related, she argues that the predicate facts underlying each claim are the same. In particular, Fallon points out that both the complaint in

Not Reported in N.E.2d
(Cite as: 2002 WL 31677216, *8 (Mass.Super.))

this action, as well as Paragraph 30 of her MCAD charge, [FN6] reference Ridge's alleged romantic overtures towards her. However, the key inquiry under the reasonable relation doctrine is whether the predicate facts underlying each claim are the same. *Davis, supra.* at 233. The predicate facts underlying Fallon's disability claim and her sex discrimination claim can hardly be considered the same. The six-page Statement of Facts Fallon filed with her MCAD charge mentioned nothing about Ridge's alleged overattentiveness towards the plaintiff, except for the vague parenthetical reference contained in Paragraph 30. Therefore, because the predicate facts underlying each claim are not the same, the reasonable relation doctrine is inapplicable to this case.

> FN6. Paragraph 30 states: "The company [FedEx] did not change its position despite my requests, however, and Mr. Ridge (incidentally, whose romantic overtures I had declined when we had worked together during earlier years) continued sending me jobs he claimed I was qualified for."

The second theory advanced by Fallon is the "scope of the investigation" rule. Under this rule, which obviates the need for the filing of an actual amendment to the administrative charge, "the exact wording of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow." *Conroy, supra.* at 58 (internal citations omitted). The focus of the scope of the investigation rule is whether the factual statement contained in the plaintiff's written charge should have alerted the agency to an alternative basis of discrimination, and whether this additional type of discrimination should have been investigated. *Id.*

This Court has not uncovered, nor has Fallon submitted, any decisions in which a Massachusetts state court has invoked the scope of the investigation rule to save an otherwise untimely discrimination claim brought under G.L.c. 151B. In *Wynn & Wynn, P.C. v. MCAD,* 431 Mass. 655, 672-73 (2000), the Supreme Judicial Court acknowledged the line of federal cases holding that a discrimination claim encompasses the allegations in the initial complaint and any resulting investigation that reasonably would be expected to grow out of those charges. [FN7] In that case, however, the SJC held that the plaintiff's untimely sexual harassment claim did not "grow out of" her initial claim of failure to hire. *Wynn,* 431 Mass. at 672-73. The Court noted that the allegations of sexual harassment were known to the plaintiff at the time she filed her failure to hire claim, and that neither she (nor

the investigating officer) discovered the facts supporting her sexual harassment claim in the course of investigating her failure to hire claim. *Id.* "While the rules of 'relation back' are liberal ... they are not so broad as to encompass any claim that was known to the complainant that could have been brought in a timely fashion." *Id.* at 673 (internal citations omitted).

> FN7. The SJC did not use the term "scope of the investigation rule," but the language cited to by the Court indicates that it was, in fact, referring to this doctrine. *See Wynn, supra* at 672.

*9 Multiple factors persuade this Court that the scope of the investigation rule is inapplicable to Fallon's sex discrimination claim. First, Fallon was fully aware of all of the facts underlying her sex discrimination claim when she filed her initial claim with the MCAD in December of 1997, and yet she chose not to pursue a sex discrimination claim at that time. Additionally, many of the federal cases invoking this doctrine do so, at least in part, because "the original ... charge is most often made without the assistance of counsel." *Adames v. Mitsubishi Bank Ltd.,* 751 F.Supp. 1565, 1572 (E.D.N.Y.1990); see also *Hicks v. ABT Associates, Inc.,* 572 F.2d 960, 965 (3d Cir.1978); *Washington v. Kroger,* 671 F.2d 1072, 1076 (8th Cir.1982). It is undisputed that Fallon was represented by counsel when she filed her MCAD claim. Since "constructive knowledge of all procedural requirements is imputed to a plaintiff who retains an attorney," *Andrews v. Arkwright Mut. Ins. Co.,* 423 Mass. 1021, 1022 (1996), this Court is not inclined to allow the plaintiff to file an untimely sex discrimination claim when she had every opportunity to do so within the limitations period proscribed by G.L.c. 151B, § 5.

Moreover, it would be unreasonable to have expected the MCAD investigator to follow up on the parenthetical reference to Ridge's alleged "romantic overtures" towards Fallon contained in Paragraph 30. First, as already noted, the MCAD claim was fashioned as a disability/workers' compensation retaliation claim, and not a sex discrimination claim. Second, the parenthetical reference notes that the romantic overtures took place during "earlier years." The MCAD investigator, undoubtedly aware of the six-month limitations period for claims under G.L.c. 151B, could rightfully have concluded from this statement that any claim arising out of these "romantic overtures" would be time-barred, and therefore not worth investigating. "Although an investigation is not strictly confined to allegations in the charge, it is not a 'fishing

Not Reported in N.E.2d
**(Cite as: 2002 WL 31677216, \*9 (Mass.Super.))**

expedition' that should be expected to extend to matters unrelated to the charge." *Lattimore v. Polaroid Corp.,* 99 F.3d 456, 465 (1st Cir.1996). Accordingly, this Court concluded that the scope of the investigation doctrine is inapplicable to the case at bar.

The final theory advanced by Fallon is the "continuing violations" doctrine. However, that doctrine is inapplicable because Fallon's sex discrimination claim does not relate back to the claims she asserted in the original MCAD complaint. *See* Section II(C), *supra.;* see also *Wynn, supra.* at 673 n. 37 ("Because we determine that [the plaintiff's] amended complaint does not relate back to her original complaint, we need not address her assertion that the "continuing violation" doctrine applies to her case").

Furthermore, the continuing violation doctrine requires that the plaintiff "anchor" the earlier instances of discrimination with a discrete violation within the six-month limitations period. *Cuddyer v. Stop & Shop Supermarket Co.,* 434 Mass. 521, 532 (2001). Fallon now submits that her termination on June 13, 1997 was a discrete instance of sex discrimination sufficient to anchor the alleged romantic overtures from previous years. However, this position is entirely inconsistent with her sworn statement filed with the MCAD,

wherein she asserted that her termination was "based on [her] disabilities" and "in retaliation for [her] seeking the protection of the law covering persons with disabilities and the workers' compensation law." Fallon cannot now contradict her previous sworn statement in order to survive a motion for summary judgment. *See,* e.g., *Phinney v. Morgan,* 39 Mass.App.Ct. 202. 207 (1995); *O'Brien v. Analog Devices, Inc.,* 34 Mass.App.Ct. 905, 906 (1993).

**\*10** In conclusion, this Court finds that the three theories advanced by Fallon to allow her otherwise untimely sex discrimination claim to proceed to trial are inapplicable. Therefore, the defendants' motion for summary judgment as to Fallon's sex discrimination claim is hereby allowed.

### ORDER

For the foregoing reasons, it is hereby *ORDERED* that the defendants' motion for summary judgment is *ALLOWED.*

Not Reported in N.E.2d, 2002 WL 31677216 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.