UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DANIEL FERRIE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No: 04-12068 (JLT) |
| v. | ) | |
| | ) | |
| KMART CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S RULE 56.1 STATEMENT
IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Civil Rule 56.1, defendant, Kmart Corporation ("Kmart"), hereby

submits its statement of material facts in support of its Motion for Summary Judgment ("Rule

56.1 Statement").

**A.    Plaintiff's Employment With Defendant**

1.    Kmart hired Daniel Ferrie ("Ferrie") on July 16, 1998. (*Documents and

Deposition Testimony Submitted In Support of Kmart's Motion for Summary Judgment

("Supporting Materials"), Tab 1 thereto at KMART 00072*).

2.    He was hired as a Pacesetter Manager in training which, in essence, was a fast

track position to becoming a Store Manager. (*Supporting Materials Tab 2 thereto, Excerpts from

the Transcript of the Deposition of Daniel Ferrie ("Ferrie Dep.") at 31-32; see also Supporting

Materials, Tab 1 at KMART 00076*)  Ferrie spent six weeks in that position, working in Kmart's

store in Braintree, Massachusetts. (*Supporting Materials, Tab 1 at 31-32*)

3.    Effective August 27, 1998, Ferrie transferred to Store # 7605 at the South Bay

shopping plaza in Dorchester, Massachusetts, where he remained for two years. (*Id. at 32-33; see

also Supporting Materials, Tab 1 at KMART 00072, 00080*)  At South Bay, Ferrie first worked as

the Assistant Soft Lines Manager (i.e., responsible for all categories of clothing), was promoted to be the Hard Lines Manager (i.e., responsible for health and beauty aids, tools, toys and equipment), was further promoted to be the Replenishment Manager (i.e., responsible for operational logistics) and was further promoted again into a Store Manager *pro tem* position (i.e., a Store Manager "in waiting"). (*Supporting Materials, Tab 2, Ferrie Dep. at 33-35; see also Supporting Materials, Tab 1 at KMART 00071, 00072, 00076*) David Napier was the District Manager responsible for Kmart's South Bay store at the time. (*Supporting Materials, Tab 2, Ferrie Dep. at 40-41*)

4.    Effective October 1, 2000, from Store #7605 in South Bay, Ferrie transferred to Store #3486 in Somerville, where he served as the Store Manager through May, 2001. (*Id. at 36-37; see also Supporting Materials Tab 1 at KMART 00079*) There, Ferrie reported to District Manager Jon Swank. (*Supporting Materials, Tab 2, Ferrie Dep. at 39-40*)

5.    From Somerville, Ferrie became the Store Manager of Store #3401 in Fall River, Massachusetts. (*Supporting Materials, Tab 2, Ferrie Dep. at 37-38; see also Supporting Materials, Tab 1 at KMART 00078, 00070*) Ferrie remained at Store #3401 in Fall River through September 2001. (*See Supporting Materials Tab 1 at KMART 00078*) There, he reported to District Manager Carleton (Chuck) James. (*Supporting Materials, Tab 2, Ferrie Dep. at 40*)

6.    Effective September 27, 2001, Ferrie became the Store Manager of Store #3879 in Braintree. (*Supporting Materials, Tab 1 at KMART 00078, 00070; Ferrie Dep. at 38-39*) In Braintree, Ferrie again reported to District Manager Jon Swank. (*Id. at 40*)

7.    Ferrie worked as the Store Manager in Braintree until Kmart terminated his employment effective March 2, 2004. (*Supporting Materials, Tab 1 at KMART 00069; see also Ferrie Dep. at 26, 39*)

**B.    Events Leading To Plaintiff's Termination**

8.      As a Manager at Kmart, Ferrie agreed that he was obligated to "maintain honest operation in every managerial responsibility assigned to the Manager." (*Supporting Materials, Tab 3 at KMART 00030-31; see also Ferrie Dep. at 45-46, 51*)

