UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL FERRIE,           )
                         )
          *Plaintiff,*   )
                         )        Civil Action No: 04-12068 (JLT)
v.                       )
                         )
KMART CORPORATION,       )
                         )
          *Defendant.*   )

## DOCUMENTS AND DEPOSITION TESTIMONY SUBMITTED
## IN SUPPORT OF KMART'S MOTION FOR SUMMARY JUDGMENT

TAB 1:     Job information data of Daniel Ferrie ("Ferrie") (KMART 00069-00084)

TAB 2:     Excerpts from Ferrie's deposition, taken February 28, 2005.

TAB 3:     KMART's management contract with Ferrie (KMART 00026-00031)

TAB 4:     Documents regarding Ferrie's termination (KMART 00032, 00036)

TAB 5:     Excerpts from the deposition of Kmart's Rule 30(b)(6) witness, David B. Hughes.

TAB 6:     Bulletin regarding Kmart's Smart Plan Extended Warranty Plan (KMART 00746-00760)

TAB 7:     Handwritten notes of Nicholas Macomber (KMART 00090-00091)

TAB 8:     Handwritten notes of Michael Hedlund (KMART 00086-00087)

TAB 9:     Facsimile (16 pages) to David Hughes (KMART 00085-00101)

TAB 10:    Smart Plan conversion data for Store #3879 (Braintree, MA) for end of fiscal year 2003 (KMART 00761)

TAB 11:    "First Report of Injury" (KMART 00253-00254)

TAB 12:    Handwritten and typed statement of Ferrie (KMART 00459-00464)

TAB 13:     Ferrie's EEOC Charge

TAB 14:     Documents regarding Carleton (Chuck) James, Daniel Nicolini and David Bennett

TAB 15:     Excerpts from the deposition of Jon Swank

Respectfully Submitted,

KMART CORPORATION

By its attorneys,

David S. Rubin, Esq. BBO# 546213
Jeffrey M. Rosin, Esq. BBO #629216
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Dated: September 19, 2005

2

# **TAB 1**

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

Job Summary

FERRIE,DANIEL A                    **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                              View All     First  1-7 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Action | Action Reason |
|----------|----------|--------|---------------|
| 03/02/2004 | 0 | Termination | Violation of Rules |
| 03/01/2004 | 0 | Return from Leave | Return From Leave |
| 02/29/2004 | 0 | Data Change | Paid Leave Pay Change |
| 01/29/2004 | 0 | Data Change | Change in Bonus |
| 01/18/2004 | 0 | Paid Leave of Absence | Workers Comp - Reduced Pay |
| 01/17/2004 | 0 | Leave of Absence | HR Network |
| 01/30/2003 | 0 | Data Change | Change in Bonus |

Return to Search

KMART00069

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

| Job Summary |

FERRIE,DANIEL A                    **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                    View All    First ◀ 8-14 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Action | Action Reason |
|---|---|---|---|
| 06/16/2002 | 0 | Pay Rate Change | Annual Increase |
| 01/31/2002 | 0 | Data Change | Change in Bonus |
| 09/27/2001 | 0 | Promotion | Promotion |
| 07/01/2001 | 0 | Pay Rate Change | Annual Increase/Adjustment |
| 06/28/2001 | 0 | Promotion | Promotion |
| 05/03/2001 | 0 | Data Change | Change in Bonus |
| 05/01/2001 | 0 | Pay Rate Change | Annual Increase |

( Return to Search )

KMART00070

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

```
Job Summary
```

FERRIE,DANIEL A              **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                              View All    First ◀ 15-21 of 26 ▶ Last

```
General | Job Information | Work Location | Compensation
```

| Eff Date | Sequence | Action | Action Reason |
|----------|----------|--------|---------------|
| 02/01/2001 | 0 | Job Reclassification | Store Volume Reclassification |
| 10/01/2000 | 0 | Promotion | Promotion |
| 08/17/2000 | 0 | Promotion | Promotion |
| 07/27/2000 | 0 | Data Change | Change in Bonus |
| 06/01/2000 | 0 | Job Reclassification | Title Change |
| 01/27/2000 | 0 | Data Change | Change in Bonus |
| 12/01/1999 | 0 | Data Change | |

Return to Search

KMART00071

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

/ Job Summary \

FERRIE,DANIEL A                    **EmplID:** 01000071260          **SSN:** 024360166

**Job Information**                                    View All    First ◀ 22-26 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| **Eff Date** | **Sequence** | **Action** | | **Action Reason** |
|---|---|---|---|---|
| 08/26/1999 | 0 | Promotion | | Promotion |
| 04/22/1999 | 0 | Pay Rate Change | | Annual Increase |
| 10/08/1998 | 0 | Promotion | | Promotion |
| 08/27/1998 | 0 | Transfer | | Lateral Transfer |
| 07/16/1998 | 0 | Hire | | New Hire |

Return to Search

KMART00072

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

⌐ Job Summary ⌐

FERRIE,DANIEL A                     **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                           View All     First ⋯ 1-7 of 26 ▶

⌐ General ⌐ Job Information ⌐ Work Location ⌐ Compensation ⌐

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Per |
|----------|----------|---------|-----------|-------------|----------------|----------|----------------|----------|
| 03/02/2004 | 0 | StrMgrIII | Salaried | Terminated | Full-Time | Regular | 48.00 | Weekly |
| 03/01/2004 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/29/2004 | 0 | StrMgrIII | Salaried | Leave W/Py | Full-Time | Regular | 48.00 | Weekly |
| 01/29/2004 | 0 | StrMgrIII | Salaried | Leave W/Py | Full-Time | Regular | 48.00 | Weekly |
| 01/18/2004 | 0 | StrMgrIII | Salaried | Leave W/Py | Full-Time | Regular | 48.00 | Weekly |
| 01/17/2004 | 0 | StrMgrIII | Salaried | Leave | Full-Time | Regular | 48.00 | Weekly |
| 01/30/2003 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |

( Return to Search )

KMART00073

-Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

/ Job Summary \

   FERRIE,DANIEL A                    **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                                View All    First ◀ 8-14 of 26 ▶

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Per |
|----------|----------|---------|-----------|-------------|----------------|----------|----------------|----------|
| 06/16/2002 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/31/2002 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 09/27/2001 | 0 | Str MgrIV | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/01/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/28/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/03/2001 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/01/2001 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |

( Return to Search )

KMART00074

Job Summary                                                                                    Page 1 of 1

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > Job Summary        New Window

⌐ Job Summary ⌐

FERRIE,DANIEL A            EmplID: 01000071260              SSN: 024360166

**Job Information**                                                    View All    First ◁ 15-21 of 26 ▷

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Per |
|---|---|---|---|---|---|---|---|---|
| 02/01/2001 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 10/01/2000 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 08/17/2000 | 0 | ProTem Mgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/27/2000 | 0 | Rep TM D | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/01/2000 | 0 | Rep TM D | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/2000 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 12/01/1999 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |

(⚲ Return to Search)

KMART00075

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > Job Summary        New Window

Job Summary

FERRIE,DANIEL A                    EmplID: 01000071260            SSN: 024360166

Job Information                                          View All    First ◄ 22-26 of 26

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Per |
|---|---|---|---|---|---|---|---|---|
| 08/26/1999 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 04/22/1999 | 0 | HL TMgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 10/08/1998 | 0 | HL TMgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 08/27/1998 | 0 | SL TAM Mtp | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/16/1998 | 0 | Pacesetter | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |

Return to Search

KMART00076

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

/ Job Summary \

FERRIE,DANIEL A                    **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                              View All      First  ◁  1-7 of 26  ▶  Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Position | Company | DeptID | Sal Plan | Grade | Pay Group | Frequency |
|----------|----------|----------|---------|--------|----------|-------|-----------|-----------|
| 03/02/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 03/01/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 02/29/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 01/29/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 01/18/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 01/17/2004 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 01/30/2003 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |

( Return to Search )

