# TAB 5

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04-12068JLT

COPY

DANIEL A. FERRIE,                                    *

      Plaintiff                                      *

vs.                                                  *

                                                                   *

K MART CORPORATION,                                  *

      Defendant                                      *

                DEPOSITION OF DAVID B. HUGHES, taken on behalf of the Plaintiff, before Maryellen Coughlin, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts held at Law Office of Paul F. Wood, P.C., 45 Bowdoin Street, Boston, Massachusetts, on May 13, 2005, commencing at 9:00 a.m.

                REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617.786.7723

1      A.      Yes.

2      Q.      And are you prepared to testify on

3 behalf of K Mart as to the 27 listed subject

4 areas?

5      A.      Yes.

6      Q.      Okay.  And you understand that you

7 are testifying not solely as to your own personal

8 knowledge but as to Kmart's knowledge concerning

9 these areas?

10      A.      Yes.

11      Q.      Okay, great.  We'll get right to

12 it.  Why was Mr. Ferrie terminated from his

13 employment from K Mart?

14      A.      Manipulation of Smart plans.

15      Q.      Okay.  Were there any other

16 reasons?

17      A.      No.

18      Q.      Okay.

19           MR. ROSIN:  I don't know if you

20 want to identify:  We're now doing subject one;

21 we are now doing subject two.  That's up to you.

22           MR. WOOD:  Off the record.

23           (Discussion off the record.)

24      Q.      Why don't we mark this as

1        Q.    When was the decision made to

2    terminate Mr. Ferrie, to the best of your

3    recollection, or the best of K Mart's

4    recollection?

5        MR. ROSIN:  I will note for the

6    record that's not an area of questioning, but I

7    will allow that question.

8        Q.    Fine.

9        A.    Mr. Ferrie was -- the decision to

10   separate Mr. Ferrie was done after an

11   investigation was completed by Donna Mastroeni

12   and John Swank, and statements were obtained

13   after Mr. Ferrie's return to work and was in the

14   store.  A statement was obtained from Mr. Ferrie

15   on manipulation of the Smart plans.  He wrote out

16   a statement.  I could not read the statement or

17   understand it, so he was asked to type a

18   statement.  I then reviewed the typed statement.

19       I sat down with Mary Jo Duffy, we

20   re-reviewed all of the statements that were

21   provided by Mr. Swank on the investigation done

22   on Mr. Ferrie, we read Mr. Ferrie's statement,

23   and me and Mary Jo Duffy made the decision to

24   separate Mr. Ferrie for manipulation of Smart

1    plans.

2         Q.       So your testimony is, the decision

3    to terminate Mr. Ferrie was made on or subsequent

4    to March 1st, 2004?

5         A.       The decision was made after I

6    obtained a statement from Mr. Ferrie, which he

7    wrote.

8         Q.       And when did you obtain that

9    statement?

10        A.       I'm sure the statement is here.   It

11   would have been dated on the statement when I

12   received it, the day he wrote it.   There should

13   have been a statement.

14        Q.       Did you or Ms. Duffy, the

15   decision-makers, speak to Mr. Ferrie prior to the

16   decision to terminate him?

17        A.       Did we speak to Mr. Ferrie

18   personally, myself or Mary Jo Duffy?

19        Q.       Yes.

20        A.       No.

21        Q.       How long a period of time expired

22   between your review of Mr. Ferrie's statement and

23   your decision to terminate him?

24        A.       It's been a while since it

1    happened, but it was -- we obtained a statement,

2    and I believe, to the best of my recognition,

3    that after we received his written statement we

4    read it.  And after that, based on the previous

5    investigation that was sent to me from Donna

6    Mastroeni, John Swank, and after obtaining a

7    statement, we then after that decided to

8    terminate Mr. Ferrie's employment.

9          Q.      Okay.

10         A.      And it was that day.

11         Q.      Who did you speak to in making the

12   decision to terminate Mr. Ferrie?

13         A.      Everyone that I spoke to?

14         Q.      Yes.

15         A.      Well, previously I had spoke to

16   Mr. Swank on the investigation.  I had spoke to

17   Mary Jo Duffy, the regional vice president, on

18   the investigation.  I spoke to Mike Haud, who was

19   the new district manager at the time when we did

20   separate him, because Mr. Swank had moved on to

21   the New Jersey market.  So I spoke to Michael

22   Haud about the investigation and the separation.

23         Q.      Okay.  Anyone else?

24         A.      To the best of my knowledge, that's

1  everyone I spoke to.

2      Q.      Okay.  To the best of your

3  knowledge, what did you and Mr. Swank discuss?

4      A.      The content of the investigation

5  that he sent me, with statements from associates

6  and the audit that was completed by Donna

7  Mastroeni on Smart plans being purchased.

8      Q.      Do you remember anything else about

9  your discussions with Mr. Swank, or is that it?

10     A.      There were other things that were

11  in the investigation that Mr. Ferrie was doing in

12  the store, but that wasn't -- me and Mr. Swank

13  only discussed, when terminating Mr. Ferrie,

14  Smart plans, but in the audit there was other

15  things uncovered.

16     Q.      And what were your discussions with

17  Ms. Duffy?

18     A.      That the code of conduct in K Mart

19  is very high.  We do not tolerate people that

20  manipulate or cheat for their benefit.  We have a

21  very high standard when it comes to how a store

22  manager should conduct themselves as a store

23  manager, and we felt through this investigation

24  that Mr. Ferrie did not conduct himself in an

1    appropriate manner, and we decided to separate

2    him for manipulation of Smart plan sales.

3        Q.        Anything else you can recall from

4    your discussions with Ms. Duffy?

5        A.        To the best of my recollection of

6    our conversation, that's what we discussed.

7        Q.        Okay.  Same question for Mike Haud,

8    what did you discuss with him?

9        A.        Mike Haud was a new district

10   manager at the location, and Mike Haud was not

11   part of the original investigation.  I discussed

12   with Mike Haud what had previously happened with

13   Mr. Ferrie in the investigation done by Donna

14   Mastroeni and Mr. Swank, and asked Mr. Hod to

15   obtain a statement from Mr. Ferrie on, you know,

16   his side of the story, on what had happened when

17   it came to regards to that investigation that was

18   completed, and to get his explanation on what had

19   happened.

20       Q.        And to the best of your

21   recollection, when did that discussion take

22   place?

23       A.        In the investigation, there's a

24   statement that was written by Mr. Ferrie, and

1    answer.  I'm just objecting to the form.

2         A.       The audit is dated 12/18, and I see

3    in here that, in Mr. Swank's statement, that it

4    looks like the investigation started 12/18

5    because he refers to Dan being out on leave prior

6    to the investigation on 12/17.

7         Q.       Okay.

8         A.       So I infer or believe that the

9    investigation started December 18th.

10        Q.       Great.  Thank you.  If you look to

11   the first page of Exhibit 5.  No, the very first

12   page.  I'm sorry.

13        A.       Okay.

14        Q.       It appears to be a fax cover sheet

15   addressed to you with the date of December 21st,

16   2003; is that correct?

17        A.       Yup.

18        Q.       Okay.  Would it be your

19   understanding that the investigation had

20   concluded and a report was being sent to you?  Is

21   that what this document is?

22             MR. ROSIN:  Objection.

23        Q.       You can still answer.

24        A.       Oh.  That it was concluded, no.

1      Q.      Okay.  What was the purpose of

2    sending this facsimile to you?

3      A.      These were statements of associates

4    alleging Smart plan manipulation by Mr. Ferrie,

5    and also an audit by Donna Mastroeni and a

6    synopsis prepared by John Swank that was sent to

7    me.  It was, again, statements, an audit and a

8    synopsis.

9      Q.      And what was the purpose of sending

10   those documents to you?

11     A.      As the regional human resource

12   director, it would be sent to me.  Any

13   investigation on a store manager, or an assistant

14   manager, or any associate, when it comes in

15   regards to manipulation.  So it was sent to me.

16     Q.      And upon receiving Exhibit 5, what

17   did you do?

18     A.      I read it.

19     Q.      And then what did you do?

20   Everything you did, sir, after receiving

21   Exhibit 5?

22     A.      I read it, then I reviewed it with

23   Mary Jo Duffy.  And then the store manager was

24   not available to discuss the findings, so it was

34

1    kept by me until Mr. Ferrie's return.

2        Q.        And why wasn't Mr. Ferrie

3    available?

4        A.        He was not at work due to a

5    workers' compensation injury.

6        Q.        Could you have called him on the

7    phone?

8        A.        No.  He was out on workers'

9    compensation.  There was no need to call anyone

10   on a workers' compensation.  We would wait until

11   he returned.

12       Q.        Okay.  Please tell me, sir, all

13   communications that K Mart had with third

14   parties.  In other words, non-K Mart employees --

15   not including K Mart's attorneys -- concerning

16   these allegations against Mr. Ferrie?

17                 MR. ROSIN:  Third parties.

18       Q.        Third parties.  Not your, K Mart's

19   attorneys and not employees of K Mart.

20       A.        On Smart plan manipulation?

21       Q.        On the allegations against

22   Mr. Ferrie which would include the Smart plan

23   manipulations, the alleged Smart plan

24   manipulations.

# TAB 6

TO:    ALL STORE MANAGEMENT TEAMS

FROM:  STORE OPERATIONS ADMINISTRATION (pg)

| STORE USE |
|---|
| **Mgr. Initials** _____ |
| **Date Reviewed** _____ |

# RE:  Bulletin SER #5
# "Smart Plan Extended Warranty"

| | |
|---|---|
| **Expectation** | The *Smart Plan* is offered to provide our customers with a lost cost option of purchasing an extended protection plan on selected merchandise throughout the store. It is the responsibility of the Store Manager/Director to ensure that all associates understand that the *Smart Plan* must be offered to every customer properly every time an eligible item is purchased. |
| **Purpose of the Smart Plan Program** | The *Smart Plan*, when implemented properly, will provide the following benefits to Kmart:<br><br>• **Improved Customer Loyalty**<br>  Our plan provides superior service to the customer after the store return policy has expired.<br>• **Improved Sales and Profit**<br>  The *Smart Plan* generates a margin of 62.5% and offers the opportunity to dramatically reduce your store's miscellaneous expenses. *Smart Plan* income is reported as a credit to expenses on the NPR.<br>• **Reduce Returns**<br>  Once sold, the *Smart Plan* has the responsibility to repair or replace the item for the consumer by having them call the 1.800.99 Kmart Customer Service Line. This Customer Service Line is available 24 hours a day, 7 days a week. This will reduce your store's returns. |
| **Expectations of the Smart Plan Program** | It is the responsibility of our Management Team to insure that the company meets and/or exceeds the expectations outlined below.<br><br>1. Our minimum expectation is, "**To offer the *Smart Plan* to every customer every time <u>properly</u>**." Properly means that when the item is prompted by the register, it is presented in a positive manner giving the customer at leas one benefit of the program. (See section *Ways to Offer the Smart Plan*). |

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| **Smart Plan Extended Warranty** | **SER** | **1 of 12** | **06/26/01** | **INDEFINITE** |

STORE OPERATING POLICIES

KMART 00746

# Smart Plan Extended Warranty, Continued

**Expectations of the Smart Plan Program, continued**

Continue to follow the expectations below.

