**EXHIBIT 5**

**ORIGINAL**

1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO. 04-12068JLT

| | |
|---|---|
| DANIEL A. FERRIE, | * |
|     Plaintiff | * |
| vs. | * |
| | * |
| K MART CORPORATION, | * |
|     Defendant | * |

**DEPOSITION OF DAVID B. HUGHES**, taken on behalf of the Plaintiff, before Maryellen Coughlin, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts held at Law Office of Paul F. Wood, P.C., 45 Bowdoin Street, Boston, Massachusetts, on May 13, 2005, commencing at 9:00 a.m.

REPORTERS, INC.
GENERAL & TECHNICAL COURT REPORTING
23 MERRYMOUNT ROAD, QUINCY, MA 02169
617.786.7783/FACSIMILE 617.786.7723

2

APPEARANCES OF COUNSEL:

For the Plaintiff:
   LAW OFFICE OF PAUL F. WOOD, P.C.
   (BY:  PAUL F. WOOD, ESQ.)
   45 Bowdoin Street
   Boston, Massachusetts 02114
   (617) 532-2666

For the Defendant:
   FOLEY & LARDNER
   (BY:  JEFFREY M. ROSIN, ESQ.)
   111 Huntington Avenue
   Boston, Massachusetts 02199
   (617) 342-4000
   E-mail:  jrosin@foley.com

```
                                                              6

 1                    DAVID B. HUGHES,
 2       having been first duly sworn, was examined
 3       and testified as follows:
 4
 5                       EXAMINATION
 6   BY MR. WOOD:
 7       Q.      Good morning, sir.  My name is Paul
 8   Wood.  I represent the plaintiff Daniel Ferrie in
 9   this matter.  Would you please state your full
10   name?
11       A.      David Brian Hughes.
12       Q.      And what is your residential
13   address, sir?
14       A.      603 Burton's Cove Way, Unit No. 7,
15   Annapolis, Maryland 21401.
16       Q.      Welcome to Boston.
17       A.      Thank you.
18       Q.      Have you ever had your deposition
19   taken before?
20       A.      Once over the phone.
21       Q.      Okay.  You may remember from --
22   when was that?
23       A.      Three years ago.
24       Q.      Okay.
```

1   Q.   And what did that encompass?
2   A.   It has changed several times during
3 that period. In the beginning, when I assumed
4 the director's position, we had stores in Ohio,
5 Pennsylvania, Maryland. And then after that it
6 changed to where we had Maine, New Hampshire,
7 Vermont, Massachusetts, Connecticut, Rhode
8 Island, New York, Ohio, Pennsylvania, Maryland,
9 Virginia, West Virginia, New Jersey. And I
10 believe those are all the states. So at the end,
11 at the time that it ended in January 2005, we had
12 all those states, and that would be the
13 northeast.
14   Q.   Okay. And as of the date of
15 Mr. Ferrie's termination, which I believe was
16 3/1/04, the northeast region encompassed those
17 latter states?
18   A.   I was a regional human resource
19 director when Mr. Ferrie was separated.
20   Q.   Right. And the region consisted of
21 the latter group of states you mentioned?
22   A.   Correct. Massachusetts would have
23 been one of the states.
24   Q.   Okay. I believe you testified

18

1  earlier that one of your duties and
2  responsibilities as regional HR director was
3  hiring and firing decisions.
4      A.    I would hire -- there's a selection
5  process with K Mart, and to hire someone we would
6  have to make sure they would go through the
7  entire selection process; but it would be my
8  responsibility to make sure that the stores hired
9  managers to staff up to the guidelines.
10     Q.    Okay.  And how would a decision to
11 terminate an employee get to you?
12           MR. ROSIN:  Just for the record,
13 I'm going to allow a little leeway here, but
14 Mr. Hughes is here as a company witness as
15 opposed to in his personal capacity --
16           MR. WOOD:  Okay, that's fine.
17           MR. ROSIN:  -- but I will allow a
18 little of this background stuff.
19     Q.    I can change it to, how would a
20 decision to terminate an employee come to a
21 regional human resources director at or around
22 the time of Mr. Ferrie's termination?
23     A.    The decision to terminate a store
24 manager at that time would be reviewed with

19

1  myself and the regional vice president, Mary Jo
2  Duffy.  We would take into an account an
3  investigation that would be done by a district
4  manager on, you know, something that a store
5  manager had done that wasn't to K Mart policy.
6  We would make sure that we were consistent in
7  what we had done in the past, and we would review
8  the investigation, and -- myself and Mary Jo
9  Duffy would review it and make a decision on
10 whether the policy was violated and the person
11 should be separated.
12          And in Mr. Ferrie's case, me and
13 Mary Jo Duffy reviewed the investigation --
14     Q.    We'll get to that a little bit
15 later.
16     A.    Okay.
17     Q.    Were part of the job duties of a
18 regional human resources director, at or around
19 the time that Mr. Ferrie was separated, did that
20 also include approval of promotion requests?
21     A.    Any promotions, transfers, or
22 anything like that would have to go through
23 myself.
24     Q.    Okay.  And, finally, you mentioned

25

1  happened, but it was -- we obtained a statement,
2  and I believe, to the best of my recognition,
3  that after we received his written statement we
4  read it.  And after that, based on the previous
5  investigation that was sent to me from Donna
6  Mastroeni, John Swank, and after obtaining a
7  statement, we then after that decided to
8  terminate Mr. Ferrie's employment.
9          Q.      Okay.
10         A.      And it was that day.
11         Q.      Who did you speak to in making the
12 decision to terminate Mr. Ferrie?
13         A.      Everyone that I spoke to?
14         Q.      Yes.
15         A.      Well, previously I had spoke to
16 Mr. Swank on the investigation.  I had spoke to
17 Mary Jo Duffy, the regional vice president, on
18 the investigation.  I spoke to Mike Haud, who was
19 the new district manager at the time when we did
20 separate him, because Mr. Swank had moved on to
21 the New Jersey market.  So I spoke to Michael
22 Haud about the investigation and the separation.
23         Q.      Okay.  Anyone else?
24         A.      To the best of my knowledge, that's

26

1  everyone I spoke to.
2      Q.    Okay.  To the best of your
3  knowledge, what did you and Mr. Swank discuss?
4      A.    The content of the investigation
5  that he sent me, with statements from associates
6  and the audit that was completed by Donna
7  Mastroeni on Smart plans being purchased.
8      Q.    Do you remember anything else about
9  your discussions with Mr. Swank, or is that it?
10     A.    There were other things that were
11 in the investigation that Mr. Ferrie was doing in
12 the store, but that wasn't -- me and Mr. Swank
13 only discussed, when terminating Mr. Ferrie,
14 Smart plans, but in the audit there was other
15 things uncovered.
16     Q.    And what were your discussions with
17 Ms. Duffy?
18     A.    That the code of conduct in K Mart
19 is very high.  We do not tolerate people that
20 manipulate or cheat for their benefit.  We have a
21 very high standard when it comes to how a store
22 manager should conduct themselves as a store
23 manager, and we felt through this investigation
24 that Mr. Ferrie did not conduct himself in an