9.      Ferrie's employment was terminated for his improper actions in connection with the sales of Kmart "Smart Plans." (*Supporting Materials, Tab 4 thereto*) As Kmart's Rule 30(b)(6) witness testified, the reason for Ferrie's termination was his "manipulation of Smart Plans." (*See Supporting Materials, Excerpts from the Deposition of Kmart's Rule 30(b)(6) deponent, David Hughes ("Rule 30(b)(6) Dep."), Tab 5 thereto, at 21, 26-27*)

10.     The Kmart Smart Plan is a warranty plan, whereby a customer buying a certain type of product (e.g., an electronic product) has the opportunity to purchase a warranty on the product. (*Supporting Materials, Tab 2, Ferrie Dep. at 56; see also Supporting Materials, Tab 6 thereto at KMART 000746*)

11.     Kmart's Smart Plan policy states as follows: "It is the responsibility of the Store Manager/Director to ensure that all associates understand that the *Smart Plan* must be offered to every customer **properly** every time an eligible item is purchased." (*Supporting Materials, Tab 6 at KMART 00746 (bold emphasis added); see also id. at KMART 000749*) Tips on how to offer the Smart Plan properly are provided in the policy. (*Id. at KMART 00757*)

12.     Ferrie testified that Kmart strives for its stores to maintain a Smart Plan conversion rate of approximately 16%, meaning that customers buy a Smart Plan for 16% of the eligible items sold. (*Supporting Materials, Tab 2, Ferrie Dep. at 56-57; see also Supporting Materials, Tab 6, at KMART 00747*)) According to Ferrie, an acceptable Smart Plan conversion rate is 10%. (*Supporting Materials, Tab 2, Ferrie Dep. at 63*)

3

13.    On Sunday, November 30, 2003, Kmart Loss Prevention Manager Nicolas Macomber ("Macomber") told Ferrie he had discovered suspicious purchases in the Braintree store by customers using two Kmart Cash Cards. (*Supporting Materials, Tab 7 thereto at KMART 00090*) A Kmart Cash Card is a plastic card on which a pre-paid amount of money is credited. (*Supporting Materials, Tab 2, Ferrie Dep. at 69*)

14.    Macomber traced the two Cash Cards to a Kmart store in Nashua, New Hampshire where they had been purchased with a stolen credit card. (*Supporting Materials, Tab 7 at KMART 00091*)

15.    As Macomber wrote in a statement:

> I then informed Store Manager Daniel Ferrie of all the above information, suggested the elimination of the remaining balances on the Kmart cash cards in question to which **Dan Ferrie responded by suggesting the purchase of Smart Plans to reduce said card balances** and relayed such information to Front End Manager Michael Hedlund.

(*Id.* (emphasis added))

16.    As Hedlund wrote in a statement:

> On Monday 12/1/03 I was advised by Nick (LPM) [Macomber] of 2 stolen cash cards.  Where we had remaining balances left on them, once it was confirmed that the card were bought with a stolen credit card.  I asked Dan [Ferrie] about "killing" the receipts that were bought with the stolen k-cash card. **Dan said to refund them and buy as many 2.99 smart plan that I could with it, because of the store poor compliance.  This wasn't what I had planned to do;** (Planned to refund then resale so that original receipt would decline if tried to be refunded) **but Dan being store manager and having been adamant about having smart plans above 10% I did what he told me even though I knew this was wrong because Dan had threatened job in the past when I haven't followed his instructions.**
> The week before this happen I was told by John (Image manager) that Dan told him to tell me if smart plan sales weren't above 10% I would be fired.

> \*        \*        \*

> [I] found discounted, cheap watches that a smart plan would ask when UPC was scanned.  Did not use anything but watch UPC that was discounted so

that it wouldn't affect non-discounted merchandise, and so the sales wouldn't all be manual.

Then each day, I would check smart plan sales and that every number short by to make ten % I would sale to reg[ister]. I would go to a number of reg[isters] and sell smart plans to get number above 10%. . . .

*(Supporting Materials, Tab 8 thereto (emphasis added))*

17.    The statements from Macomber and Hedlund were among those taken in

connection with Kmart's audit of Store #3879 in Braintree "to review suspicious Kmart Cash

card activity relating to the purchase of Smart Plan Warranties from December 1-12, 2003."