KMART00077

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

⌐ Job Summary ⌐

FERRIE,DANIEL A                    **EmplID:** 01000071260          **SSN:** 024360166

**Job Information**                                          View All    First ◀ 8-14 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Position | Company | DeptID | Sal Plan | Grade | Pay Group | Frequency |
|---|---|---|---|---|---|---|---|---|
| 06/16/2002 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 01/31/2002 | 0 | | KMC | 3879-Store | STC | 017 | Y53 | Semimonthl |
| 09/27/2001 | 0 | | KMC | 3879-Store | STC | 018 | Y53 | Semimonthl |
| 07/01/2001 | 0 | | KMC | 3401-Store | STA | 016 | Y53 | Semimonthl |
| 06/28/2001 | 0 | | KMC | 3401-Store | STA | 016 | Y53 | Semimonthl |
| 05/03/2001 | 0 | | KMC | 3486-Store | STC | 017 | Y53 | Semimonthl |
| 05/01/2001 | 0 | | KMC | 3486-Store | STC | 017 | Y53 | Semimonthl |

 Return to Search

KMART00078

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > Job Summary          New Window

/ Job Summary \

FERRIE,DANIEL A                EmplID: 01000071260            SSN: 024360166

**Job Information**                                   View All    First ◀ 15-21 of 26 ▶ Last

| General | Job Information | Work Location | Compensation | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Eff Date** | **Sequence** | **Position** | **Company** | **DeptID** | **Sal Plan** | **Grade** | **Pay Group** | **Frequency** |
| 02/01/2001 | 0 | | KMC | 3486-Store | STC | 017 | Y53 | Semimonthl |
| 10/01/2000 | 0 | | KMC | 3486-Store | STC | 017 | Y53 | Semimonthl |
| 08/17/2000 | 0 | | KMC | 7605-Store | KMC | 015 | Y53 | Semimonthl |
| 07/27/2000 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 06/01/2000 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 01/27/2000 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 12/01/1999 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |

[⚲ Return to Search]

KMART00079

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

```
┌ Job Summary ╲
```

FERRIE,DANIEL A                    EmplID: 01000071260              SSN: 024360166

**Job Information**                                    View All          First ◀ 22-26 of 26   Last

```
┌ General ╲┌ Job Information ╲┌ Work Location ╲┌ Compensation ╲
```

| Eff Date | Sequence | Position | Company | DeptID | Sal Plan | Grade | Pay Group | Frequency |
|----------|----------|----------|---------|--------|----------|-------|-----------|-----------|
| 08/26/1999 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 04/22/1999 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 10/08/1998 | 0 | | KMC | 7605-Store | KMC | 011 | O53 | Biweekly |
| 08/27/1998 | 0 | | KMC | 7605-Store | KMC | 010 | O53 | Biweekly |
| 07/16/1998 | 0 | | KMC | 3879-Store | KMC | UNG | O53 | Biweekly |

( Return to Search )

KMART00080

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

/ Job Summary \

FERRIE,DANIEL A                    EmplID: 01000071260                SSN: 024360166

**Job Information**                                    View All       First ◄ 1-7 of 26 ► Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Annual Rt | Monthly Rt | Daily Rt | Hrly Rate | Currency | Change Percent | Components |
|----------|----------|-----------|------------|----------|-----------|----------|----------------|-----------|
| 03/02/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 03/01/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 02/29/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 01/29/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 01/18/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 01/17/2004 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 0.000 | Components |
| 01/30/2003 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 1.950 | Components |

Return to Search

KMART00081

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

Job Summary

FERRIE,DANIEL A          **EmplID:** 01000071260          **SSN:** 024360166

**Job Information**                                                    · View All    First ◀ 8-14 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Annual Rt | Monthly Rt | Daily Rt | Hrly Rate | Currency | Change Percent | Components |
|----------|----------|-----------|-----------|----------|-----------|----------|----------------|-----------|
| 06/16/2002 | 0 | $88,900.000 | $7,408.333 | $341.923 | $35.616987 | USD | 1.950 | Components |
| 01/31/2002 | 0 | $87,200.000 | $7,266.667 | $335.384 | $34.935897 | USD | 2.108 | Components |
| 09/27/2001 | 0 | $87,200.000 | $7,266.667 | $335.384 | $34.935897 | USD | 2.108 | Components |
| 07/01/2001 | 0 | $85,400.000 | $7,116.667 | $328.461 | $34.214744 | USD | 1.667 | Components |
| 06/28/2001 | 0 | $84,000.000 | $7,000.000 | $323.076 | $33.653846 | USD | 16.829 | Components |
| 05/03/2001 | 0 | $71,900.000 | $5,991.667 | $276.538 | $28.806090 | USD | 4.200 | Components |
| 05/01/2001 | 0 | $71,900.000 | $5,991.667 | $276.538 | $28.806090 | USD | 4.200 | Components |

🔍 Return to Search

KMART00082

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

┌ Job Summary ┐

FERRIE,DANIEL A                    **EmplID:** 01000071260              **SSN:** 024360166

**Job Information**                                          View All    First ◀ 15-21 of 26 ▶ Last

| General | Job Information | Work Location | Compensation |

| Eff Date | Sequence | Annual Rt | Monthly Rt | Daily Rt | Hrly Rate | Currency | Change Percent | Components |
|----------|----------|-----------|------------|----------|-----------|----------|----------------|-----------|
| 02/01/2001 | 0 | $69,000.000 | $5,750.000 | $265.384 | $27.644231 | USD | 16.949 | Components |
| 10/01/2000 | 0 | $69,000.000 | $5,750.000 | $265.384 | $27.644231 | USD | 16.949 | Components |
| 08/17/2000 | 0 | $59,000.000 | $4,916.667 | $226.923 | $23.637821 | USD | 18.000 | Components |
| 07/27/2000 | 0 | $50,000.000 | $4,166.667 | $192.307 | $20.032051 | USD | 0.000 | Components |
| 06/01/2000 | 0 | $50,000.000 | $4,166.667 | $192.307 | $20.032051 | USD | 0.000 | Components |
| 01/27/2000 | 0 | $50,000.000 | $4,166.667 | $192.307 | $20.032051 | USD | 0.000 | Components |
| 12/01/1999 | 0 | $50,000.000 | $4,166.667 | $192.307 | $20.032051 | USD | 6.838 | Components |

Return to Search

KMART00083

Job Summary

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

Job Summary

FERRIE,DANIEL A          EmplID: 01000071260          SSN: 024360166

**Job Information**                                    View All      First ◀ 22-26 of 26 ▶ Last

General | Job Information | Work Location | **Compensation**

| Eff Date | Sequence | Annual Rt | Monthly Rt | Daily Rt | Hrly Rate | Currency | Change Percent | Components |
|----------|----------|-----------|------------|----------|-----------|----------|----------------|-----------|
| 08/26/1999 | 0 | $50,000.000 | $4,166.667 | $192.307 | $20.032051 | USD | 6.838 | Components |
| 04/22/1999 | 0 | $46,800.000 | $3,900.000 | $180.000 | $18.750000 | USD | 4.000 | Components |
| 10/08/1998 | 0 | $45,000.000 | $3,750.000 | $173.076 | $18.028846 | USD | 7.143 | Components |
| 08/27/1998 | 0 | $42,000.000 | $3,500.000 | $161.538 | $16.827000 | USD | 0.000 | Components |
| 07/16/1998 | 0 | $42,000.000 | $3,500.000 | $161.538 | $16.827000 | USD | 0.000 | Components |

 Return to Search

KMART00084

# TAB 2

1

1    CERTIFIED ORIGINAL                VOLUME: I

2    LEGALINK BOSTON                   PAGES: 1 to 199

3                                      EXHIBITS: See Index

4

5              UNITED STATES DISTRICT COURT

6              DISTRICT OF MASSACHUSETTS

7    - - - - - - - - - - - - - - - - - x

8    DANIEL A. FERRIE

9              Plaintiff

10       v.                        No. 04CV12068JLT

11

12   KMART CORPORATION

13             Defendant

14   - - - - - - - - - - - - - - - - - x

15

16             DEPOSITION of DANIEL FERRIE

17             Monday, February 28, 2005

18                  10:00 a.m.