2. To achieve the planned conversion rate as established by Kmart. The conversion rate % is calculated by dividing the number of Smart Plans sold by the number of opportunities you had to sell a Smart Plan. The conversion rate % is to be communicated to, and achieved by:
   - Associate
   - Area/Department
   - Store
   - District
   - Region and Company

3. That all associates (new hires, seasonal, and current), have been properly trained and understand the minimum expectation.

4. The Operations Manager is assigned the responsibility for managing the program and achieving the store goals, including:
   - Track and communicate results on a daily basis by using the *End of Day Smart Plan* report and provide guidance on the program to the Assistant, Upfront, and Department Managers for: Cashiers, Jewelry, Electronics, Image Center, Sporting Goods, Lawn and Garden, Layaway, and Service Desk.
   - Post the *End of Day Smart Plan* report so that it is accessible for all associates to see. Require Assistant, Upfront, and Department Managers to know their figures and cover the report with their associates.
   - Create friendly competition by using the End of Day report, among the Assistant, Upfront, and Department Managers.
   - Insure that all management and associates in the store understand the company's minimum expectation of the *Smart Plan* which is to: **Offer the *Smart Plan* to every customer every time _properly_**, when an eligible product is purchased.
   - Review daily *Smart Plan* results when walking the floor with the Assistant, Upfront, and Department Managers.
   - Follow up with the Human Resource Manager to insure proper training is being done properly.
   - Motivate associates positively and give recognition to those that are performing well.
   - Determine with the Assistant, Upfront, and Department Managers what action is needed to improve the performance in areas that are struggling.
   - Insure adequate *Smart Plan* supplies are in stock.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 2 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

# Smart Plan Extended Warranty, Continued

**Commission**  The register will prompt the associate when a *Smart Plan* is available. The associate selling the *Smart Plan* to the customer will receive a commission for every *Smart Plan* sold. Each associate will receive a new *Commission Record* from the Upfront Manager or Front End Supervisor each Thursday. In order to receive the commission, each associate is responsible for validating the *Commission Record*. Validations are done on eligible items and warranty sales. Only register validations are acceptable, handwritten entries are not acceptable. The *Commission Records* are to be signed by the associate and turned into the cash office every Wednesday. The *Commission Record* can be reordered through KIN and the Mops code is 00944538-115.

**Smart Plan Programs**  The *Smart Plan* Program consists of two plans, the **Replacement Plan** and the **Service Plan**. The products covered run on gas, electricity, and batteries, plus mechanical products like exercise equipment and bicycles. It does not cover firearms or watch batteries.

The **Replacement Plan** replaces the defective product with a new identical product, or the customer is reimbursed for the purchase amount plus tax. Coverage begins on the date of purchase and lasts one year. If a problem occurs within 30 days of purchase, the customer returns the product to Kmart/SuperK. If it is after 30 days, the customer is to call the *Smart Plan Call Center* at 1.800.99Kmart (1.800.995.6278).

The **Service Plan** gives the customer one additional year of coverage after the manufacturer's warranty expires. If an item cannot be repaired, it will be replaced. Additional coverage is also provided. This additional coverage includes power and surge protection, failure due to normal usage, remote control problems, annual head cleaning on VCR's and in-home service on TVs 20" or larger and exercise equipment.

**Offline / Voids**  When the registers are "offline", the warranty prompt will not be displayed. Use the UPC's that are printed at the top of the *Smart Plan* form to ring up the warranty plan during offline conditions.

When a void is need to be done it is important to remember that a line void will void the item sold, but a *Smart Plan* needs to have the UPC number of the *Smart Plan* manually entered to complete the void.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 3 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

## Smart Plan Extended Warranty, Continued

**Store Manager Duties**

The Store Manager is responsible for the following:

1. Has ultimate responsibility for the store's performance.
2. Insure that all management and associates in the store understand the company's minimum expectation of the *Smart Plan* program, which is: **Offer the *Smart Plan* to every customer every time <u>properly</u>**.
3. Reviews daily conversion rate % achieved with the Operations Manager to determine variance to goal.
4. Supports the Operation Manager in achieving the program goals.
5. Provides recognition and motivates associates positively when discussing the *Smart Plan* program.
6. Insure the following points are covered during the 10 Minute Huddle meeting:
   - Announce the store's daily figures from the prior day's *End of Day Smart Plan* report.
   - Recognize the top performers from the previous day.
   - Discuss the number of total opportunities for the store and the potential that exists.
   - Discuss the commission potential in terms of missed opportunities and explain what the commission could mean to an associate's average hourly rate (i.e. give yourself a raise).
   - Alert associates to featured ad items that are eligible for the *Smart Plan*.
   - Ask for one of the top performers to tell the group their secret for success.

**Human Resource Manager Duties**

The Human Resource Manager is responsible for the following:

1. Cover the minimum expectation during the interview, orientation, and 90 day appraisal process. Insure that all associates understand that "Offering the *Smart Plan* to every customer every time <u>properly</u>" is a requirement of the job.
2. Insure that all new and current associates have been properly trained and have successfully passed the test by scoring 100%. All current associates are to be tested using the test at the back of this Golden Rod. (Make additional copies of the test at store level).
3. Cover the "Ways to Offer the *Smart Plan*" with each associate.
4. Review the register prompt and show an actual *Smart Plan* contract to the associate. Explain how to use it.
5. Explain the commission record and how to validate and record a *Smart Plan* sale. Explain how to file for the commission, and how the commission is paid to the associate.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 4 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

KMART 00749

## Smart Plan Extended Warranty, Continued

**Human Resource Manager Duties**

Continue to follow the Human Resource Manager responsibilities below.

6. Explain to each associate the potential commission income that can be earned by selling the *Smart Plan*. Each associate will earn $1.00 for each service plan, $.50 for the $4.99 and $7.99 replacement plans and $.25 for the $2.99 replacement plan. Discuss the potential that the associate has to earn extra income and what the income could do for their average hourly rate.

7. Assists the Assistant, Upfront, and Department Managers on a daily basis in identifying associates that need addition training and works with the Assistant/Department Managers to schedule associates for retraining where necessary.

8. Utilize the following tools to conduct training:
   - The Eight Minute Video tape
   - The CBT Module
   - The Smart Plan test
   - Commission Record (Mops # 0-944538-115)
   - Smart Plan Contract

**Smart Plan Testing**

**New Hires and Seasonal Hires**
- If a new hire scores less than 100% on the test they must immediately review the training materials and retake the test. If a perfect score is not achieved, review the questions with the associate to determine their understanding of the program before they report to the sales floor.
- Place all test results in the associate's personnel files.
- As the associate reaches their 90 days of employment, review their conversion rate % results to determine if additional training is needed.

**Current Associates**
- All current associates are required to take the *Smart Plan* test within 30 days of the store's receipt of this Golden Rod.
- Place test results in the associate's personnel file.
- If a current associate scores less than 100% on the test they must immediately review the 8-minute video and CBT (Computer Based Training) Module and retake the test. If a perfect score is not achieved, review the questions with the associate to determine their understanding of the program before they report to the sales floor. Insure they understand the program and that they can offer the *Smart Plan* properly to customers.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 5 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

KMART 00750

# Smart Plan Extended Warranty, Continued

| | |
|---|---|
| **Assistant Managers' Duties** | The Assistant Managers' responsibilities include the following: |

1. Achieve the conversion rate % results in their departments.
2. Have knowledge of and communicate conversion rate % goals to the Department Managers and associates.
3. Review daily results with their Department Managers and associates.
4. Demonstrate and insure that all of their Department Managers and associates are trained and that they "Offer the *Smart Plan* to every customer every time <u>properly</u>."
5. Identify associates who need training and insure that it is conducted in a timely manner.
6. Motivate associates and provide positive recognition when discussing the *Smart Plan* program.
7. Insure *Smart Plan* signing materials are in place and that the contract pads are available at all registers.

| | |
|---|---|
| **Department/ Upfront Managers'/ Front End Supervisor Duties** | The Department/Upfront Managers' and Front End Supervisors' responsibilities include the following: |

1. Includes all Assistant Managers' responsibilities.
2. Insures each associate understands each line of the *Smart Plan* register prompt.
3. Insures each associate understands how to validate the commission record and how to receive their commission.
4. Cover the "Ways to Offer the *Smart Plan*" with each associate.

| | |
|---|---|
| **Associate Duties** | The associate's responsibilities include the following: |

1. Understand the *Smart Plan* program: Benefits of the plan, how to offer it properly to every customer every time, and how to read each line of the *Smart Plan* register prompt.
2. Required to "Offer the *Smart Plan* to every customer every time" in a positive manner giving at least one benefit of the plan.
3. Review the "Ways to Offer the *Smart Plan*".
4. Responsible to record sales on the commission record and turn it in as required to receive commission.
5. Insure that you have contract pads at your register.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 6 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

# Smart Plan Extended Warranty, Continued

**Signing Materials and Supplies**

Follow the chart below when it is necessary to order *Smart Plan* signage and supplies.

| Mops Code | Description | Store Max Order | Pkg. Qty | Size |
|---|---|---|---|---|
| 0-933560-112 | Ticket Pad (English) | 2 | 12/pkg | 5" x 3" |
| 0-933561-110 | Contract (all stores except FL) | 3 | 10/pkg | 5" x 11" |
| 0-933562-118 | Channel Sign | 1 | 12/pkg | 3" x 10" |
| 0-933564-114 | Ticket Pad (Spanish) | 2 | 12/pkg | 5" x 3" |
| 0-933565-111 | Contract (Spanish-all stores except FL) | 6 | 10/pkg | 5" x 11" |
| 0-933565-129 | Contract (Spanish-FL stores only) | 6 | 10/pkg | 5" x 11" |
| 0-933566-119 | Price Service Plan | 1 | 50/pkg | 5" x 3" |
| 0-933567-117 | Channel Sign (Spanish) | 1 | 24/set | 3" x 10" |
| 0-933568-115 | Channel Sign/Replacement Service Plan | 1 | 24/set | 3" x 5" |
| 0-933569-113 | Static Cling (Electronics) | 1 | 12/pkg | 6.7" x 6.7" |
| 0-933575-110 | Replacement Plan (Spanish) | 3 | 10/pkg | 7" x 11" |
| 0-933730-111 | Replacement Plan (Spanish) | 2 | 50/pkg | 5" x 3" |
| 0-933731-119 | Static Cling Triangle SPA | 1 | 12/pkg | |
| 0-933732-117 | Contract (FL stores only) | 3 | 10/pkg | 5" x 11" |
| 0-936242-114 | Smart Plan Hang Tag | 2 | 100/pkg | 4" x 7" |
| 0-936612-118 | Static Cling Watch | 1 | 6/pkg | 5.7" x 5.7" |
| 0-936612-126 | Static Cling Watch (Spanish) | 1 | 6/pkg | 5.7" x 5.7" |
| 0-936612-134 | Static Cling Jewelry | 1 | 6/pkg | 5" x 5" |
| 0-936724-111 | 2 Poster for Breakroom | 1 | 2/set | |
| 0-937827-111 | Smart Plan Scoreboard | 1 | 1/each | 36" x 24" |