*(Supporting Materials, Tab 9 thereto, at KMART 00097)*

18.    The Treasury Department at Kmart's Resource Center ("KRC") had picked up on

the suspicious Smart Plan purchases and requested Donna Mastroeni ("Mastroeni") from

Kmart's Audit Services Department to review the purchases. (*Id.*)

19.    Tracking Store #3879's Smart Plan conversion rate showed the following data:

| WEEK | DATES | CONV RATE |
|------|-------|-----------|
| 32 | September 10 – 16 | 7.49 |
| 33 | September 17 – 23 | 7.86 |
| 34 | September 24 – 30 | 7.65 |
| 35 | October 1 – 7 | 7.02 |
| 36 | October 8 – 14 | 7.70 |
| 37 | October 15 - 21 | 8.38 |
| 38 | October 22 - 28 | 7.53 |
| 39 | October 29 - November 4 | 5.19 |
| 40 | November 5 – 11 | 6.64 |
| 41 | November 12 – 18 | 7.32 |
| 42 | November 19 – 25 | 9.85 |
| 43 | November 26 - December 2 | 9.32 |
| **44** | **December 3 – 9** | **11.59** |
| **45** | **December 10 – 16** | **11.43** |

*(Supporting Materials, Tab 10 thereto (KMART 00761) (emphasis added))*[1]

---

[1]    Further, after this period of time, Store # 3879's Smart Plan data was as follows:

20.    On December 12, 2003, Mastroeni contacted Swank and asked him to meet her at the store in Braintree on December 18, 2003 to review her findings. (*Supporting Materials, Tab 9, at KMART 00097*)

21.    Ferrie fell at work on December 17, 2003. (*Supporting Materials, Tab 11 thereto at KMART 00253-254; Ferrie Dep. at 96-97*) He was not available for Mastroeni to interview on her visit. (*Supporting Materials, Tab 9, at KMART 0097*)

22.    Ferrie testified that he has been incapable of working since his December 17th fall. (*Supporting Materials, Tab 2, Ferrie Dep. at 28*)

23.    In her December 18, 2003 Memorandum, Mastroeni wrote:

> At the request of the Treasurer's Department at KRC, I reviewed Kmart Cash/Smart Plan activity for Kmart Cash Card #6006490300774118626. Using Electronic Journal detail, I discovered that it was used to purchase 106 watches with selling prices ranging from $1.90 to $10 and 135 Smart Plans for $2.99 from December 1-12, 2003. The purchases were made in multiple transactions at a number of registers within a short time period. As the $2.99 Smart Plan warranties purchased cover replacement cost only and the warranty itself cost more than the watch, it is unlikely that a customer would make such a purchase. The purchases occurred during the Smart Plan Double Commission Period, although double commissions would not be paid for these transactions as the warranties registered were less than $7.99. Although the store did not reach its conversion goal for week ending 11/26, the required conversion rate was met in weeks ending 12/3 and 12/10, the period in which these suspicious transactions occurred.

(*Supporting Materials, Tab 9, at KMART 00097-00098*)

24.    Mastroeni further wrote:

| December 17 – 23 | 6.58 |
|---|---|
| December 24 – 30 | 6.20 |
| December 31 - January 6 | 4.72 |
| January 7 – 13 | 4.83 |
| January 14 – 20 | 4.73 |
| January 21 – 28 | 4.84 |
| January 29 – February 5 | 7.22 |

(*Supporting Materials, Tab 10*)

> [I]t appears Front End Manager Mike Hedlund used a Kmart Cash card to purchase 135 Smart Plan Warranties after Store Manager Dan Ferrie indicated warranty sales needed to increase to meet the store's conversion rate goal.

(*Id.*)

25.    Loss Prevention District Manager, Jon Reeves ("Reeves") was also involved in the investigation, and he detailed the findings from his investigation in a memorandum dated December 20, 2003. (*Supporting Materials, Tab 9 at KMART 00100*)  As Reeves wrote:

> After interviewing the remaining 5 witnesses it was also discovered that Dan [Ferrie] instructed the cashiers to automatically ring in a smart plans for customer's transactions when prompted and not notify the customer unless they questioned the purchase.  Several of the cashiers with the exception of one did as instructed by Dan.  All cashiers were afraid to question Dan due to Dan making threats to them of being "fired" (see attached statements B, C, D, E, & F).  The information was consistent with all associates interviewed.