19             Foley & Lardner, LLP

20             111 Huntington Avenue

21             Boston, Massachusetts 02199

22

23             Michelle Keegan, Court Reporter

24

Daniel Ferrie                                    02/28/2005

26

1    soured me.  I decided to leave.

2        Q.  Now, we know that you left employment at

3    Kmart March 2nd, 2004, correct?

4             MR. WOOD:  Objection.  You can answer.

5        A.  March 1st, 2004.

6        Q.  And since that time have you been employed?

7        A.  No.

8        Q.  And are you physically capable of working?

9        A.  No, not at this time.

10       Q.  In any capacity?

11       A.  Not at this time.

12       Q.  Have you been physically capable of working

13   at any time since March 1st, 2004?

14       A.  No, not full-time.

15       Q.  And is that due to your back injury?

16       A.  Yes.

17       Q.  And have you ever been -- Have you been

18   given any indication by your physicians as to

19   whether or when you'll ever be able to return to

20   work on a regular basis?

21       A.  I have not.

22       Q.  What were you about to say?  You just what?

23       A.  I just returned to Dr. Jouve.  And I'm going

24   to enter physical therapy, so hopefully shortly I

Daniel Ferrie                                        02/28/2005

28

1    specifically.  You testified that you've been

2    incapable of working at least since the time you

3    left Kmart?

4        A.  Right.

5        Q.  Have you been incapable of working since you

6    incurred your injury, which I believe was on

7    December 17th, 2003?

8        A.  That's correct.

9        Q.  Have you been incapable of working since

10   that time?

11       A.  That's correct.  Right.

12       Q.  And just briefly, the first document,

13   Exhibit 2 there, is that the application for

14   management employment that you submitted to Kmart?

15   I know it's hard to read.

16       A.  Yes.

17       Q.  And that's all your handwriting?

18       A.  Yes.

19       Q.  And how did it come to be that you applied

20   for employment at Kmart?

21       A.  They were recruiting.

22       Q.  How did you learn that?

23       A.  From the Internet.

24       Q.  And you were looking for employment at that

31

1    A.   Yes.

2    Q.   Okay.  So if it had been reduced, you still

3  got to use the 10 percent discount?

4    A.   Yes.

5    Q.   When you said before off of regularly-

6  priced merchandise, it's not exclusively regularly-

7  priced merchandise?

8    A.   Yes, it is.

9    Q.   Can you explain?  I think I'm confused,

10  then.  Could you just explain to me the distinction?

11    A.   Regularly-priced merchandise is the price

12  the merchandise is now selling at.  So you could use

13  your discount card if something is seasonally marked

14  down and that became the new pricing.  You could not

15  use it on sale items and exclusions.  That was

16  temporary price reduction.

17    Q.   Okay.  So there's a difference between

18  marked down -- seasonally marked down and sales

19  price?

20    A.   Yes.

21    Q.   Now, the letter says that you were being

22  hired as a pacesetter manager in training at Kmart

23  3879.  And it says the store is located in

24  Graintree.  I assume that was Braintree.

Daniel Ferrie                                    02/28/2005

32

1      A.   Yes.

2      Q.   Was that the store you worked at the entire

3   time?

4      A.   No.

5      Q.   So can you tell me, what was a Kmart

6   pacesetter manager in training?

7      A.   Pacesetter training was a fast track to

8   store management.

9      Q.   Okay.  I assume you were eligible for that

10   because you had retail management experience before?

11      A.   I would assume, yes.

12      Q.   And how long were you in that program, that

13   management training program?

14      A.   Six weeks at that store.

15      Q.   In Braintree?

16      A.   Yes.

17      Q.   And when where did you go?

18      A.   To 7605.

19      Q.   Store number 7605?

20      A.   Yes.

21      Q.   Where was that?

22      A.   South Bay.

23      Q.   In Dorchester?

24      A.   Yes.

Daniel Ferrie                                           02/28/2005

33

1       Q.  Were you in the Dorchester store or the

2   South Bay store for the remainder of your employment

3   at Kmart?

4       A.  No.

5       Q.  How long were you at the Dorchester store?

6       A.  Two years.

7       Q.  So was that -- You were six weeks in

8   Braintree as a pacesetter trainee?

9       A.  Uh-hmm.

10      Q.  And at the end of that training program you

11  went to the South Bay store?

12      A.  Correct.

13      Q.  For two years, approximately?

14      A.  Approximately two years.

15      Q.  And what did you do while you were at the

16  South Bay store?

17      A.  I was brought to the South Bay store as the

18  assistant soft lines manager.  I then was promoted

19  to the hard line manager's position, was promoted to

20  the replenishment manager's position, and then was

21  promoted to the store manager pro tem position.

22      Q.  All at South Bay?

23      A.  All at South Bay.

24      Q.  I'm going to back up a little bit.  Just

Daniel Ferrie                                    02/28/2005

34

1    tell me, what is soft lines versus hard lines?

2        A.   Soft lines is all the clothing -- categories

3    of clothing, and hard lines is the -- all hard

4    lines, the health and beauty aids, the hammers,

5    automotive, toys.

6        Q.   Then you went from soft lines to hard lines

7    to replenishment manager?

8        A.   Replenishment.

9        Q.   What is replenishment manager?

10       A.   Replenishment manager was a title change

11   from operations manager.  It involved the inner

12   store logistics, flowing the merchandise, and the

13   operational aspect of the store.

14       Q.   Inside the store itself?

15       A.   Inside the store itself, yes.

16       Q.   Not from distribution to the store but --

17       A.   No.  Within the store itself.

18       Q.   Okay.  And you never had the title

19   operations manager, or did you?

20       A.   There was no operations manager at that

21   time.

22       Q.   You said that this was a --

23       A.   This was a revamping of that terminology.

24       Q.   But when you took the job it had already

Daniel Ferrie

02/28/2005

35

1    been revamped?

2        A.   It had been revamped, yes.

3        Q.   And then you went to, did you say, manager

4    pro tem?

5        A.   Manager pro tem.   Store manager pro tem.

6        Q.   What was that?

7        A.   I was considered a store manager in waiting

8    for a store.

9        Q.   While you were in that role, what did you

10   do?

11       A.   Everything the store manager would do,

12   making decisions about the store.   Everything the

13   store manager would do.

14       Q.   But was there a store manager already?

15       A.   Yes, there was.

16       Q.   Okay.   Who was that?

17       A.   Brian Favor.

18       Q.   So Brian Favor was the store manager at

19   South Bay?

20       A.   Yes.

21       Q.   And you were the manager pro tem working at

22   South Bay?

23       A.   Yes.

24       Q.   Was there an assistant store manager?

Daniel Ferrie                                          02/28/2005

36

1       A.   No.

2       Q.   Did the pro tem operate like an assistant

3    store manager?

4       A.   No.

5            Do you want me to expound?

6       Q.   Please.

7       A.   All levels were assistants.  The soft lines

8    manager was an assistant, the hard lines manager was

9    an assistant, the replenisher was an assistant.

10      Q.   Okay.

11      A.   And all had sectional areas of

12   responsibility.

13      Q.   But when you became a manager pro tem, did

14   you no longer have a sectional area of

15   responsibility?

16      A.   I no longer had a sectional area of

17   responsibility.  I had entire store manageability.

18      Q.   But reporting to the manager himself?

19      A.   Reporting to the store manager.

20      Q.   Okay.  Was that the position you had at the

21   time you left that store?

22      A.   Yes.

23      Q.   Okay.  And where did you go upon leaving

24   that store?

Daniel Ferrie                                          02/28/2005

37

1        A.   Somerville, Massachusetts.

2        Q.   You went to Somerville.  In what capacity?

3        A.   Store manager.

4        Q.   And how long were you in the Somerville

5    store?

6        A.   Eight or nine months.

7        Q.   You were the store manager in Somerville for

8    eight or nine months?