**Placing orders on KIN procedures**

Follow the procedure below to place an order for *Smart Plan* signage and supplies.

| Step | Action |
|---|---|
| 1 | On the KIN CRT, from the *Application Menu*, select option 4, *Ordering* and press F12.<br><br>**Result:** The *Ordering* screen displays. |
| 2 | Select option 2, *Enter Orders, Cancellations* and press F12.<br><br>**Result:** The *Enter Orders or Cancellations* screen displays. |

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 7 of 12 | 06/26/01 | INDEFINITE |

# Smart Plan Extended Warranty, Continued

**Placing orders on KIN procedures, continued**

Continue to follow the procedure below.

| Step | Action |
|---|---|
| 3 | On the *Enter Orders or Cancellations* screen, select option 1, *Regular Order* and press F12.<br><br>**Result:** The *Regular Order* screen displays. |
| 4 | On the *Regular Order* screen, do the following to place an order:<br><br>1. Enter the Kmart Code, press ENTER.<br>2. Enter the quantity needed, press ENTER.<br>3. Repeat procedures as needed until all Kmart Codes and needed quantities are keyed in.<br>4. Press F12 to accept order. |

**Smart Plan End of Day Report**

The *Smart Plan End of Day* Report was developed to accomplish several objectives:

1. Provides a fair and uniform way of judging performance regardless of the number of hours an associate works.
2. Ability to track performance from the store member level up to the Divisional level.
3. Creates awareness at all levels of the organization.
4. Allows for positive recognition at every level.
5. Helps to identify training needs.

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 8 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

# Smart Plan Extended Warranty, Continued

**Smart Plan End of Day Report, continued**

Below is an example of the *Smart Plan End of Day* Report.



*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 9 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

KMART 00754

## Smart Plan Extended Warranty, Continued

| | |
|---|---|
| **How to read the Smart Plan End of Day Report** | Follow the chart below to read the *Smart Plan End of Day* Report. |

| Heading | Description |
|---|---|
| Operator # | Identifies the associate who rang the sale. |
| Item Purchased | This is the SKU number of the merchandise that had a *Smart Plan* available on it. |
| Plan Sold | Y for yes if a *Smart Plan* was sold and N for no if it was not. |
| Location # | This is the register location where the sale was rung. |
| Trans# | The transaction number of the sale. |
| Smart Plan Sale | The price the customer paid for the *Smart Plan*. |
| Smart Plan Opportunities | Total number of opportunities the operator had to sell a *Smart Plan*. |
| Smart Plans Sold | Total number of *Smart Plans* the operator sold. |
| Smart Plans Refunded | Shows on first operator only as this is the Service Desk. Tells how many plans were refunded. |
| Conversion Rate % | This is calculated by dividing the number of plans sold by the number of opportunities. |
| Store Totals | This section recaps the total store's *Smart Plan* numbers by adding the operators' numbers together. |

| | |
|---|---|
| **How to use the Smart Plan End of Day Report** | Follow the points below to use the *Smart Plan End of Day* Report.

- This report prints automatically each morning.
- Each morning the Operations Manager is to review this report, and share the results with the Assistant, Upfront, and Department Managers. Use this information at the morning meeting to announce the store and associate results.
- Record the stores total figures on the *End of Day Smart Plan Log*.
- During the day the Assistant, Upfront, and Department Managers are to review each operator's numbers with the associate if they are working that day. Give praise or encouragement to each person you speak to. Keeping awareness levels high drives results. Remind associates of how much additional compensation they can earn in commission.
- Talk to associates that have low conversion rate %. Ask them how you can help. Have them watch the training video or try to team them up with another associate that is doing well so that they can share best practices.
- Post the daily report by the time clock, where all associates can see it. On the following day file the report in the *Daily Smart Plan Binder*. Keep this report for one year. |

*Continued on next page*

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 10 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

# Smart Plan Extended Warranty, Continued

**Smart Plan Conversion Rate % Report**



Continued on next page

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| Smart Plan Extended Warranty | SER | 11 of 12 | 06/26/01 | INDEFINITE |

STORE OPERATING POLICIES

# Smart Plan Extended Warranty, Continued

| | |
|---|---|
| **Ways to Offer the Replacement Plan** | Use the examples below to offer the *Replacement Plan* to your customers. |

- Did anyone tell you about our **1-Year Replacement Plan**. It's only $_____ which means if your product fails to work for any reason other than abuse or accidental damage we will reimburse you for the full purchase price plus tax!
- Your product qualifies/is eligible for our **1-Year Replacement Plan** which means if your product fails to work for any reason other than abuse or accidental damage we will reimburse you for the full purchase price plus tax!
- I personally recommend our **1-Year Replacement Plan**. If your product fails to work for any reason other than abuse or accidental damage we will reimburse you for the full purchase price plus tax!
- You'll want to take advantage of a great program that we offer on your product, it's our **1-Year Replacement Plan**. If your product fails to work for any reason other than abuse or accidental damage we will reimburse you for the full purchase price plus tax!
- Want to know the best way to protect your product? Our **1-Year Replacement Plan** will reimburse you for the full purchase price plus tax if your product fails for any reason other than abuse or damage!

Practice a phrase that works for you!

| | |
|---|---|
| **Ways to Offer the Service Plan** | Use the examples below to offer the *Service Plan* to your customers. |

- May I suggest our **Service Plan**. If offers surge protection and pays for all parts and labor.
- Your product qualifies for our **Service Plan** which means if we can't repair it after (3) attempts, we will replace it!
- You'll want to take advantage of a great program we offer on your product, it's our **Service Plan**. If your product fails due to normal wear and tear or power surges we will pay for all repairs and if we can't fix it after 3 times, we will replace it!
- I PERSONALLY RECOMMEND our **1-Year Service Plan**.
- For added convenience we offer free in-home service on TV's 20' or larger if anything were to go wrong.

Practice a phrase that works for you!

| | |
|---|---|
| **Questions** | For any procedure questions, please contact your District Manager. |

| TOPIC | TAB | PAGE | DATE | DISCARD DATE |
|---|---|---|---|---|
| **Smart Plan Extended Warranty** | **SER** | 12 of 12 | 06/26/01 | **INDEFINITE** |

STORE OPERATING POLICIES

KMART 00757

**Smart Plan Test**
**(Note: Make additional copies at store level)**

To: Kmart Associate

After reviewing the *Smart Plan Video* and the *Computer Based Training* course, take the following test and return it to the Human Resource Manager. Please sign and date this document at the bottom of the page when you have completed the test.

1. The commission amount that you are paid on every *Smart Plan* that you sell is:
   a. $.25 for replacement / $.50 for service.
   b. $.50 for replacement / $.75 for service.
   c. $.25 and $.50 for replacement / $1.00 for service.
   d. Kmart does not pay a commission.

2. To be paid your commission you must:
   a. Submit an IRS 1099 form.
   b. Do nothing, it automatically comes in my check.
   c. Fill out and validate the commission record and turn it into HR.
   d. Get approval from the Store Manager.

3. The Smart Plan does NOT cover:
   a. Accidental damage and/or abuse.
   b. Normal wear and tear.
   c. Power surges.
   d. Annual VCR cleaning.

4. The 1.800.99Kmart number for *Smart Plan* customers is open:
   a. Monday – Friday 8:00 a.m. – 5:00 p.m.
   b. Monday – Saturday 7:00 a.m. – 7:00 p.m.
   c. Everyday from 7:00 a.m. – 7:00 p.m.
   d. 24 hours a day / 7 days a week / 365 days a year.

5. Who should you offer the *Smart Plan* to?
   a. Only people you think who will buy it.
   b. Only people buying expensive items.
   c. Every customer every time.
   d. Only people who pay with cash.

6. The number ONE reason Kmart sells the *Smart Plan*?
   a. Because customers want it. It gives them peace of mind.
   b. To make money.
   c. Competitors offer it.
   d. The prices are so low.

7. Which of the following is FALSE?
   a. The *Replacement Plan* provides 1-year of coverage.
   b. The *Service Plan* starts after the manufacture's warranty expires.
   c. The *Replacement Plan* is for products under $100.00.
   d. The *Replacement Plan* will repair the customer's product.

8. Which of the following is FALSE?
   a. The customer pays for shipping the replacement item.
   b. The *Smart Plan* customer calls 1.800.99Kmart when they have a problem with their product.
   c. The *Replacement Plan* will reimburse the customer for the price of the product only.
   d. The *Service Plan* is for products over $100.00

9. When offering the *Smart Plan*, which should you NOT do?
   a. Smile.
   b. Give the customer a benefit.
   c. Prejudge the customer.
   d. Be positive about the plan.

10. Which of the following is NOT true?
    a. The *Watch* plan covers everything except the battery and abuse.
    b. The *Replacement Plan* and *Service Plan* are both 1-year in length.
    c. The *Replacement Plan* starts on the date of purchase, the *Service Plan* starts after the manufacture's warranty ends.
    d. The *Smart Plan* covers everything.

11. What does the typical manufacture's warranty cover?
    a. Abuse.
    b. Acts of God.
    c. Defects in parts and workmanship.
    d. All of the above.

12. What does the *Smart Plan* cover on watches?
    a. Case & crown.
    b. Band & bezel.
    c. Stem & cracked crystal.
    d. All of the above.

13. What does the watch manufacture cover under their warranty?
    a. Inner movement only.
    b. Broken crystal.
    c. Defects in the band.
    d. All of the above.

14. *Smart Plan* provides in-home service on which of the following?
    a. VCR's
    b. Bicycles
    c. Playstation
    d. TV's 20' and above and stationary exercise equipment.

15. When offering the *Smart Plan*, which of the following should you always practice?
    a. Never take a 'no' response personally.
    b. Thank the customer for shopping at Kmart.
    c. Offer the plan with a smile and a benefit.
    d. All of the above.

Associate Name_____Date:_____

**Answers to Smart Plan Test**

1. The commission amount that you are paid on every *Smart Plan* that you sell is:
   - ( c ) $.25 and $.50 for replacement / $1.00 for service.

2. To be paid your commission you must:
   - ( c ) Fill out and validate the commission record and turn it into HR.

3. The Smart Plan does NOT cover:
   - ( a ) Accidental damage and /or abuse.

4. The 1.800.99Kmart number for *Smart Plan* customers is open:
   - ( d ) 24 hours a day / 7 days a week / 365 days a year.