(*Id. at KMART 000100*)

26.    One statement provided:

> Dan has made general comments about just ringing Smart Plan for customers and if they do not want them they can return them.  He has made commits (sic) about firing anyone who does not sale (sic) Smart Plans.

(*Id. at KMART 00088*)

27.    Another statement provided:

> I, Rosa Rivera, was asked by the Store Manger to increase the amount of Smart Plans sales.  He joked about "punch them in" even if the customers didn't want them.  I asked him if he was serious about it.  He said he was and never talked about anymore.  He only asked how the sales are going.

(*Id. at KMART 00089*)

28.    Another statement provided:

> I, Susan Jones, had a conversation with Dan Ferrie in regard to Smart Plans.  I was told my job depended upon me selling Smart Plans.  I was told to just sign them up.  I told him I couldn't do that.  He asked if I ever rang one up by mistake and what I did about it.  I told him I took it out of the sale.  He then said that I was

> assuming that the customer didn't want it. I said I had already asked the customer and they didn't want it. . . .

(*Id.* at KMART 00092)

29.    Another statement provided:

> I, Lea South, was told by Dan Ferrie to just ring in Smart Plans without customers request to purchase them. I told him I would not do that because it was wrong. The next day he told me I disappointed by not doing what he asked me to do. My job position was not threatened by him. But I know of him threatening other people with their positions.

(*Id.* at KMART 00094)

30.    On December 21, 2003, Mastroeni faxed all of the above statements (and others) to Regional Vice President, David Hughes ("Hughes"). (*Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 32-33; see also Supporting Materials, Tab 9 at KMART 00085*)

31.    Hughes reviewed the matters at-issue in Mastroeni's investigation with Regional Vice President, Mary Jo Duffy ("Duffy"). (*Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 33*)

32.    Kmart would not conclude its investigation until Ferrie returned to work to discuss the findings. (*Id. at 33*)

33.    Swank transferred to New York in January/February 2004. (*Supporting Materials, Tab 2, Ferrie Dep. at 137*) A new District Manager, Mike Hawd ("Hawd"), took over Swank's responsibility for Braintree. (*Id. at 145; see also Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 25*)

34.    Hughes spoke to Hawd about the investigation, and he asked Hawd to take a statement from Ferrie when he returned. (*Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 25, 27*)

8

35.    Ferrie came to work on March 1, 2004. (*Supporting Materials, Tab 2, Ferrie Dep. at 137, 144-46*) He handwrote a statement upon his return. (*Supporting Materials, Tab 2, Ferrie Dep. at 138-39, 149-51; see also Supporting Materials, Tab 12 thereto at KMART 00461-00464*) Hughes could not read Ferrie's handwriting, so he asked that the statement be typed. (*Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 23*) Ferrie then typed the statement he wrote. (*Supporting Materials, Tab 2, Ferrie Dep. at 139, 151; see also Supporting Materials, Tab 12 at KMART 00459-00460*)

36.    Hughes and Duffy reviewed Ferrie's statement and then they re-reviewed all of the statements received in Mastroeni's investigation. (*Supporting Materials, Tab 5, Rule 30(b)(6) Dep. at 23*) The decision to terminate Ferrie's employment was made by Hughes and Duffy and they made this decision after they reviewed Ferrie's statement. (*Id. at 23-25*)

37.    As Hughes testified about his discussion with Duffy:

> [T]he code of conduct in K Mart is very high. We do not tolerate people that manipulate or cheat for their benefit. We have a very high standard when it comes to how a store manager should conduct themselves as a store manager, and we felt through this investigation that Mr. Ferrie did not conduct himself in an appropriate manner, and we decided to separate him for manipulation of Smart plan sales.

(*Id. at 26-27*)

KMART CORPORATION

By its attorneys,

David S. Rubin, Esq. BBO# 546213
Jeffrey M. Rosin, Esq. BBO #629216
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Dated: September 19, 2005

9