9        A.   Correct.

10       Q.   And where did you go after that?

11       A.   Fall River, Massachusetts.

12       Q.   Why did they move you out of Somerville, or

13   why did you move out of Somerville?

14       A.   I was asked to move.

15       Q.   Okay.  Do you know why?

16       A.   Yes.

17       Q.   Why was that?

18       A.   The regional vice president, Ryan Shea,

19   called me and told me that they needed a high

20   profile manager to go to Fall River, Massachusetts,

21   that the chairman of the board, Chuck Conway, had

22   asked him to find a high profile manager to run the

23   Fall River store.

24       Q.   Why?

Daniel Ferrie                                           02/28/2005

                                                            38

1      A.   Due to the fact that it would be the first

2   time -- Wal-Mart had rented an empty space formerly

3   occupied by Bradlees at one end of the plaza at the

4   Harbor Mall, and we had the other store.  And they

5   felt at that time that it would draw a lot of the

6   people out of New York, a lot of the Wall

7   Street-type people, because it would be the first

8   time two stores operated under the same roof line.

9   And they needed someone there that would be able to

10  handle the job and talk to them.

11     Q.   Oh, he thought that Wall Street analysts

12  would be coming into the store?

13     A.   They felt that the analysts would pay close

14  attention to that particular store at that time

15  because of the situation like that.

16     Q.   And did that in fact happen?

17     A.   They never revamped the store.

18     Q.   Who never did?

19     A.   Kmart.

20     Q.   I see.  So you -- How long were you there in

21  Fall River for?

22     A.   A short period of time, maybe five or six

23  months.

24     Q.   Okay.  And then what happened?

Daniel Ferrie
02/28/2005

39

1    A.   I went to Braintree.

2    Q.   Which is where you remained for the

3    remainder?

4    A.   For the remainder, correct.

5    Q.   Okay.  How was it that you went from Fall

6    River to Braintree?

7    A.   I was in the southeastern district.  Again,

8    we received a call from Ryan Shea saying that the

9    Braintree Kmart was in trouble.  The store manager

10   had had a heart attack, had not been there, and the

11   store was in deplorable condition, and the town was

12   there ready to close the store, and he needed me to

13   go there.

14   Q.   What happened to the Fall River store after

15   you left?

16   A.   It was given to another manager.

17   Q.   Okay.  And tell me Ryan Shea's title again.

18   A.   It was regional vice president.

19   Q.   And did you report to him as store manager?

20   A.   No, I did not.

21   Q.   Who did you report to when you were store

22   manager at Somerville?

23   A.   John Swank.

24   Q.   What was his title?

Daniel Ferrie                                                02/28/2005

40

1       A.   District manager.

2       Q.   Who did you report to when you were store

3    manager in Fall River?

4       A.   Chuck James.

5       Q.   And he was district manager?

6       A.   Yes.

7       Q.   And who did you report to when you were the

8    manager of Braintree?

9       A.   John Swank.

10       Q.   And what about when you worked at South Bay?

11       A.   David Napier.

12       Q.   So Napier was the district manager who had

13    South Bay under his responsibility?

14       A.   Yes.

15       Q.   Okay.  But while you were at South Bay you

16    didn't report directly to him because the store

17    manager reported directly to him?

18       A.   Correct.

19       Q.   And how big was a district?  How many stores

20    would be in a district?

21       A.   It varied.

22       Q.   I'm just wondering because, for example,

23    Somerville and South Bay were not in the same

24    district?

Daniel Ferrie

02/28/2005

41

1    A.  At a different time.  Napier had been moved,

2    and they redistricted.  They were both in the same

3    district.

4    Q.  Okay.  But while you were at South Bay that

5    was his?

6    A.  I don't understand what you're asking me.

7    Q.  While you were at South Bay Napier was the

8    district manager?

9    A.  District manager, yes.

10    Q.  But sometime after you left the South Bay

11    store there was some redistricting?

12    A.  Yes.

13    Q.  And Swank became responsible for that?

14    A.  Swank was promoted and became responsibile

15    for that store.

16    Q.  And what happened to Napier?

17    A.  Napier went to the New Hampshire district.

18    Q.  I see.  Okay.  So you've never worked

19    directly for Napier?

20    A.  No.

21    Q.  In your role as store manager, you reported

22    either to James or to Swank?

23    A.  Correct.

24    Q.  Got it.

Daniel Ferrie                                      02/28/2005

45

1              (Recess taken)

2        Q.  I've shown you a document marked as Exhibit

3   6, which is Bates-stamped Kmart 026 through 031.

4   And I know there are a couple of blank pages in

5   there.  Apparently, that's how they were originally

6   photocopied.

7              Have you had a chance to look at this

8   document?

9        A.  Yes.

10       Q.  And are you familiar with this?

11       A.  Yes.

12       Q.  And could you tell us what it is?

13       A.  It's a contract between store managers and

14   Kmart.

15       Q.  So did you sign this upon becoming a store

16   manager?

17       A.  No.

18       Q.  After you were already a store manager?

19       A.  Yes.

20       Q.  And that's your signature on the last page,

21   82500?

22       A.  Yes.

23       Q.  And if you'd look at the page that's stamped

24   030 on the bottom.  It's the second to last page.

Daniel Ferrie                                      02/28/2005

46

1    Do you see the section that's titled "Selling prices

2    and honest operation"?

3        A.   Yes.

4        Q.   Okay.   Could you read that section to us.

5    It's pretty short.

6        A.   "The manager will see that all selling

7    prices conform with pricing policy issued by the

8    international headquarters of the company and will

9    maintain honest operation in every managerial

10   responsibility assigned to the manager."

11       Q.   And did you understand that to be the

12   company policy?

13       A.   At that time, yes.

14       Q.   Was it anything different at any other time?

15       A.   Yes.

16       Q.   Okay.   At what time was it different?

17       A.   When the -- When this corporation failed and

18   the new corporation took over.

19       Q.   When was that?

20       A.   2003.

21       Q.   In 2003 that policy changed?

22       A.   The policy was changed, yes.

23       Q.   And what did the policy become?

24       A.   It became that the new owners of the company

Daniel Ferrie                                            02/28/2005

51

1      Q.  And they didn't -- The notion that the store

2   manager was obligated to maintain honest operation

3   in every managerial responsibility assigned to the

4   manager, that remained intact, correct?

5      A.  Correct.  Yes.

6      Q.  Did you ever sign an agreement after this

7   one, a similar agreement after this one; do you

8   know?  By "this one," excuse me, I'm referring to

9   Exhibit 6.

10     A.  We received many documents.  I don't

11  remember particularly what they were.  We received a

12  lot of documents that had to be signed.

13     Q.  Okay.  Do you recall when the store went

14  into bankruptcy, the company?

15     A.  I'm not sure what the official date was.  I

16  can't be honest.  I can't even guess.  I'm not sure

17  when it was.

18     Q.  Was it the end of '03?

19     A.  No.  It was in the beginning, I believe.

20     Q.  The beginning of '03?

21     A.  The end of '02 or the beginning.  I'm not

22  sure when.

23              (Exhibit Numbers 7 and 8

24              marked for identification)

Daniel Ferrie                                    02/28/2005

56

1    conversion rates.  What were those?

2        A.   Smart Plan conversion rates were the rate

3    the company wanted you to turn your Smart Plans,

4    merchandise eligible to receive extended warranties,

5    to convert to those rates.

6        Q.   Meaning the rate on which you sold extended

7    warranties for eligible product?

8        A.   Yes.

9        Q.   So a Smart Plan is an extended warranty?

10       A.   Yes.

11       Q.   If I bought some kind of electronics, the

12   question is, would I also buy an extended warranty

13   on top of that?

14       A.   Correct.

15       Q.   For an additional price?

16       A.   Right.

17       Q.   And that extended warranty was called a

18   Smart Plan?

19       A.   Correct.

20       Q.   And do you recall what the Smart Plan

21   conversion rates were supposed to be?