5. Who should you offer the *Smart Plan* to?
   - ( c ) Every customer every time.

6. The number ONE reason Kmart sells the *Smart Plan*?
   - ( a ) Because customers want it. It gives them peace of mind.

7. Which of the following is false?
   - ( d ) The *Replacement Plan* will repair the customer's product.

8. Which of the following is FALSE?
   - ( c ) The *Replacement Plan* will reimburse the customer for the price of the product only.

9. When offering the *Smart Plan*, which should you NOT do?
   - ( c ) Prejudge the customer.

10. Which of the following is not true?
    - ( d ) The *Smart Plan* covers everything.

11. What does the typical manufacture's warranty cover?
    - ( c ) Defects in parts and workmanship.

12. What does the *Smart Plan* cover on watches?
    - ( d ) All of the above.

13. What does the watch manufacture cover under their warranty?
    - ( a ) Inner movement only.

14. *Smart Plan* provides in-home service on which of the following?
    - ( d ) TV's 20' and above and stationary exercise equipment.

15. When offering the *Smart Plan*, which of the following should you always practice?
    - ( d ) All of the above.

# **TAB 7**

On Sunday 11/30/03, Layaway Team Member Gloria Potter informed me of a suspicious female customer's (i.e., Taesha Holmes) attempt to pay off her layaway contract with a Kmart cash card. Layaway Team Member Potter then told the customer layaway registers do not accept Kmart cash cards to which the customer responded by asking for a refund on her contract thus incurring a layaway cancellation fee. Layaway Team Member Potter deemed the customer's request suspicious thereby informing me. I then began video surveillance of said customer and an accompanying male throughout the store. I noticed the two of them were making a lot of indiscriminate selections of high ticket value and purchased said selections at different registers (i.e., register #11, service desk register #32, and home electronics department register #34). I further noted their method of payment via Kmart cash cards. With the aid of a POS computer terminal, I ascertained the Kmart cash card numbers. I brought said Kmart cash card numbers to the attention of Front End Manager Michael Hedlund and he called the 1-800 phone number to obtain Kmart cash card histories on said Kmart cash card numbers. Front End Manager Hedlund then provided such histories to me and I contacted

KMART00090

the applicable store (i.e., NASHUA, NH). I spoke to the NASHUA, NH store's Front End Manager who was able to track the Kmart cash card purchases to a Discover credit card. I then called the Discover card's hotline number and a representative told me the Discover credit card was reported stolen on 11/29/03 (Note: The NASHUA, NH store sold the Kmart cash cards on 11/29/03). I was able to obtain a license plate number from the vehicle used by said suspicious customers and later passed said information (and all of this statements' information) to the NASHUA, NH police. I then informed STORE MANAGER DANIEL FERRIE of all of the above information, suggested the elimination of remaining balances on the Kmart cash cards in question to which DAN FERRIE responded by suggesting the purchase of SMART PLANS to reduce said card balances and relayed such information to FRONT END MANAGER MICHAEL HEDLUND. (Note: I informed STORE MANAGER DANIEL FERRIE of the above information on 11/30/03 via telephone.)

Nicholas J. Merot

# TAB 8

12/22/2003  09:51    7812311603                 K MART 3333                        PAGE  02

# Loss Control Statement Form

Case Number _____                    Page _____ of _____

| Statement of | Michael L Hedlund | Address | 49 Ingell St. |
|---|---|---|---|

| City | State | Zip | Phone |
|---|---|---|---|
| TAUNTON | MA | 02780 | 808-822-3217 |

Where Taken: Kmart Braintree MA          Date and Time of Statement: 12/14/03  2pm
12/1/03 MA

On Monday I was advised by Nick (LPM) of 2 stolen cash cards. Where we had remaining balances left on them, once it was confirmed that the card were bought with a stolen credit card. I asked Dan about "killing" the receipts that were bought with the stolen krash card. Dan said to refund then and buy as many 299 smart plan that I could with it, because of the store poor compliance. This wasn't what I had planned to do; (Planned to refund then resale so that original receipt thoubl decline if tryed to be refunred) but Dan being store manager and haveing been adamant about having smart plans above 10% I did what he told me even thought knew this was wronge because Dan had threatened job in the pasted when I haven't followed his instuctions.

The week before this happen I was told by John (Image manager) that Dan told him to tell me if smart plan sales where above 10% I would be fired. And the week before that I was tolded by Dan that I was to tell the cashiers that if sales weren't up he would fire a cashier that was not preforming as a example.

KMART00086

I got all receipts with the stolen Ice cards used at store level off office computer. I took them to refund desk; keyed in Id number and refunded them to cash card. To save time and not to show inventory that was actually not being returned; I took total dollar amount but tax shift and refunded it to Dept. NINE as keyed entry.

Then went of office looked on discounted list, found discounted cheap watches that a smart plan would ask when UPC was scanned. Did not use anything but watch upc that was discounted so that it wouldn't affect non-discounted merchandise, and so the sales wouldn't all be manual.

Then each day I would check smart plan sales and that every number short by to make ten % I would sale to reg. I would go to a number of reg. and sell smart plans to get to number above 10%. I did manul sell at reg, etc, and refund desk.

As each smart plan I sold to the reg. some cashiers asked if they got comission on them. I told them that they wouldn't get comission on these, but these would make their % look better.

---

The above statement is the truth to the best of my knowledge. I have made the above statement of my own free will and accord without any promise of immunity or reward and without any force or duress.

12 / 19 / 03                                   Mike Mallund
Date/Time                                      Signature

KMART00087

Witness(s)

Jon Reeves                                     Nicholas J. Macomber
Print or Type Name                             Print or Type Name

Signature                                      Signature

# TAB 9

12/22/2003  09:51    7812311683               K MART 3333                        PAGE  01




# Loss Control Department
## Fax Transmission
## Cover Sheet

Date: _12-21-03_

To: _David Hughes_

Re: _#3875 Investigation_

From:
Loss Control Team

K-Mart 3333
180 Main St.
Saugus, MA 01906

There are _16_ pages with this fax (cover
sheet included) if you do not receive all pages
please call me at store _#3333_ .

KMART00085

12/22/2003  09:51    7812311603               K MART 3333                    PAGE  02

# Loss Control Statement Form

| Case Number | | Page _____ of _____ |
|---|---|---|

| Statement of | Michael L Hedlund | Address | 49 Imgell St. |
|---|---|---|---|

| City TAUNTON | State MA | Zip 02780 | Phone 508-822-321? |
|---|---|---|---|

| Where Taken Kmart Braintree Mn | Date and Time of Statement 12/14/03   2pm |
|---|---|

12/1/03 MA

On monday I was advised by Nick (LPM) of 2 stolen cash cards. where we had remaining balances left on them, once it was comfirmed that the card were bought with a stolen credit card. I asked Dan about "killing" the receipts that were bought with the stolen krash card. Dan said to refund then and buy as many 299 smart plan that I could with it, because of the store poor compliance. This wasn't what I had planned to do; (Planned to refund then resale so that original receipt thould decilne if tyed to be refunrd) but Dan being store manager and haveing been adamant about havingsmart plans ebox 10% I did what he told me & even thought knew this was wronge because Dan had threatdned job in the pastfed when I havenl't followed his instuctions.

The week before this happen I was told by John (Image manager) that Dan told him to tell me if smart plan sales wheren't above 10% I would be fired. And the week before that I was tolcled by Dan that I was to tell the cashiers that if sales wheren't up he would fire a cashier that was not presforming as a exumple.

KMART00086

(Continued on reverse)

12/22/2003  09:51    7812311603                    K MART 3333                              PAGE  03

I got all receipts with the stolen kcards used at store level off office computer. I took them to refund clerk; keyed in Id number and refunded them to cash card. To save time and not to show inventory that was actually not being returned; I took total dollar amount hit tax shift and refunded it to Dept. NINE as keyed entry.

Then went of office looked on discounted lkt. Found discounted cheap watches that a smart plan would ask when UPC was scanned. Did not use anything but watch upc. that was discounted so that it wouldn't affect non-discounted merchandise, and so the sales wouldn't all be manual. Then each day I would check smart plan sales and that every number short by to make ten % I would sale to reg. I would go to a number of reg. and sell smart plans to get to number above 10 %. I did manule sell at, reg, etc, and refund desk.

As each smart plan I sold to the reg. some cashiers asked if they got comission on them. I told them that they wouldn't get comission on these, but these would make their % look better.

The above statement is the truth to the best of my knowledge. I have made the above statement of my own free will and accord without any promise of immunity or reward and without any force or duress.

12 / 18 / 03                                    Mike Mallard
Date/Time                                       Signature

KMART00087

Witness(s)

Jon Reeves                                      Nicholas J. Macomber
Print or Type Name                              Print or Type Name

Signature                                       Signature

12/19/03

Mike informed me that inorder to help increase smart plan sales he used a confiscated k cash card and bought smart plans toward watches.

Dan has made general comments about just ringing smart Plan for the customers and if they do not want them they then can return them. He has made comments about firing anyone who does not sale smart plans.

KMART00088

December 19, 2003.
Braintree, MA

To whom it may concern:

    I, Rosa Rivera, was asked by the Store Manager to increase the amount of Smart Plans Sells. He joked about "punch them in" even if the customers didn't want them. I asked him if he was serious about it. He said, he was and never talked about anymore. He only asked how the sells are going.

Thank you,

Sincerely,

Rosa Rivera

Clerk # 24

Cashier.