22       A.   The company wanted a Smart Plan conversion

23   rate of 16 percent.

24       Q.   Of 16 percent?

Daniel Ferrie                                    02/28/2005

57

1      A.  Right.  The company averaged under 10

2   percent.

3      Q.  Okay.

4      A.  For all the stores.

5      Q.  All stores nationally or --

6      A.  All stores nationally.

7      Q.  Now, if we go to Exhibit 8 -- So now this

8   appears to be the appraisal for fiscal year '02,

9   which I'm assuming then would have been February 1,

10  '02 to January 31, '03.  Does that sound right?

11     A.  I believe so, yes.

12     Q.  And again, Mr. Swank prepared this?

13     A.  Yes.

14     Q.  And for what store, then, would that have

15  been at?

16     A.  I believe this is Braintree.

17     Q.  And I'm going to take you to -- ask you to

18  go to the third page of that document, which is

19  Kmart 0048.  And do you see the section that says

20  "Decision quality"?

21     A.  Uh-hmm.

22     Q.  Okay.  I'm going to read the manager's

23  comments there.  "Dan's decision-making capabilities

24  are strong in regards to handling operational and

Daniel Ferrie                                          02/28/2005

63

1      A.  I said I told him that -- I didn't tell him

2    he would lose his job.  I told him he would be

3    removed from the position he had, up to and

4    including termination.  And I put that in writing.

5      Q.  Did you tell him where he had to get the

6    conversion rate to?

7      A.  I told him what the company standards were,

8    yes.

9      Q.  You said the company standard was 16

10   percent?

11     A.  Correct.

12     Q.  Did he have to achieve 16 percent?

13     A.  No.  The acceptable level was 10 percent.

14     Q.  So he had to get over 10 percent?

15     A.  He had to get 10 percent or above.

16     Q.  Okay.  And did you ever speak to any of the

17   cashiers or other employees about --

18     A.  I spoke to every employee at meetings.  I

19   spoke to every employee in that store about Smart

20   Plan conversion.

21          MR. WOOD:  And Dan, once again, just

22   make sure he's done asking the question before you

23   answer.

24          THE WITNESS:  Okay.

Daniel Ferrie                                                  02/28/2005

69

1   customer had taken the cash card, had refused to do

2   the transaction and had left the store with the cash

3   card.

4        Q.   Okay.  What is a cash card?

5        A.   A cash card is like a gift card.  It's used

6   for people who do not have cash receipts for

7   refunds, they give them a cash card.  If you want to

8   send one to your son or daughter or mother, a gift

9   card, they call them cash cards.  Same thing.  It's

10  used for a variety of things.

11       Q.   You can put $50 or $100, whatever it is?

12       A.   Exactly.  Sure.

13       Q.   And does it look like a plastic credit card?

14       A.   It looks like a plastic credit card,

15  correct.

16       Q.   And so as I understand it, someone had

17  purchased a cash card in the Nashua store using a

18  stolen credit card?

19       A.   Correct.

20       Q.   And is that, like, a scam, a common kind of

21  way of stealing?  Why would they do that?

22       A.   That would be a way of stealing because now

23  they could -- instead of being caught with a cash

24  card -- when they steal a credit card, they have a

Daniel Ferrie                                          02/28/2005

96

1        Q.  Was it a conversion rate -- Was it
2    calculated per sale or per dollar?
3        A.  Per opportunity.
4        Q.  Okay.  Per sale, sale opportunity?
5        A.  Right, sale opportunity.
6        Q.  Now, at some point it came to your attention
7    that Reeves and/or others would be coming to do an
8    investigation at the store?
9        A.  No, it never came to my attention there
10   would be an investigation at my store.
11       Q.  When did you first learn there was an
12   investigation in your store?
13       A.  After I was injured.
14       Q.  Well, how did you learn?
15       A.  I talked to Swank.
16       Q.  When?
17       A.  Swank called me every day -- was calling me
18   every day after my injury.  He called me on a daily
19   basis.
20       Q.  Well, your injury occurred on the -- was it
21   the 17th?
22       A.  The 17th, correct.
23       Q.  And tell me about -- where did the injury
24   occur?  Where did the injury occur?

Daniel Ferrie                                      02/28/2005

97

1       A.   At the Braintree store.

2       Q.   Where?

3       A.   Behind the service desk.

4       Q.   And how did it occur?

5       A.   The store had a second level that the

6    management could sit up behind the desk, a higher

7    level, pedestal level, and look out.

8            And I like to sit up there in the

9    morning.  I could see everybody who was coming in

10   and sit and write my daily notes up there.  And

11   that's what I was doing.

12      Q.   And then what happened?

13      A.   I got up to come down and walk down the

14   stairs and hit a shopping bag and fell down.

15      Q.   Was there anyone there to witness it?

16      A.   There was Martin Hall.  Lea South was there,

17   was walking by with another girl.  And there was a

18   girl behind the register or behind her.  I can't

19   remember what her name was.  She was working behind

20   the service desk.

21      Q.   Martin Hall and Lea South.  And you already

22   told us who Lea South was.  Who is Martin Hall?

23      A.   He was one of my assistants.

24      Q.   Your assistants.  What was his title?

Daniel Ferrie                                    02/28/2005

133

1    audit or regular audit like you were -- you

2    testified earlier that you were expecting, correct?

3        A.  We were expecting a regular audit.

4        Q.  That's not what this is?

5        A.  Apparently not.

6            MR. WOOD:  Objection.

7        A.  Apparently not.

8        Q.  And to your knowledge, did they ever come in

9    and do a regular audit?

10       A.  I don't know.  Not to my knowledge.  I don't

11   know.

12       Q.  But your testimony is that as of December

13   17th, you didn't know she was coming in on the 18th?

14       A.  I didn't know when she was coming in.

15       Q.  Now, you went out on the 17th.  Did you ever

16   try to return to work?

17       A.  Two times prior to that.  Actually, a total

18   of three times.  Two times prior to the first.

19       Q.  And when was the first time?

20       A.  Around -- December 28th or 29th.  It was at

21   the end of December.  And then probably mid to late

22   January I tried to go in.

23       Q.  And what happened?

24       A.  I couldn't walk.  My back was really

Daniel Ferrie                                02/28/2005

134

1    bothering me.  I couldn't walk.  I had to leave and

2    go home.  I called Swank and told him I had to leave

3    and go home.

4        Q.  Were you there for a full day either time?

5        A.  No.  I was there one time for about four

6    hours and one time for a couple of hours only.

7        Q.  And then you came in on March 1st?

8        A.  Came in on March 1st.

9        Q.  Well, on the time you came in in late

10   December, had you told Swank you were going to try

11   to come in?

12       A.  Sure.  I talked to him that morning.

13       Q.  And the same thing in January?

14       A.  Yeah.

15       Q.  And then was it the same when you went and

16   came back in in March?

17       A.  Yes.

18       Q.  Between the time you went out on December

19   17th and the time you tried to come back the first

20   time, you testified that four or five days after you

21   went out Swank told you they had come in and done an

22   audit and identified those three issues.

23       A.  Right.

24       Q.  That some guns were sold that weren't pre

Daniel Ferrie                                    02/28/2005

137

1        A.   Yeah.

2        Q.   Do you know whose name that is?

3        A.   I do not know his name.  I don't know how to

4    pronounce it.  I don't know who he is.  I know who

5    he is by sight now because it was the first day I

6    had met him.

7        Q.   Was Swank no longer your district manager?

8        A.   He had been transferred to New York.

9        Q.   When was Swank transferred to New York?

10       A.   Sometime in January, February.  I don't

11   know.

12       Q.   So then there was a new manager?

13       A.   A new district manager.

14       Q.   And the first time you met him was on March

15   1 when you came back to work?

16       A.   Right.

17       Q.   He was in the store when you got there?

18       A.   Right.

19       Q.   Did you expect him to be there when you got

20   in?

21       A.   No, not really.

22       Q.   Was anyone else there while you were away --

23   when you came in to meet with you?