KMART00089

On Sunday 11/30/03, Layaway Team Member Gloria Potter informed me of a suspicious female customer's (i.e., Tarsha Holmes) attempt to pay off her layaway contract with a Kmart cash card. Layaway Team Member Potter then told the customer layaway registers do not accept Kmart cash cards to which the customer responded by asking for a refund on her contract thus incurring a layaway cancellation fee. Layaway Team Member Potter deemed the customer's request suspicious thereby informing me. I then began video surveillance of said customer and an accompanying male throughout the store. I noticed the two of them were making a lot of indiscriminate selections of high ticket value and purchased said selections at different registers (i.e., register #11, service desk register #32, and home electronics department register #34). I further noted their method of payment via Kmart cash cards. With the aid of a POS computer terminal, I ascertained the Kmart cash card numbers. I brought said Kmart cash card numbers to the attention of Front End Manager Michael Hedlund and he called the 1-800 phone number to obtain Kmart cash card histories on said Kmart cash card numbers. Front End Manager Hedlund then provided such histories to me and I contacted

KMART00090

the applicable store (i.e., NASHUA, NH). I spoke to the NASHUA, NH store's Front End Manager who was able to track the Kmart cash card purchases to a Discover credit card. I then called the Discover card's hotline number and a representative told me the Discover credit card was reported stolen on 11/29/03 (Note: The NASHUA, NH store sold the Kmart cash cards on 11/29/03). I was able to obtain a license plate number from the vehicle used by said suspicious customers and later passed said information (and all of this statements information) to the NASHUA, NH police. I then informed STORE MANAGER DANIEL FERRIE of all of the above information, suggested the elimination of remaining balances on the Kmart cash cards in question to which DAN FERRIE responded by suggesting the purchase of SMART PLANS to reduce said card balances, and relayed such information to FRONT END MANAGER MICHAEL HEDLUND. (Note: I informed STORE MANAGER DANIEL FERRIE of the above information on 11/30/03 via telephone)

Nicholas J. Morrow

KMART00091

KMART00092

12/19/03

I Susan Jones had a conversation
with Dan Ferris in regard to
Smartplans. I was told my job
depended upon me selling Smart Plans.
I was told to just ring them up.
I told him I couldn't do that. He
asked if I ever rang one up by
mistake and what I did about it.
I told him I took it out of the
sale. He then said that I was
assuming that the customer didn't
want it. I said I had already
asked the customer and they didn't
want it. I didn't know what I
was doing in regard to selling Smart plans.
This conversation took place
around 3 or 4 weeks ago in the L.P.
Office. No one else was present at
the time.
    The pressure has really been on
about the Smart plans. There was
another incident about selling the plans
after Thanksgiving were I was told
that I dragged the whole store down
by not selling the plans. It was all

my fault even though I didn't ring
that day. Unfortunately it was my
number in the register. The
pressure was definately on and
everyone was feeling it. Dan
also told Julie to mark me down
on my review because of them.

Susan Jones

KMART00093

12-19-03

I Lea South was told By Dan Ferrie
To just Ring in smart plans without
Customers request To Purchase them. I Told
Him I would not Do that because it was
wrong. The next Day he told me I [struck out]
Disappointed By not Doing what he Asked me
To Do. My Job position was not threatened By
him. But I know of him threating other
People with their positions.

_Lea Smith_

KMART00094

Smart Plan were told to be sold on
a daily and hourly basis, would have
to sell so many. I was told to add the
smart plan to the people because they
would not realize that it was on there
reciept. The comaision part of it would
come up on the screen and we were
told that we didnt have to validate
and would get the commsion in full
this didnt happen. Dan said because
we didnt validate you couldnt get
the intormation. My review said
that i did not sell enough smart plan
and this should not reflect my
skill. We are not to be treated this
way because I didnt sell these. Dan
was mad all the time and I felt
that it I didnt sell enough I
didnt know what was to happen next

Maybe Tina

12/19/03

KMART00095

12-19-03

DAN ASKED ME TO PUT A BIKE IN THE
TRAINING ROOM FOR HIM ABOUT 3½ MONTHS AGO.
I PUT IT THERE AND HE SAID HE KNEW WHAT HE
WAS GONNA TO DO WITH IT. IT IS A PRE 2003
BIKE THAT RINGS IN AT .01¢ IT IS STILL THERE.

ON ANOTHER OCCASION DAN PLACED 2 CARTS WITH
VARIOUS MERCHANDISE IN THEM INTO MY GUN ROOM.
THEY WERE THERE FOR A FEW WEEKS BEFORE HE REMOVED
THEM. THIS WAS PRIOR TO 9/11/03.

ON 9/11/03 DAN AUTHORIZED THE P.R. MARKDOWNS
ON SOME PRE 03 GUNS AND AMMO AND ALSO ON
6 GUNS NOT PRE 03 FOR THE PURPOSE OF SELLING
THEM TO A FRIEND OF HIS. DAN WAS PRESENT
FOR THE ENTIRE SALE SUPERVISING IT.

I KENNETH R Coy MAKE THESE STATEMENTS OF MY
OWN FREE WILL TO SUPPORT AN LP INVESTIGATION.
THESE STATEMENTS ARE TRUE AND FACTUAL.

Kenneth R C

KMART00096

Privileged & Confidential
Report Retention: 3 Years From Date Of Issue



# Kmart Corporation
## Audit Services Department

**TO:**        Mike Foltyn.

**FROM:**      Donna I. Mastroeni
               Audit Services Department

**DATE:**      December 1?, 2003

**SUBJECT:**   Kmart #3879 – Braintree, MA
               * **Suspicious Smart Plan Warranty Sales and Kmart Cash Card Activity**
               * **Discounted Bulk Sales Irregularities**

---

**Summary**

At the request of the Treasurer's Department at KRC, I visited Kmart #3879 – Braintree, MA to review suspicious Kmart Cash card activity relating to the purchase of Smart Plan Warranties from December 1-12, 2003. Based on my preliminary findings, it appears Front End Manager Mike Hedlund used a Kmart Cash card to purchase 135 Smart Plan Warranties after Store Manager Dan Ferrie indicated warranty sales needed to increase to meet the store's conversion rate goal. Loss Prevention District Manager Jon Reeves indicated he would interview Mr. Hedlund on December 19, 2003 and notify Audit Services of his findings.

During my visit, two additional issues were brought to my attention by both District Manager John Swank and Loss Prevention District Manager Jon Reeves regarding softlines bulk sales and firearm sales.

* On November 5 and 7, 2003, clearance softlines merchandise was sold to a single buyer after the clearance POS price for the items purchased was reduced to $1. District Manager John Swank indicated Store Manager Dan Ferrie had requested approval for the sale, however, he had authorized that the price be reduced only 25%. The original selling value of the $699 sale was $2,617.
* Twenty clearance firearms, five slingshots, six replacement bands, three. rifled slugs and nine steel shots from pre 2003 clearance were reduced in price and allegedly sold to Store Manager Dan Ferries' girlfriend's brother on September 11, 2003 for $703. The original selling value for this merchandise was $2,367.

Store Manager Dan Ferrie was not available for comment due to an injury he sustained at the store on December 17, 2003.

District Manager John Swank has been notified of my findings.

**Findings**

**Smart Plan Kmart Cash Activity**
At the request of the Treasurer's Department at KRC, I reviewed Kmart Cash/Smart Plan activity for Kmart Cash Card #6006490300774118626. Using Electronic Journal detail, I discovered that it was used to purchase 106 watches with selling prices ranging from $1.90 to $10 and 135 Smart Plans for $2.99 from December 1-12, 2003. The purchases

KMART00097

Privileged & Confidential
Report Retention: 3 Years From Date Of Issue

were made in multiple transactions at a number of registers within a short time period. As the $2.99 Smart Plan warranties purchased cover replacement cost only and the warranty itself cost more than the watch, it is unlikely that a customer would make such a purchase. The purchases occurred during the Smart Plan Double Commission Period, although double commissions would not be paid for these transactions as the warranties registered were less than $7.99. Although the store did not reach its' conversion goal for week ending 11/26, the required conversion rate was met in weeks ending 12/3 and 12/10, the period in which these suspicious transactions occurred. Based on my preliminary findings, I contacted District Manager John Swank on December 12, 2003 and requested he meet me at the store on December 18, 2003 to review my findings.

Upon arriving at the store, I reviewed my findings with Loss Prevention Manager Nick Macomber who stated it is likely that Front End Manager Lead Front End Associate Mike Hedlund, Clock #27, moved from register to register, making these purchases. Mr. Hedlund was not available for comment during my visit.

Loss Prevention District Manager Jon Reeves initiated an investigation on December 19, 2003 and indicated he interviewed four associates who provided statements indicating Store Manager Dan Ferrie berated them by stating their lack of Smart Plan sales were pulling the store's conversion rate down and Mr. Ferrie wanted them to automatically add Smart Plan sales to eligible purchases without first asking the customer. Mr. Reeves indicated he would interview Mr. Hedlund when he arrived for work on December 19, 2003.

In researching how the Kmart Cash card used for these Smart Plan purchases had originally received value, it is my understanding that the store applied refunds to this cash card using the transaction number and amount of fraudulent purchases relating to a stolen credit card. It appears this was done by the store to trigger the refund system to block the fraudulently purchased merchandise from being refunded by using up the "open to refund" balance outstanding for the fraudulent purchase transaction. The effect of this was to create value on the cash card used to subsequently purchase the Smart Plans in question.

## Softlines Clearance Bulk Purchase

On December 18, 2003, District Manager John Swank alluded to what he apparently believed to be the reason for my visit by indicating that he gave permission to Store Manager Dan Ferrie to discount a bulk purchase of softlines clearance merchandise by 25%; however, Mr. Swank stated that Mr. Ferrie exceeded what he had been authorized to do by reducing the clearance price to $1.00 for each of 699 items purchased. I reviewed a sample of the items purchased on November 7, 2003 and found: 163 Boys White Polo (UPC #72122458772) with a current clearance KRC price of $2.00 sold at $1.00. Another example was 80 Jr Tee (UPC # 65061334642) with a current markdown price of $4.00 sold at $1.00. A review of *Item Maintenance Reports* dated November 5 and 7, 2003, revealed Clock #78 – Unit & Pricing Associate Linda Wood and Store Manager Dan Ferrie reduced the POS prices of these items. District Manager John Swank reiterated that he authorized Mr. Ferrie only to reduce the softlines clearance merchandise by 25% and 193 backpacks included in the purchase should not have been part of the bulk sale.

## Firearms Clearance Bulk Purchase

KMART00098

Privileged & Confidential
Report Retention: 3 Years From Date Of Issue

During my visit, Loss Prevention District Manager Jon Reeves indicated he had concerns with a bulk purchase of firearms that occurred on September 11, 2003. Mr. Reeves indicated the firearms (twenty firearms, six replacement bands, five slingshots, nine slingshot ammo, three rifled slugs and nine steel shots) were discounted and sold to the Store Manager's girlfriend's brother, Earl Brewer as validated by Loss Prevention Manager Nick Macomber. Based on the Electronic Journal detail, the POS price for these items was again lowered in the system prior to the purchase. Although I researched *Item Maintenance Reports* for September 2003, I was unable to locate the date the prices were reduced. District Manager John Swank stated he did not have concerns on this sale because the merchandise was Pre 2003 clearance and the merchandise was not transferable to a surrounding district because of their large in-stock position.

**Manager's Response**

Store Manager Dan Ferrie was unavailable for comment due to an injury he sustained at the store on December 17, 2003.

**Follow Up**

District Manager John Swank stated he would follow up to the above findings during all subsequent visits to #3879 and advise Regional Vice President MaryJo Duffy of all issues included in this memo. Loss Prevention District Manager Jon Reeves stated he will advise the Audit Services Department of the outcome of the questioning of Clock #27, Lead Front End Associate Mike Hedlund regarding the Smart Plan activity.

A follow up visit will be scheduled within six months to ensure corrective measures remain in place.