24       A.   To meet with me?

Daniel Ferrie                                          02/28/2005

                                                            138

1        Q.  Yeah.

2        A.  Yeah.  John Reeves, the loss control

3    district manager.

4        Q.  Okay.  And so you met with Reeves and this

5    man -- this new district manager?

6        A.  Right.

7        Q.  But you don't believe that he ever presented

8    you with --

9        A.  I know he didn't present it to me.

10       Q.  -- this form?

11       A.  Never did.

12       Q.  Okay.  I'm going to show you a document

13   we're going to mark as Exhibit 14.

14            MR. RUBIN:  Why don't we go off for a

15   second.

16            (Off the record)

17            (Exhibit Numbers 14 and 15

18            marked for identification)

19       Q.  Have you had a chance to take a look at the

20   documents we've marked as Exhibits 14 and 15?

21       A.  Yes.

22       Q.  Now, Exhibit 14, is that your handwriting?

23       A.  Yes.

24       Q.  And that's your signature at the end?

139

1      A.   Yes.

2      Q.   And then on Exhibit 15, did you type that

3  document?

4      A.   Yes, I did.

5      Q.   And where did you do that?

6      A.   At the HR office.

7      Q.   At the store?

8      A.   Yes.

9      Q.   And just for the record, Exhibit 14 is

10  Bates-stamped Kmart 102 through Kmart 105, and

11  Exhibit 15 is Bates-stamped Kmart 106 through 107.

12               Is Exhibit 15 a verbatim transcription

13  of Exhibit 14?

14      A.   I don't believe it is.

15      Q.   Okay.  I'm going to ask you if you could

16  read 14 to us.  I know it's long.  But just so that

17  we'll have at least one clear version of it.

18      A.   Okay.  "On 3/1/04 I had been asked to make a

19  statement to incidents relative to" -- I can't read

20  the word.

21      Q.   Would it be "accusation"?

22      A.   I guess it could be "accusation."  I can't

23  read the word.

24               -- "made by unknown people, unknown" --

Daniel Ferrie                                    02/28/2005

144

1          "I have even been accused of stealing a

2  $4 phone; however, closed-circuit cameras proved by

3  the loss control showed otherwise.

4          "Further and final, I deny any and all

5  allegations relative to conversations I was alleged

6  to have had and to have done anything.  I only ask

7  one question, what did I gain by doing what was

8  alleged of me during this," something, something,

9  "Smart Plans" --

10     Q.   "During the holiday season"?

11     A.   Yeah, that could be "holiday season."

12          "Smart Plans were a priority to sell.

13  However, to" -- I can't read the next two words --

14  the next three words.  "The store performed" -- I

15  can't -- I think that should have been -- I think it

16  was a negative word there, "terrible" or something.

17  "I was made to work Sundays without a day off by

18  Mr. Swank.

19          "4.  I did talk to cashiers and did

20  check about every two hours on Smart Plan sales but

21  never to the alleged -- but never to the alleged

22  incident."

23     Q.   Okay.  Thank you.  Well, tell me what

24  happened when you came in on March 1.  Let's go back

Daniel Ferrie                                02/28/2005

145

 1   to March 1.  You go into work for the first time in

 2   about a month?

 3       A.   Yeah, about a month, month and a half.

 4   Right.

 5       Q.   And then you had only been in for a few

 6   hours that previous couple of times?

 7       A.   Right.

 8       Q.   Were other people in the store expecting

 9   you?  Did the store know you were coming?

10       A.   I called everybody and told them that the

11   doctor had wanted me to take more time off, but I

12   didn't want to, that I was going to be leaving.  And

13   I call Mike Howell -- I had never met him before.

14       Q.   New district manager?

15       A.   He was the New district manager.  I left a

16   message at his office in Somerville.

17            Actually, I believe I had a conversation

18   with him that I would have to take time off.  The

19   doctor told me I could come back but leave if I had

20   to and that I would be going to Dedham for physical

21   therapy and I would have to leave for a couple hours

22   every day to go to physical therapy.  So he told me

23   to come in on Monday.

24            When I got there, I got there Monday

Daniel Ferrie                                         02/28/2005

146

1    morning about 7 o'clock in the morning, and Julie

2    Manning was the opening store manager at that time.

3    And when I walked in she says, "John Reeves and Mike

4    Howell," whatever his name is, "are down in your

5    office."

6              So I walked down to my office.  They

7    were in there.  I said, "Oh, what's up?"  They said,

8    "Dan, we're here to ask you some questions."  And I

9    said, "About what?"  And they laid this on me.

10       Q.   Laid what on you?

11       A.   That people had made the allegations and

12   that that's what they were there for that morning.

13       Q.   Which allegations did they apprise you of?

14       A.   All of them.  Everything that was in that

15   report was what they apprised me of.

16       Q.   The Smart Plans?

17       A.   The Smart Plans, the bulk sale and the --

18       Q.   Firearms?

19       A.   -- firearms.  And they kept saying about --

20   I remember Reeves -- It was Reeves who was doing

21   most of the talking about $1.99 watch sales, $1.99

22   watch sales.

23       Q.   Yup.  Okay.  And what did you say?

24       A.   I said, "Let's do what we have to do."  They

Daniel Ferrie                                          02/28/2005

149

1   report.  The same form of document but nothing on

2   it.

3        Q.  If you look at Exhibit...

4            MR. WOOD:  13.

5        Q.  Exhibit 13.  Was it that form?

6        A.  It was that form blank, yes.

7        Q.  Was your name filled into it?

8        A.  No, not at all.

9        Q.  All right.  So you saw that in the HR

10  office?

11       A.  Yeah.

12       Q.  And then what happened?

13       A.  I waited for them to come out, and I

14  questioned them about it.

15       Q.  What did you say?

16       A.  I said, "I want to ask you a question."  I

17  said, "I believe you have already predetermined that

18  you are going to terminate me."  And John Reeves

19  said, "Absolutely not."  He said, "We're here to

20  take a statement."  He said, "It won't be up to us.

21  It will be up to regional HR."

22       Q.  Okay.

23       A.  I said, "Why would I be terminated?  Tell me

24  what violations I've made.  Show me what violations

Daniel Ferrie                                    02/28/2005

150

1    I've made."

2            And they said, "Let's take the statement

3    and see where we go from here." They told me,

4    "Don't worry about it at this time." I was taken by

5    total surprise as the week before that I was called

6    by John Swank from New York asking me to transfer to

7    New York to work in one of his stores on Long

8    Island.

9       Q.   What did you say to Swank when he asked?

10      A.   I told him that a move to Long Island would

11   probably not be in it for me because of my family.

12   I said I wouldn't count anything out, that there

13   would be a lot of factors I would have to consider.

14      Q.   So Reeves and Michael told you, "The

15   decision hasn't been made. It's not up to us to

16   make the decision. Don't worry about that for now"?

17      A.   Right.

18      Q.   And then what happened?

19      A.   They asked me if I'd give a statement.

20   Well, they talked to me about it. I gave them the

21   same answers.

22            They asked me about -- They wouldn't

23   give me any specific names. I asked them for

24   specific names so I could answer the allegations.

Daniel Ferrie                                    02/28/2005

151

1    They said they couldn't do that.  Then they asked me

2    at some time to make a statement that morning.

3         Q.  Okay.  And is that when you wrote down this

4    written statement, this Exhibit 14?

5         A.  Yes.

6         Q.  Now, if we look at Exhibit 15, when did you

7    write that?

8         A.  About 35 to 40 minutes later.

9         Q.  Well, how did that come about?

10        A.  I was in such pain at that point from

11   sitting for so long that my handwriting is just

12   about illegible.  When they transferred it, they

13   couldn't read it.  They asked me if I'd mind putting

14   it in type.

15             They got the type up on the HR office,

16   which was the only computer with a word processing

17   program in it.  I went in there and did it.

18        Q.  So that's when you wrote this up?

19        A.  Yeah.

20        Q.  Earlier you said that employees in the store

21   had tried to get other managers terminated?