3879/dim/wgc

cc:    MaryJo Duffy
       Janet Langford-Kelly
       Susan Rapp
       Jon Reeves
       Dave Schuvie
       Mike Stine
       Mark Thompson

KMART00099

Date:     12/20/2003

To:       Jon Swank DM, Donna Mastroeni, Internal Audit &

          Mike Foltyn, Director Internal Audit

Cc:       Larry Scheid APRD, MaryJo Duffy RVP, David Hughes RHD

From:     Jon A. Reeves, LPDM

RE:       Investigation #3879 Braintree, MA

---

This proclamation is a synopsis of the investigation in store #3879 Braintree, MA
conducted by this writer, Jon Swank and Donna Mastroeni. On 12/18/03 this writer met
with Donna Mastroeni at the Kmart store #3879 Braintree, MA. Donna instructed this
writer that she was investigating a suspicious transaction in regards to purchases of
smart plans dated from 12/01/03 to 12/06/03. During this investigation evidence was
found that Smart plans were purchased using an undisclosed K-cash card. The
investigation showed the following information;

Two fraudulent cash cards were purchased in store #3630 Nashua, NH on 11/29/03 by
an unknown customer using a stolen credit card. *(The Nashua Police Dept. are
investigating this case).* These k-cash cards in question were used in store #3879
Braintree, MA to purchase miscellaneous merchandise by the unknown customer.
LPM, Nick Macomber observed the transaction and immediately began to investigate
the sale. Confirmation was received from the credit card company that the two k-cash
cards were purchased with a stolen credit card. LPM Macomber then contacted store
manager, Dan Ferrie to report what he had discovered concerning the above transaction.
Dan was told by Macomber that there was $600 remaining on the fraudulent cash cards.
Nick and Dan both agreed to wipe out the remaining balance on the k-cards in question
by purchasing merchandise by dept. using dept. #9. Nick under Dan's direction
instructed front end manager, Mike Hedman to make appropriate purchases necessary to
leave a Zero balance on the said k-cards.

On 12/19/03, this writer in conjunction with Donna Mastroeni began to interview
several of the associates and identified clock numbers which made smart plan purchases
using the K-cards. A total of 6 Kmart associates including Mike Hadman, Front end
manager regarding the above issue. All associates provided a written statement
regarding the fraudulent smart plan transactions. It was learned that Store Manager,
Dan Ferrie instructed Mike Hedman to refund the $600 from the original fraudulent k-
cards to another k-card and use this k-card to purchase watches for $1.90 and smart
plans for $2.99 due to the store having poor compliance. Mike admitted he knew this
was wrong, but was afraid to challenge Dan due to Dan making threats of termination in
two prior weeks (see attached statement A). After interviewing the remaining 5
witnesses it was also discovered that Dan instructed the cashiers to automatically ring in
a smart plans for customer's transactions when prompted and not notify the customer
unless they questioned the purchase. Several of the cashiers with the exception of one
did as instructed by Dan. All cashiers were afraid to question Dan due to Dan making
threats to them of being "fired" (see attached statements B, C, D, E, & F). The
information was consistent with all associates interviewed.

12/22/2003  09:51     7812311603               K MART 3333                    PAGE  17

12/20/2003                          Investigation #3879 Braintree, MA

At the conclusion of the investigation it was determined that Dan Ferrie instructed
Front-end Manager, Mike Hedman to make fraudulent smart plan purchases using the
third k-card to improve compliance. Dan also gave direction to his front-end cashiers to
force ring smart plans without the knowledge of the customers to also improve
compliance. The evidence was confirmed in all statements and detail tapes of keyed
smart plans entries. Dan has made many threats of termination to any associate who
doesn't follow his direction. The information obtained was disturbing and a clear
violation of company policy, creating a hostile work environment as well as
questionable integrity in regards to the corporate code of conduct.

Mike Hedman & Nick Macomber were both given guidance, concerning the improper
way they dealt with the two fraudulent k-cards in the beginning. The original
inappropriate action of wiping out the fraudulent Cash cards exposed the opportunity
for the fraud to take place. All associates were instructed to review the appropriate
front-end bulletins to eliminate any future incidents. They are to report to the LPDM in
the future of all dubious issues concerning Smart plans and any potential fraudulent use
of k-cards.

In addition to this investigation it was also learned that Dan has allowed sizable
questionable purchases to be made by alleged friends without complete approval. These
issues are still under investigation to determine the validity of the information. Jon
Swank, Donna Mastroeni and I were unable to interview Dan due to Dan being out on a
medical leave which started a day prior to the start of the investigation 12/17/03.


JR

Enc. 5

Attachments

KMART00101

# TAB 10

Smart Plan Conversion Data
Kmart #3879
2003
End of Fiscal Year 2003

| WEEK | DATES | CONV RATE |
|---|---|---|
| 32 | September 10 - 16 | 7.49 |
| 33 | September 17 - 23 | 7.86 |
| 34 | September 24 - 30 | 7.65 |
| 35 | October 1 - 7 | 7.02 |
| 36 | October 8 - 14 | 7.70 |
| 37 | October 15 - 21 | 8.38 |
| 38 | October 22 - 28 | 7.53 |
| 39 | October 29 - November 4 | 5.19 |
| 40 | November 5 - 11 | 6.64 |
| 41 | November 12 - 18 | 7.32 |
| 42 | November 19 - 25 | 9.85 |
| 43 | November 26 - December 2 | 9.32 |
| 44 | December 3 - 9 | 11.59 |
| 45 | December 10 - 16 | 11.43 |
| 46 | December 17 - 23 | 6.58 |
| 47 | December 24 - 30 | 6.20 |
| 48 | December 31 - January 6 | 4.72 |
| 49 | January 7 - 13 | 4.83 |
| 50 | January 14 - 20 | 4.73 |
| 51 | January 21 - 28 | 4.84 |
| 52 | January 29 - February 5 | 7.22 |

# TAB 11

First Report of Injury



# First Report of Injury
## *Worker's Compensation*

    **Xmit ID** -     **Notice ID** WCM3879026559     **Date received by Intake** 12/18/2003 09:04

## Employer Information

| | | |
|---|---|---|
| **Reporting Unit:** 3879 UNCLASSIFIED | **Loc Specific SIC Code:** - | **Employer ID:** - |
| **Unemployment ID:** - | **FEIN:** - | **Policy Name:** - |
| **Phone No.:** - | **Client Name:** - | **Client Address1:** - |
| **Client Address2:** - | **Client Address3:** - | **Client City:** - |
| **Client State:** - | **Client Zip:** - | **Location Name:** - |
| **Location Address1:** - | **Location Address2:** - | **Location Address3:** - |
| **Location City:** - | **Location State:** - | **Location Zip:** - |

## Insurance Information

| | | |
|---|---|---|
| **Carrier name:** - | **Carrier Policy No:** - | **Agent Code No:** - |
| **Effective Date:** - | **Expiration Date:** - | **Admin Notify Date:** 12/17/2003 |
| **Account No:** - | **Carrier Address1:** - | **Carrier Address2:** - |
| **Carrier Address3:** - | **City:** - | **State:** - |
| **Zip:** - | | |

*DOB· 3/14/47*     (FT)

## Employee Information

| | | |
|---|---|---|
| **First name:** Daniel | **Mid Name:** - | **Last Name:** Ferrie |
| **Home Phone No:** (617) 899-1716 | **Work Phone No:** - | **SSN:** 024360166 |
| **Name of Kin:** - | **Relation of Kin:** - | **Employee over 65 ?:** N |
| **Hired in Benefit State ?:** Y | **Hire Date:** - *7/16/98* | **Last Hired:** - |
| **State of Hire:** MA | **Department:** 3879 BRAINTREE, MA | **Length of Service:** - |
| **Work Status:** - | **Supervisor:** - | **Wage Period:** - |
| **Wages($):** 000000000.00 | **Average Wage($/wk):** 000000000.00 | **Other Income($):** 000000000.00 |
| **Employee married? :** - | **No of Dependents:** - | **Dependents Under 18:** - |
| **Salary Continue? :** - | **Race:** - | **Address1:** 1600 Pine St |
| **Address2:** - | **Address3:** - | **City:** Dighton |
| **State:** MA | **County:** - | **Zip:** 02715 |

*$88,900/annual salary*

## Return to Work & Schedule

KMART00253

| | | |
|---|---|---|
| **Work begins:** 06:00 | **Daily Working Hours:** 10 | **Weekly Working Hours:** 048 |
| **RTW Date:** - | **Occupation:** Has left for the day | **Return Wage($):** 000000000.00 |
| **Expected RTW:** - | | |

## Accident Information

**Loss Description:** He slipped on a plastic bag on a bottom step while walking down. Karen Masseo is a witness and her clock number is 130. He injured his left arm, hand, back, and a leg. Which leg is unknown.

**Accident D/T:** 12/17/2003 07:15     **Employer Notified D/T:**     **Last Work Date:** 12/17/2003

12/17/2003 07:20

| | | |
|---|---|---|
| **Injured Body Part:** Lower Arm, Hand, Lower Back Area (Incl. Lumbar &, Thigh, Lower Leg | **Body Code:** 33, 35, 42, 52, 54 | **Cause of Injury:** - |
| **Injury Cause Code:** - | **Type of Injury:** All Other | **Injury Type Code:** 59 |
| **Accident Address1:** - | **Accident Address2:** - | **Accident Address3:** - |
| **City:** - | **State:** - | **Zip:** - |
| **Home Phone No:** - | **Work Phone No:** - | **First Name:** - |
| **Mid Name:** - | **Last Name:** - | **Loss Prevention Manager :** - |
| **LPM Phone No:** - | **Date of Death If Apply:** - | **Benefit State:** MA |
| **Safety Equip Provided?:** - | **Safety Equip used?:** N | **Any Photo taken?:** - |

## Treatment Information

| | | |
|---|---|---|
| **Hospital Name:** - | **Treatment Type:** - | **Physician Name:** UNK |
| **Physician First Name:** - | **Physician Mid Name:** - | **Physician Last Name:** - |
| **Home Phone No:** - | **Work Phone No:** - | **Physician Address1:** - |
| **Physician Address2:** - | **Physician Address3:** - | **Hospital Address1:** - |
| **Hospital Address2:** - | **Hospital Address3:** - | **City:** - |
| **State:** - | **Zip:** - | |

## TPA Branch Information

| | | |
|---|---|---|
| **Branch Name:** - | **Branch Phone:** - | **Branch Address1:** - |
| **Branch Address2:** - | **Branch Address3:** - | **City:** - |
| **State:** - | **Zip:** - | |

## Witnesses Information

| | | |
|---|---|---|
| **Witness First Name :** - | **Witness Last Name:** - | **Home Phone :** - |
| **Work Phone:** - | **Witness Address1 :** - | **Witness Address2 :** - |
| **Witness Address3 :** - | **City:** - | **State :** - |
| **Zip:** - | | |

## Preparer Information

| | | |
|---|---|---|
| **Title:** - | **First name:** - | **Mid Name:** -    KMART00254 |
| **Last Name:** - | **Home Phone No:** - | **Work Phone No:** - |