22        A.  They tried to get the store manager, meaning

23   me, terminated.

24        Q.  Not previous managers.  You?

Daniel Ferrie                                          02/28/2005

                                                            186
1    because these are people who supposedly have

2    knowledge relative to this case.

3              Mr. Ferrie, you're listed first, right?

4        A.   Uh-hmm.

5        Q.   And then Napier.  We've talked about Napier?

6        A.   Right.

7        Q.   Swank, we've talked about him?

8        A.   Right.

9        Q.   Ryan Shea, we've talked about him?

10       A.   Uh-hmm.

11       Q.   Daniel LNU, is that last name unknown?

12       A.   Last name unknown.

13       Q.   Who is Daniel?

14       A.   Another New Yorker that received a district

15   manager's promotion ahead of me.

16       Q.   Was he one of the ones we talked about?

17       A.   No.

18       Q.   What district manager job did he get?

19       A.   He got southern New Hampshire.

20       Q.   And when was that?

21       A.   When I was in -- Right when I went to Fall

22   River.  Right after I went to Fall River.

23       Q.   And approximately when did you go to Fall

24   River again?

Daniel Ferrie
02/28/2005

187

1      A.   It was in '01, right before.

2      Q.   And was this guy Daniel, was he younger than

3   you?

4      A.   Much younger and not experienced.

5      Q.   Okay.  Charles James, we talked about him,

6   right?  He was the district manager?

7      A.   Right.

8      Q.   Is there anything about Charles James that

9   would be -- that we haven't talked about that's

10   relevant to your case here?

11      A.   Not that I know of.  He was a younger man

12   that got hired in as a district manager from Wal-

13   Mart.

14      Q.   Were you already employed when James got

15   hired?

16      A.   Yes, I was.

17      Q.   Were you a store manager yet?

18      A.   Yes, I was.

19      Q.   You were a store manager when Charles James

20   got hired to be district manager?

21      A.   Right.

22      Q.   They both talk about that -- both Daniel and

23   Charles James, that they would have knowledge of

24   your employment and/or discrimination.  What do they

Daniel Ferrie                                                02/28/2005

188

1   know about your -- either of them know about your

2   employment or discrimination?

3        A.   Well, James -- I worked directly for James.

4        Q.   Did he ever discriminate against you?

5        A.   Did he ever discriminate against me?  No.

6        Q.   And what about Daniel, would he have any

7   knowledge of your employment or discrimination?

8        A.   He was part of the New York crew.  And I

9   believe he would.

10        Q.   What would he know?

11        A.   I believe he was privy to conversations.  He

12   was privy to numerous conversations on weekends and

13   weekend outings.

14        Q.   And on what do you base that?

15        A.   Through conversations that I had with him

16   after.

17        Q.   After what?

18        A.   After the outings and things that he told me

19   about.

20        Q.   What did he say?

21        A.   He said he would tell me things about, "Your

22   name got brought up this weekend.  This one said

23   this.  This one said that."

24        Q.   Who said what?

Daniel Ferrie                                    02/28/2005

189

```
 1        A.   Well, it was Ryan, Swank, him and other
 2   people.   He said, "Ryan said this" or "John said
 3   that."
 4        Q.   But what is it that they supposedly said
 5   about you?
 6        A.   It would usually be something negative.
 7        Q.   Like what?
 8        A.   One time Ryan called me a fat troll.
 9        Q.   So this guy Daniel told you about that?
10        A.   Yeah.
11        Q.   Any other instances?
12        A.   I can't remember at this time.  I don't
13   remember at this time.
14        Q.   Well, you remember that one specifically?
15        A.   I remember that one specifically.
16        Q.   Do you remember anything that Swank ever
17   supposedly said about you out of your presence?
18   You've already talked about what he said to you
19   supposedly to your face.
20        A.   I don't.  I can't remember at this time.
21        Q.   What about David Bennett, who was he?
22        A.   David Bennett was the gentleman who was
23   promoted and brought back to the company, the one
24   that had the poor performance and had been brought
```

1    back to the company.

2        Q.  And would he know anything specifically

3    about your employment or discrimination?

4        A.  He would know that he got brought back over

5    me based on information I was a better performer.

6        Q.  He would know about his own experience?

7        A.  He would -- And on the metrics of

8    performance, he would know I was a better performer.

9        Q.  How would he know that?

10       A.  He would know what his metrics were and he

11   would read what my metrics were and compare them.

12       Q.  Had you done that in the past?  Have you

13   seen that information?

14       A.  Certain information, yes.

15       Q.  What information?

16       A.  Certain information that when he ran a store

17   in New York, that he had, I think, a 9 and a half

18   percent shrink, almost a 10 percent shrink.

19       Q.  This is the information that you said that

20   you knew because it was just generally known?

21       A.  Yeah.

22       Q.  Anything else?  Any other information?

23       A.  No.

24       Q.  Reeves we've already talked about.  Anything

Daniel Ferrie                                                02/28/2005

191

1    we haven't talked about about Reeves?

2         A.   No.

3         Q.   Who is Mike Lardino?

4         A.   Mike Lardino was the district -- was the

5    regional HR person during the Shea administration.

6         Q.   All right.  What would he know about your

7    employment or discrimination?

8         A.   He knew that -- He was involved in the

9    conversations and knew about my offer as district

10   manager in the southern district.

11        Q.   How do you know that?

12        A.   Because I was told conversations had been

13   had with Lardino, Swank and Shea.

14        Q.   This is what Swank told you?

15        A.   Exactly.

16        Q.   And that you're going to be offered this

17   job?

18        A.   Uh-hmm.

19        Q.   Did anyone ever say to you anything after

20   that about why you didn't get the job?

21        A.   Because they hired Bennett back.

22        Q.   Who told you about it?

23        A.   Shea called me.

24        Q.   Shea called you and said what?

# TAB 3

# KMART CORPORATION
## STORE MANAGEMENT

EXHIBIT NO. 6
2-28-05
MICHELLE KEEGAN

**THIS CONTRACT** between Kmart Corporation, a Michigan Corporation, hereinafter called the Company and Daniel Ferrie hereinafter called the Manager.

**TERM OF CONTRACT**
The Company agrees to, and does hereby, employ the above individual in a store management position as described in Compensation Plan Document.

**COMMITMENT**
The Manager agrees to devote best efforts and undivided time and attention to the conduct of business of the Company and to abide by Company policies.

**COMPENSATION**
The Company agrees to pay the Manager a minimum annual base salary set forth in the Compensation Plan Document. If the Manager is actively employed in the same position as set forth in Compensation Plan Document at the end of the fiscal year, the Manager will be paid Incentive Compensation for the individual personal performance as set forth in Compensation Plan Document.

**TIME OF PAYMENT**
The Compensation to be paid to the Manager as aforesaid shall be payable following the end of the fiscal year, when the profit before U.S. income tax of said Store shall be computed, provided that the Company may, if it deems it advisable, select some other date as the time when the Pre-Tax Profit shall be computed, and further provided, that the Company agrees to pay the Manager currently an established base salary. The salary is payable each month by check from the International Headquarters of the Company. No advances are to be made to the Manager from the funds of the Store covered by this Contract.

**PRE-TAX PROFIT**
Where applicable, Pre-Tax Profit shall be defined as the Total Gross Profit and Fees, less the Total Controllable Operating Expenses, Overhead and Occupancy charges, before U.S. Income Taxes.

**COMPUTATION**
The Pre-Tax Profit of said Store shall be computed covering the business of the Store for the entire fiscal year or for the entire time less than one fiscal year that the Store is in operation.

KMART00026

KMART00027

**INVENTORY**

There shall be taken at the close of a cycle period, or at the nearest convenient date thereto (provided that the Company shall have the right to select some other date as the end of its business year or cycle), a true and correct inventory and account of the Store covered by this Contract. In taking said inventory, unsaleable merchandise will not be taken into account, depreciated merchandise shall be inventoried at a price related to its present market value, and old or unseasonable merchandise shall be valued in accordance with such uniform rules which the Company shall from time to time adopt. The Company reserves the right to cause an inventory to be taken at any time.