## Other Field Information

| | | |
|---|---|---|
| **Accident type:** - | **Carrier self insured?:** - | **Employee department no:** 3879 BRAINTREE, MA |
| **Employee has dependent?:** - | **Client number:** - | **Employee hired in benefit state?:** Y |
| **Is employee a owner/partner of the office?:** - | **CSC flag :** Y | **Employee owned? :** - |
| **Employee title :** Store Mgr | **Employee status code :** - | **First disability begin :** 12/17/2003 |
| **First disability begin time :** 07:15 | **Form entered date/time :** 12/17/2003 00:00 | **Full/part time :** - |
| **Full wages paid? :** - | **id :** 1006596 | **Insurance line :** WORKCOMP |
| **Internet user Y/N? :** - | **Job class code :** - | **Loaded to claim staging :** 12/18/2003 10:11:15 |

# TAB 12

Statement of Daniel A. Ferrie, Store Manager of K-Mart 3879;

On 3/1/04 the above was met at the Braintree store by Loss Control DM  John Reevers & Operations DM
Mike ( unsure of last name) who were there to investigate several issues involving my self, please note that
today was my first restricted day back at work to a work related injury involving a slip and fall accident on
12/17/03. After some verbal conversation I was asked to make a written statement relative to these
alligations. I did so giving a handwritten copy, however when this copy was faxed to the Regional office
they were unable to read it and I was asked to type the said statment. Please note that one of the alligations
was that I made certaion statements to employees relative to smart plans when I asked who these employees
were and when I was told by Mr Reeves that this information would not be made available to me by the
investigators, note the investugators have written staments in hand.

#1) I NEVER made  statement or gave instructions to nayone to sell smart plans on watches for $1.99 ( I
got this information from the investigators) with out the sale being legitimate. I nereve gave a one on one  to
any person or person relative to this matter.

#2) The sale of SMART PLANS from a Cash card that had been used in a relatoions to a stolen credit card.
While at home one night (not certaian of the date) I received a call from Nick MaComber my Loss Control
Manager and a former Loss Control DM in the Boston Market, Mr MaComber advised me taht he and Mike
Headlund the stores up front manager had encountered a team of people (consisted of 1 man and 1 lady)
that had used a K-Cash card at the Braintree store to make purchases in thhe Electronics dept, because of
the surrounding event they became suspicious and had learned that the Card ( I am not sure of the amount)
had been purchases at the Nashua NH  K-Mart. Nick indicated that the normal process to stop the card via
the company took to long and asked about killing the card ( they had given the original card back to the
customers) who had since left the store, I agreed over the phone to switch the monies left  on the card to a
new card. We hung up. Some time the next day I called Mr Swank about the incident to advise him what a
had happened he called John Reeves and and invstigation was started with the Nashua NH Police
Department. Some time in the next couple of days ( I am not sure of the dates and times) Nick MaComber
again came to me and stated for some reason the NEW card should also be killed because he felt the
violators could still get to the monies. I discussed giving the card back to Nasuha, for some reason ( again I
cant remember) it was Mutually dedied to make purchases on the card to kill it and that again just transferin
the card would avail the people to still get to the cards money, We talked abould how this was to be
handeled and  we eventually came to a disoission to bay smart palns with the card, 1) we would not affect
any integrities and 2) it would be an easy fix as we knew the money would have to go back on a card or
fixed in some other way. After Nasuha Police completed there invesigation ( warrants issed) I asked Nick to
be sure he fixed the card with Mike Headlund 4 times I asked him and was told that the issue was resolved.
I never saw the card or had a conversation with any one other than Nick relative to the card  or use of.
The reason that Nick had talked to Healund  was that he and Mike got along and that I had on several
occations delt with poor performance isses with Headlund and including poor smart plan results. I was a
well know fact that I did not like Mike Headlund due to his constant poor performance in fact this was
noted by Jon Swank former DM as he and I had numerous discussions about Mike. ( note one of the time I
talked to MaComber about reconstructing the card was in the GENERAL office( again I can not remember
dates and times). Note at this time I do not know where the card is I was told by Nick that it was in the cash
office. Relative to telling people (associates to ring up smart plans when they promted w/o asking the
customer) I don't know with whom I was pose to have had these convesations with. I did have many
conversations with casbiers and associates about smart plans  and their poor performances on smart plan
sales, but during those time I indacted that continued NON performace would lead to other corrective
actions. Note that many personal interviews were issued. I do not remember having any conversation with
an associate giving instructions to ring up sales with out asking the customer, I do retriember other
conversations about smart plans but not that.

#3 Answering to selling guns that did not appear on the pre-2003 list. The store had fire arms that were not
selling at the mark down. I asked Jon Swank if he wanted me to get someone in to but the guns he stated
yes, which I did through a friend of mine who collects guns. I arranged for a date and time for the guns to
be sold, I remember it was Thursday and that I had Ken Coy the Sporting Goods Manager come in on  his
day off to do the paper work (Thursday was the only day othe other person could come) I also arranged for
Nick MaComber to come in t the store to supervise the sale of the guns. On the day of sale I intruduced the

02/09/2004  09:07   7818433994                    KMART 3879                                    PAGE   02

parties who all went to sporting goods. I did make Ken get an LRT and scan each gun to insure they were pro2003, I also asked MaComber to verify each gun. The sale took over 3 hours to complete ( several guns were sold and all paper work had to be completed) during this time I stopped by several times to see how things were going on each time I asked if they were checking each gun they stated yes. *have sinse talked to Ken Coy who insists that* each guns was checked and they were all 2003. I have no other knowledge about this sale.

#4 Bulk sale of mark down clothing per the clearance scheadule. Please note that the store had become the dumping ground for clearnace MDs. As this sold down I indavoted to Jon Swank That I could get someone to buy this merchandise to ship it overseas, Mr Swank gave me the OK. Prior to the sale We had recived a very large transfer of back packs out of 9424, I had placed these bags at the front of the store and they did not sell even at the MD we were authorized. I had a conversation with Mr. Swank on these items as well as the clearance I was told to do what I had to do to get rid of them as they did not want carry over. I also sold these in the sale. I had several conversations with Mr. Swank relative to these items including some hard lines items that were 2003, Mr. Swank ( day of sale) incicated that he had NOT seen these items and was not confortable. I did not sell the. In fact due to the holiday sales they remained BOXED and listed by the 605 room.Ishowed these to Mr. Reeves on one of his visit. In fact the day of sake Mr Swank asked me to have the people go to 9424 to "help" Blanch (store Mgr) out with her clearance. I did in fact call 9424 that day with the information.

Please note ( have advised Mr. Reeves and Mike) that on my walk around the store to day I was advised that I was going to be fired ( 3 seperate associates), this would indicate to me that these chargeps have a predetermined result. Recves incated thatthey did not, however find an involuntary seperation report out of folder indicated otherwise. ( found report on desk when I came in to type report).

I have had numerous problems in this store and had MANY conversations with Joh Swank relative to alligations of qrong doing up to and including theft of a $4.00 phone, note Reeves investigated and resulted VIA camera system to be a boggus report, and I indicated that being foit at this store would only result in a final demise for me as it had for every store manager who preseeded me here.

I hereby state that I belive the facts that I have given in this investigation. If I have done ANY wrong it was to intentional or for any personal gain ( what did I gain with the smart lans). I further offer to submit to a polygraph test based on my report and any others given in this investigation in an attempt to show I have told the truth relative to these issues.

Respectfully submitted,

Daniel A. Ferrie



page#1

**Loss Prevention    Statement Form**

Case Number _____                    Page ___ of 4

| Statement of | | Address | | |
|---|---|---|---|---|
| Donald A. Ferro | | K-mart | | |
| City | State | Zip | | Phone |
| Auburn | Me | | | |
| Where Taken | | Date and Time of Statement | | |
| at K-mart | | | | |

On 3/1/04 I have been asked to make
#1 statement to incidents relative to accusatory
made by customer people (unknown names) I have
asked for the same to people making statement about
me + the information could not (would not) be
processed by the investigation.

#1 I never made any statement to anyone
in the store relative to sale less contents smart
plan cards being a legitimate sale.

#2 the sale of smart plan on a pre-
card were allowed by me sell to the cust then
the card was stolen. I did on 4 different
occasions instruct Nick McCorbe who activated
the plan + sales to connect the plan + put
them back on the card. the card was free to
customer Kmart police has made an investigation +
complaint on this case. I can't tell this this
problem has been taken care by Nick McCorbe.
Nick was in direct connection w/ mike Northcastle
front end manager, Nick instructed mike. it was
my understanding that this issue would have been resolved.

#3 I have been accused of making statement to
people to sell smart plans by any means
for sale asking the customer I do not

KMART 00461

0116410

remember any such conversation w/ anyone relating to this. I deny any allegation referring to when I made alleged statement to [illegible].

For the process of selling guns that did not appear on the 2003 list. I found a buyer to purchase guns for a price known to me. On the day of sale I [illegible] Nick our [illegible] the loss control manager + Kmart on the same guns [illegible] each gun before sale with a list to see if it qualified to be a 2003 gun - I did not carry a [illegible] guns to close the sale - I did go down several times to view - not looking at any paper work each time I asked if they were checking each gun as they sold it Nick + Ken were tied up for over 3 hours doing paperwork + at the end assured me the sale was correct + correct procedures were followed.

#4 The sale of [illegible] clothing was done by Jon [illegible], I reviewed the sale w/ him several times prior to the actual sale of merchandise - + did what I told him I was going to do - I was instructed to do "what ever it takes". After the sale I called [illegible]

The above statement is the truth to the best of my knowledge. I have made the above statement of my own free will and accord without any promise of immunity or reward and without any force or duress.

Date / Time | Signature

**Witness(s)**

Print or Type Name | Print or Type Name

Signature | Signature

Code (37) 0944843-11-9--pad/50--mts--rev. 5/98

page of 3

Scamp + he asking me to give Steve
Guy a call + give Blake the name of
the person so she too easy get ri of
her excess inventory

Please note. I have been advised by Jack
Nance Loss control D.I. + Mike Haule (spelly?)
relative to this matter. I have expressed the
fact that this issue has been pre Determined due
to the fact several employees have remarked how
+ stating I was going to be terminated over these
alleged incidents.

For the note. That the Employees of this
Store have told on numerous occasion to
get The Store manager Fired or pushed +
this information is known as I have talked
John Nance + Jack Scamp about. I has even
been accused of Stealy a ½ pint — however
closed circuit cameras moved by Loss control
stand otherwise.

Further + Final I Denie any or all
allegations relative to conversations I was

---

The above statement is the truth to the best of my knowledge. I have made the above statement of my
own free will and accord without any promise of immunity or reward and without any force or duress.