**CONCLUSION OF INVENTORY**

The Pre-Tax Profit of said Store shall be computed by the Company, and the Manager shall receive the Compensation calculated as aforesaid, less any Company loans due at the end of the fiscal year.

**ERRORS**

If through error, or other cause, the Compensation paid is afterward found to be erroneous, the Compensation shall be recalculated on the correct basis of earnings. The difference in Compensation then determined shall be paid by either party to the other of whatever balance is due.

**COMPENSATION IN FULL**

The Compensation of the Manager provided for in the Compensation Plan Document is to be the total Compensation of the Manager for all services rendered to the Company. The Manager may be called upon to perform work and services for the Company of any nature in connection with the business of the Company or incidental thereto, and agrees to perform such services as a part of the undertaking of this Contract. The Compensation provided for in this Contract is to be in full payment for all services of every nature.

**MANAGER'S AUTHORITY**

The Manager is not a general agent and shall have no authority to use the name of said Company to endorse, guarantee or otherwise become a surety for any person, or bind the Company for the payment of money. The authority of the Manager is to be confined to the endorsement of checks for deposits, receipting of bills and goods from carriers, and such other incidental matters as may be necessary to properly conduct said Store. The Manager shall be liable to the Company for any abuse of authority by said Manager, and any loss, damage or expense, incurred by Company because of, or arising out of, any acts or dealings by the Manager, in excess of herein stated authority, may be treated by the Company as a debt owing to it by the Manager and may be deducted as provided in the "Lien on Compensation" section of this document.

KMART00028

KMART00029

**LIEN ON COMPENSATION**

The Company shall have a lien upon the Compensation due to the Manager for any indebtedness of the Manager to the Company. The Company may deduct and retain from any sum found to be due the Manager to pay any indebtedness or part thereof due and owing from the Company to the Company with interest at the current prime rate, unless specifically exempted, and pay the balance of said sum to the Manager in full settlement and payment of the Compensation due by the Company.

**FIRE**

In case the Store covered by this Contract shall be totally destroyed by fire, or other cause beyond the control of either party, this Contract shall thereupon terminate without notice to the Manager and the Manager shall receive Compensation through the date of destruction as provided n the "Termination" section of this document.

**NOT A CO-PARTNERSHIP**

This instrument shall in no way be deemed a co-partnership agreement. The Compensation as provided in the Compensation Plan Document is to be regarded as the Compensation of the Manager, dependent upon the success of the Company's business as conducted by the Manager in the locality covered by this Contract.

**SELLING PRICES AND HONEST OPERATION**

The Manager will see that all selling prices conform with pricing policy issued by the International Headquarters of the Company and will maintain honest operation in every managerial responsibility assigned to the Manager.

**TERMINATION**

The Company has, and hereby reserves, the right to terminate the relations established by this Contract with or without cause at its discretion. This termination may be without notice to the Manager and the Manager shall have no claim for any Compensation beyond the date of discharge. It is understood and agreed by the Manager that the nature of the employment relationship as set forth in this Paragraph cannot be modified except by an express written agreement signed by the Vice President of Human Resources; that this Paragraph supersedes all prior agreements either express or implied; and that the terms of this Paragraph shall remain in effect for so long as the Manager remains employed by the Company in any capacity. The Manager may sever relations with the Company under this Contract at any time, and thereupon, this Contract shall become null and void and the Manager shall not be entitled to participate in any manner in the Incentive Compensation as provided in Paragraph 3 hereof, until the time relations with the Company shall be severed. The Manager may, at the option of the Company, be transferred to some other position or from a store management position at any time, in which case this Contract shall be considered terminated at date of said change.

KMART00030

**IF ANY** of the above Paragraphs or portions thereof are found to be invalid for any reason by a Court of competent jurisdiction, the remaining paragraphs and or portions thereof will continue in full force and effect as set forth herein.

**IT IS AGREED** between the Parties that this Contract shall be construed according to the laws of the State of Michigan.

Date: _08/25/00_    By: _Daniel A. Ferrie_ Manager
DANIEL A. PERRIE
024 - 36 - 0166

KMART00031

# TAB 4

Mar 05 04 11:29a

P.1

1 day vac

# Salaried Status Change Notice

**:uction:** To ensure accurate processing of changes in status for salaried ~~associates~~, complete the following:

1. Personal Information section
2. Section that best matches the status change AND
3. Fax the information to the Kmart Resource Center for processing

## 1. Required

**Personal Information:**

| Name: Daniel Ferrie | Social Security Number: 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 |
|---|---|
| Store Number/City/State: 3879 - Braintree MA. | Date of Hire: 7/16/98 |

## 2. Select the section that best matches the status change

■ **Transfer from another store:**

| New Location Store Number: | Previous Location Store Number: |
|---|---|
| Effective Date at new store: | Last day worked at Previous Store: |
| New Job Title: | Previous Job Title: |

■ **Transfer from salaried to hourly payroll:**

| Effective Date: | New hourly rate of pay per hour: |
|---|---|

■ **Change in Job Title within store:**

| New Job Title: | Previous Job Title: |
|---|---|

■ **Separation from Company:**

| Last Day Worked: 3/1/04 | # Vacation Days Taken: O | Remaining Vacation amount will be calculated and paid on pro-rated basis by KRC |
|---|---|---|
| Resignation Reason: | Dismissal Reason: Missapropriation / Smart Plan Sales | |
| Lease Car Returned: Yes ___ No ___ N/A | | |
| Company paid relocation in progress: Yes ___ No  X | | |

■ **New Hire or Promotion from Store Hourly:**

HR Super K & Caribbean  248-458-1079
HR West Central  248-458-1074

HR Great Lakes  248-458-1078
HR West  248-458-1075

HR Midwest  248-458-1077
HR Southeast  248-458-1060

248-458-1082
fl 248-458-1081

KMART00032

**SEPARATION INVOLUNTARY**

1. Complete for all associates separating from Kmart Corporation.
2. Do not use this form if associate on an approved leave of absence.
3. Complete all entries with specifics - including reason for separation.
4. Retain in the Associate Confidential Record Folder.

# K Separation Report

Store Stamp: 3679

**Personal Information**

Name (Please Print): Ferrie Daniel     Clock #: 5000

Last Known Address: _____     Social Security Number: 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

Date Hired: _____   Exact Date of Separation: 3/1/04   Exact Last Date Worked: 3/1/04   Eligible for re-employment: Yes ____ No X

Job Title: Store manager     Rate of Pay: 88900   Full Time: X   Part Time: ____   Seasonal: ____   Co-Op: ____

Check Appropriate Box:  ☐ Reduction in workforce   ☑ Other     **Involuntary - Explain below with specifics**

State Reason: Misappropriation of "Smart play" rules

Number of prior corrective interviews recorded on personal records pertaining to this associate: _____

**Voluntary - Explain below with specifics**

State Reason: _____

Associate's Signature: (Refuse to sign)

Witness: _____     Supervisor's Signature: _____

(Signature of Supervisor Present During Termination Interview)     Store Manager/Director: Michael Stand (District Manager)

Associate's Comments: _____

Supervisor's Comments: _____

**Collection of Company Property/Benefit Information**

Company Property Returned?     No X   Yes ____   ► If No, advise Associate to return the card

Did you retrieve Associate's Discount Card?     No X   Yes ____

Is Associate enrolled in a Medical Plan?     No ____   Yes X   If Yes, advise of right to convert coverage under COBRA

Is Associate enrolled in a Dental Plan?     No X   Yes ____   If Yes, advise of right to convert coverage under COBRA

Is Associate covered under Basic Group Life Plan?     No X   Yes ____   If Yes, advise of right to convert coverage by contacting 1-800-50KMART within 60 days of last day worked

Is Associate enrolled in the Retirement Savings Plan? No ____   Yes X   If Yes, advise to call 1-800-83KMART

KMART00036