Date / Time  2/1/04

Signature _____

**Witness(s)**

David Foss
Print or Type Name

_____
Print or Type Name

_____
Signature

_____
Signature

KMART 00463

Avy att #4

alleged to have [illegible] & Tell the
story Doing of anything. I only ask I
question what Did I gain by Doing
& what is alleged of me Doing the
Helping someone. Smart plans were a priority
To sell however the store preferred [illegible]
I was made To work Sunday after a Day
off by [illegible] (4 hours) I Did Talk To
cashier & Did claim not only on hours or
smart plan sale but none To the
alleged incident

The above statement is the truth to the best of my knowledge. I have made the above statement of my own free will and accord without any promise of immunity or reward and without any force or duress.

2/1/04
Date / Time

Signature

**Witness(s)**

Daniel Ferro
Print or Type Name

[signature]
Signature

Print or Type Name

Signature

# TAB 13

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place, Boston, MA 02108**
**Phone: (617) 994-6000 Fax: (617) 994-6024**

---

MCAD DOCKET NUMBER: 04BEM01562          EEOC/HUD CHARGE NUMBER: 16CA401817
FILING DATE: 06/15/04                              VIOLATION DATE: 03/01/04

----------------------------------------------------------------------------------------------------

Name of Aggrieved Person or Organization:
Daniel A. Ferrie
1600 Pine Street
Dighton, MA 02715
Primary Phone: (508) 669-6349 ext. _____

----------------------------------------------------------------------------------------------------

Named is the employer, labor organization, employment agency, or state/local government agency who
discriminated against me:
K-Mart Corp.
Attn: Human Resources
3100 W. Big Beaver Rd.
Troy, MI 48084
Primary Phone: (248) 463-1000 ext. _____

No. of Employees:          25+

Work Location: Braintree, MA

----------------------------------------------------------------------------------------------------

Cause of Discrimination based on:
Age, Age of Complainant, specified; Other, Paragraph 4, Retaliation.

----------------------------------------------------------------------------------------------------

**The particulars are:**
I, Daniel A. Ferrie, the Complainant believe that I was discriminated against by K-Mart Corp., on the basis
of Age, Other. This is in violation of M.G.L. 151B Section 4 Paragraph 1B, 4 and ADEA.

See Attached

----------------------------------------------------------------------------------------------------

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations
contained herein are true to the best of my knowledge.

                                                                _____        5/15/04
                                                                (Signature of Complainant)          Date

# TAB 14

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**    New Window

Job Summary

JAMES,CARLTON                    **EmplID:** 01003900060                    **SSN:** 158725810

Job Information                                                                    View 7    First

| General | Job Information | Work Location | Compensation | | | | |
|---------|----------------|---------------|--------------|---|---|---|---|
| **Eff Date** | **Sequence** | **Jobcode** | **Empl Type** | **Empl Status** | **Full/Part Time** | **Reg/Temp** | **Standard** |
| 02/01/2005 | 0 | DVPStrConv | Salaried | Active | Full-Time | Regular | 45.00 |
| 01/27/2005 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 10/12/2004 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 02/01/2004 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 01/29/2004 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 05/01/2003 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 01/30/2003 | 1 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 01/30/2003 | 0 | DTM | Salaried | Active | Full-Time | Regular | 45.00 |
| 06/16/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 01/31/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 12/10/2001 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 07/25/2001 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |
| 07/15/2001 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 |

Q Return to Search )

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**          New Window

Job Summary

NICOLINI,DANIEL                    **EmplID:** 01000066220              **SSN:** 114683657

**Job Information**                                                              View 7      First      1-32 of 32

| General | Job Information | Work Location | Compensation |
| --- | --- | --- | --- |

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Pe |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 02/16/2005 | 0 | Str MgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/2005 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/07/2004 | 0 | StrMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/27/2003 | 0 | Str MgrVI | Salaried | Terminated | Full-Time | Regular | 48.00 | Weekly |
| 01/30/2003 | 0 | Str MgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 09/01/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 08/09/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/16/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/31/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/26/2001 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/05/2001 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/01/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/03/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/01/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/01/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/18/2001 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 11/02/2000 | 0 | Oper Mgr G | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/27/2000 | 0 | Rep TM D | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/01/2000 | 0 | Rep TM D | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 04/20/2000 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/2000 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/06/2000 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 12/01/1999 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 04/22/1999 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 11/12/1998 | 0 | Repl TM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/19/1998 | 0 | HL TAM MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/18/1998 | 0 | HL TMgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/07/1998 | 0 | HL TAM MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/29/1998 | 0 | HL AM MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/15/1998 | 0 | HL AM MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 12/11/1997 | 0 | Pacesetter | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 10/30/1997 | 0 | Pacesetter | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |

Q Return to Search

Job Summary                                                                                            Page 1 of 2

Home > Administer Workforce > Administer Workforce (GBL) > Inquire > **Job Summary**         New Window

Job Summary

BENNETT,DAVID G                    EmplID: 61000007156                SSN:  089661296

Job Information                                                        View 7      First     1-48 of 48

General | Job Information | Work Location | Compensation

| Eff Date | Sequence | Jobcode | Empl Type | Empl Status | Full/Part Time | Reg/Temp | Standard Hours | Work Pei |
|----------|----------|---------|-----------|-------------|----------------|----------|----------------|----------|
| 06/15/2005 | 0 | ProTem Coa | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/2005 | 0 | DTM | Salaried | Active | Full-Time | Regular | 45.00 | Weekly |
| 01/29/2004 | 0 | DTM | Salaried | Active | Full-Time | Regular | 45.00 | Weekly |
| 01/30/2003 | 1 | DTM | Salaried | Active | Full-Time | Regular | 45.00 | Weekly |
| 01/30/2003 | 0 | DTM | Salaried | Active | Full-Time | Regular | 45.00 | Weekly |
| 06/16/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/31/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/16/2002 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 12/17/2001 | 0 | DTM | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/12/2001 | 0 | Str TMgrVI | Salaried | Terminated | Full-Time | Regular | 48.00 | Weekly |
| 07/01/2001 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/03/2001 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/01/2001 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/01/2001 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/27/2000 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/01/2000 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/2000 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 12/01/1999 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/07/1999 | 0 | Str TMgrVI | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/01/1999 | 0 | Str TMgrIV | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/28/1999 | 0 | Str TMgrIV | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 08/10/1998 | 0 | StrTMgrIII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/07/1998 | 0 | Str TMgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/01/1998 | 0 | Str Mgr I | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 03/13/1997 | 0 | Str Mgr II | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/30/1997 | 0 | Ops Mgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 04/18/1996 | 0 | Ops Mgr | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/01/1996 | 0 | HL Manager | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/29/1995 | 0 | HL Manager | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 02/09/1995 | 0 | HL Mgr LII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/26/1995 | 0 | SK HL LII | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 07/14/1994 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 05/12/1994 | 0 | OM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/27/1994 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 40.00 | Weekly |
| 04/15/1993 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 40.00 | Weekly |
| 01/28/1993 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/23/1992 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 06/17/1991 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 04/18/1991 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 01/24/1991 | 0 | MAM-MTP | Salaried | Active | Full-Time | Regular | 48.00 | Weekly |
| 03/07/1990 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 08/09/1989 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 03/08/1989 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 07/16/1988 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |

**Job Summary**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 07/13/1988 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 06/01/1988 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 03/27/1988 | 0 | Store Hrly | Hourly | Active | Full-Time | Regular | 40.00 | Weekly |
| 03/23/1988 | 0 | Sys Start | | Active | Full-Time | Regular | 40.00 | Weekly |

Q Return to Search  ↓≣ Next in List  ↑≣ Previous in List

# TAB 15

1

# COPY

1  UNITED STATES DISTRICT COURT
2  DISTRICT OF MASSACHUSETTS
   ----------------------------------------x
3  DANIEL A. FERRIE,
4          Plaintiff,
5      vs.
6  K MART CORPORATION,
7          Defendant.
   ----------------------------------------x
8

9

10

11         DEPOSITION OF JON SWANK

12         New York, New York

13       Friday, June 24, 2005

14

15

16

17

18

19

20

21

22

23    ELLEN GRAUER COURT REPORTING, CO., LLC
          133 East 58th Street, Suite 1201
24          New York, New York 10022
              212-750-6434
25              REF: 77920

52

1                          SWANK

2          A.      She was a store manager for me

3    at Brighton, Mass.

4          Q.      What was her age, sir?

5          A.      Once, again, the previous

6    question you asked me to guess at that.  If I

7    were to guess, I would have to put her over

8    50.

9          Q.      And the name of the other

10   individual, sir?

11         A.      Leslie Clark.

12         Q.      What was her age?

13         A.      I would have to guess her age to

14   be in her mid-40s, possibly late 40s.

15         Q.      At any time, sir, in your

16   communications with Mr. Ferrie, did you ever

17   mention anything to do with his age?

18         A.      Not that I can specifically

19   recall.

20         Q.      Did you ever refer to Mr. Ferrie

21   as old?

22         A.      Not that I can specifically

23   recall.

24         Q.      Even in a joking manner?

25         A.      I recall that Mr. Ferrie would

SWANK

1
2  frequently joke about himself.  He would
3  frequently refer to himself as old.  I cannot
4  recall specifics.  I know he used to refer to
5  himself as the Dunkin Donuts man that he
6  looked like the Dunkin Donuts man.
7       Q.      Did you ever refer to Mr. Ferrie
8  as old and fat --
9       A.      Not that I can specifically
10 recall.
11      Q.      -- either to Mr. Ferrie or to
12 anyone else in reference to Mr. Ferrie?
13      A.      Not that I can specifically
14 recall.
15      Q.      Generally, do you have any
16 recollection concerning your statements about
17 Mr. Ferrie's age?
18              MR. ROSIN:   Objection.
19              You can answer that if you can.
20      A.      Repeat the question.
21      Q.      Do you have any general
22 recollections of you referring to Mr. Ferrie's
23 age, either to Mr. Ferrie or to anyone else?
24      A.      The only general recollection I
25 have of Mr. Ferrie is him referring to himself

54

SWANK

1

2    jokingly in that context.  My response, I

3    might have responded to his jokes.

4        Q.    Do you have any recollection of

5    referring to any other K Mart store manager as

6    old?

7        A.    No, I do not recall.

8        Q.    To the best of your

9    understanding why was Mr. Ferrie terminated

10   with his employment with K Mart?

11       A.    I was not the district manager

12   of the Boston market when he was terminated.

13       Q.    Regardless of your position at

14   the time of Mr. Ferrie's termination, what was

15   your understanding as to the reasons for Mr.

16   Ferrie's termination?

17       A.    Once again, I was not privy to

18   the specific reasons for his termination.  I

19   cannot speak to that.

20       Q.    At some point did you become

21   aware that Mr. Ferrie was no longer employed

22   with K Mart?

23       A.    Yes.

24       Q.    When did you become aware that

25   Mr. Ferrie was no longer employed with K Mart?