UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| DANIEL FERRIE, <br><br> *Plaintiff,* <br><br> v. <br><br> KMART CORPORATION, <br><br> *Defendant.* | ) <br> ) <br> ) <br> ) <br> ) Civil Action No: 04-12068 (JLT) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT'S NOTICE OF ADDITIONAL RECORD
EVIDENCE WHICH MAY BE CITED AT ORAL ARGUMENT
ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant, Kmart Corporation ("Defendant"), hereby gives plaintiff, Daniel A. Ferrie ("Ferrie"), notice that, at oral argument on Defendant's Motion for Summary Judgment, Defendant may cite additional record evidence, which is identified as follows:

1. Further excerpts from the Ferrie's deposition, at 80-83 (See Tab A); and

2. Further excerpts from the deposition of Jon Swank, at 51-52, 60-64, 73-75. (See Tab B)

Respectfully Submitted,

KMART CORPORATION

By its attorneys,

_____
David S. Rubin, Esq. BBO# 546213
Jeffrey M. Rosin, Esq. BBO #629216
FOLEY & LARDNER LLP
111 Huntington Avenue
Boston, MA 02199
(617) 342-4000

Dated: October 13, 2005

BOST_183500.1

# TAB A

```
                                          1

CERTIFIED ORIGINAL          VOLUME: I
LEGALINK BOSTON
                            PAGES: 1 to 199

                            EXHIBITS: See Index


            UNITED STATES DISTRICT COURT

              DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - - x
DANIEL A. FERRIE

        Plaintiff

   v.                         No. 04CV12068JLT


KMART CORPORATION

        Defendant
- - - - - - - - - - - - - - - - - - x


          DEPOSITION of DANIEL FERRIE

            Monday, February 28, 2005

                   10:00 a.m.

                Foley & Lardner, LLP

                111 Huntington Avenue

            Boston, Massachusetts 02199


          Michelle Keegan, Court Reporter
```

1   still be able to access the cash?

2       A.  Right.

3       Q.  And two, in order to avoid that, you were
4   going to zero out the cash by buying a Smart Plan?

5       A.  Right.

6       Q.  And what did Swank say to that?

7       A.  I don't remember.  He didn't say not to.  He
8   didn't say anything to it.  He was more concerned
9   about where Reeves was and why Reeves wasn't
10  involved in it.

11      Q.  Okay.  So after you had that conversation
12  with Swank, then what happened?

13      A.  I received a call a short time later from
14  John Reeves asking me what had happened and why I
15  had called Swank.

16      Q.  Okay.  And what did you tell Reeves?

17      A.  I explained everything I had explained to
18  Swank, what had happened -- to my knowledge, what
19  had happened.  I also told him Nick was in the store
20  and that he should talk to Nick and get more details
21  on what was going on at that time.

22      Q.  And did you talk to Reeves about the concern
23  that Nick had about these individuals still being
24  able to access -- you've got to wait -- still being

Daniel Ferrie                                                  02/28/2005

81

1   able to access the cash?
2       A.   Yes.
3       Q.   And did Reeves share that concern?
4       A.   He didn't indicate one way or another with
5   me, that I remember.
6       Q.   Okay.  And can you explain for us, if you
7   know, if their card that they had no longer has any
8   cash on it, why was there a concern that they were
9   going to be able to somehow access the cash on a
10  different cash card that they didn't have?
11      A.   Because you can follow the card back to
12  every purchase.  You can take that cash card and
13  find exactly what was bought, the time it was
14  bought.
15      Q.   Who can?
16      A.   You can call into -- You have a card.  You
17  have the blank card.  There is a number on the back
18  of the card.  And you can call into that number and
19  you can follow the trail of purchase on that card.
20      Q.   So the concern was they would call in
21  that -- onto that phone number.  This is what
22  Macomber said to you?
23      A.   Right.
24      Q.   And did you share that same concern?

1    A.  I was of the concern that they could get the
2    money.
3    Q.  So the idea was that they would be able to
4    call into this phone number and be able to figure
5    out that all of the balance -- Do you know what the
6    balance was?
7    A.  I don't remember what the balance was.
8    Q.  Whatever the balance was on their card had
9    been transferred to a different card?
10   A.  Right.
11   Q.  They could have determined that by calling
12   in?
13   A.  Right.
14   Q.  Could they have then -- How could they then
15   have accessed the second card?
16   A.  They could have asked for the number to the
17   second card saying that they had lost it.
18   Q.  I see. And so that was the concern that
19   Macomber expressed to you?
20   A.  Yes.
21   Q.  And then did you tell Reeves when you spoke
22   to Reeves about your idea to purchase Smart Plans
23   with the second card?
24   A.  Yes.

1    Q.  And what did he say?
2    A.  He said nothing.  I told him what my concern was, that we would have -- before that money disappeared, when the Nashua police came, that we could reverse it back -- we could reverse the sale back out, cancel the sale and revert back to a card if that's what they needed for the prosecution.
8    Q.  And wouldn't you need to buy an item before you could buy a Smart Plan?
10   A.  No.
11   Q.  You can buy a Smart Plan without buying --
12   A.  Correct.
13   Q.  You can buy a Smart Plan on nothing?
14   A.  You can buy a Smart Plan.  You can buy a Smart Plan on anything you want.
16   Q.  But you wouldn't have anything.
17   A.  You can buy a Smart Plan with nothing.  You can buy a Smart Plan -- just blank Smart Plans.
19   Q.  You can buy blank Smart Plans?
20   A.  Yes.
21   Q.  And is that what your idea was to do?
22   A.  Yes.
23   Q.  So did you go ahead and do that?
24   A.  I told Nick Macomber to handle it.  I didn't

# TAB B

COPY

1

```
 1  UNITED STATES DISTRICT COURT
    DISTRICT OF MASSACHUSETTS
 2  ------------------------------------x
 3  DANIEL A. FERRIE,
 4           Plaintiff,
 5       vs.
 6  K MART CORPORATION,
 7           Defendant.
    ------------------------------------x
 8
 9
10
11            DEPOSITION OF JON SWANK
12              New York, New York
13            Friday, June 24, 2005
14
...
23       ELLEN GRAUER COURT REPORTING, CO., LLC
24         133 East 58th Street, Suite 1201
             New York, New York 10022
                  212-750-6434
25                REF: 77920
```

SWANK

basically, in my feedback and to my regional vice president.

Q. At any time did you do this for Mr. Ferrie? In other words, at any time did you rate Mr. Ferrie or identify Mr. Ferrie as promotable to the position of district manager?

A. No, I did not.

Q. And why did you not, sir?

A. Within my district I had two other candidates that demonstrated abilities that would make a good district manager and would have and were closer to being capable of being a district manager. I would not state that Mr. Ferrie would not have the ability over time to be a district manager. I had two other candidates that were stronger candidates to be a district manager.

Q. And who were these individuals, sir?

A. Branch Madill and Leslie Clark.

Q. And you testified previously, I apologize, where Ms. Madill was the store manager, correct?

1           SWANK
2      A.     She was a store manager for me
3 at Brighton, Mass.
4      Q.     What was her age, sir?
5      A.     Once, again, the previous
6 question you asked me to guess at that.  If I
7 were to guess, I would have to put her over
8 50.
9      Q.     And the name of the other
10 individual, sir?
11     A.     Leslie Clark.
12     Q.     What was her age?
13     A.     I would have to guess her age to
14 be in her mid-40s, possibly late 40s.
15     Q.     At any time, sir, in your
16 communications with Mr. Ferrie, did you ever
17 mention anything to do with his age?
18     A.     Not that I can specifically
19 recall.
20     Q.     Did you ever refer to Mr. Ferrie
21 as old?
22     A.     Not that I can specifically
23 recall.
24     Q.     Even in a joking manner?
25     A.     I recall that Mr. Ferrie would

SWANK

A. Yes.

Q. And the front end manager was the manager in charge of the cashiers at the front of the store?

A. Yes.

Q. And you don't have any specific recollections of any communications between you and Mr. Ferrie concerning smart plan sales?

A. I do not have any specific recollection. Once again in the course of my job, I would speak to every store manager in regards to their performance metrics and speak in groups and on conference calls.

Q. Earlier, sir, you testified that it was your assumption that Mr. Ferrie was separated from K Mart for smart plan manipulation. Please tell me your knowledge of every fact that gave you that assumption that caused you to make that assumption?

A. I recall that the K Mart internal auditor related to me the course of her investigation that she had come into Braintree to complete was in regards to smart

1         SWANK
2  plan manipulation, prior to the completion of
3  that investigation I was transferred or
4  promoted from Boston to New Jersey.
5       Q.    Is that the entire basis for
6  your assumption that Mr. Ferrie was separated
7  for smart plan manipulation?
8            MR. ROSIN:  Objection.
9       Q.    I will ask it a different way.
10           Are those all the facts that you
11 relied upon in basing or making your
12 assumption that Mr. Ferrie was separated for
13 smart plan manipulation?
14           MR. ROSIN:  Objection.
15      Q.    You can answer, sir.
16      A.    Do I have to answer?
17      Q.    If you understand the question,
18 you do.
19           MR. ROSIN:  I think he already
20      answered that question.  You first asked
21      him all the facts; he gave the facts and
22      you are asking him to say those are all
23      the facts again.
24           MR. WOOD:  That's what I'm
25      doing.

62

SWANK

A.    The internal auditor came into Braintree and identified to me she was conducting an investigation into smart plan manipulation in the store. I had been moved to New Jersey. As I previously testified, it came to my general awareness that Mr. Ferrie was separated, so my immediate assumption was that it was as a result of the internal audit which was taking place in regards to smart plan manipulation would be the primary reason for my assumption of his separation.

Q.    When you say that would be the primary reason for your assumption, are there other reasons for your assumption that that was the reason for Mr. Ferrie's separation?

A.    Not that I can recall.

Q.    Did you have any involvement in the investigation concerning the alleged smart plan manipulation by Mr. Ferrie?

A.    No, I did not.

MR. WOOD:    I will ask the reporter to mark this as Exhibit 5.

(Plaintiff's Exhibit 5, document marked for identification, as of this

                              SWANK

1     date.)
2        Q.     I show you what has been marked
3  as Exhibit 5 and ask you to take a look at it.
4        A.     Yes.
5        Q.     Have you seen what has been
6  marked as Exhibit A previously, sir?
7        A.     I don't recall specifically
8  reviewing it.
9        Q.     Look at the first sentence of
10 Exhibit 5 after the date to cc from and
11 regarding sections if you could read that to
12 yourself, please, and tell me when you are
13 done.
14       A.     Yes.
15       Q.     Does that refresh your
16 recollection as to whether you were involved
17 in the investigation of the alleged smart plan
18 manipulation by Mr. Ferrie?
19       A.     When I stated that I was not
20 involved in the investigation, I was present
21 and oversaw the store at the time of the
22 investigation, Donna Mastroeni, the auditor,
23 conducted the actual investigation of the
24 smart plan.  I did not pull reports or do any

64

1        SWANK
2  interviews regarding this investigation.
3  Interviews would have been conducted, after I
4  had been promoted to New Jersey.
5        Q.     What was the date of your
6  promotion to New Jersey?
7        A.     I recall reporting to New Jersey
8  in the end of January of 2004.
9        Q.     So then, sir, the first sentence
10 in Exhibit 5 is incorrect when it states that
11 the investigation was conducted by you among
12 others?
13       MR. ROSIN:    Objection.
14       Q.     You can answer the question.
15       A.     I was present for Donna
16 Mastroeni's early investigations into this
17 case.  Once, again, I did not do any of the
18 actual pulling, reviewing of reports or
19 conducting any interviews with any associates.
20 I would be or I was present and had the
21 overall responsibilities of the location at
22 the time Donna Mastroeni was in my store
23 conducting her investigation.
24       Q.     When you state that you were
25 present for Ms. Mastroeni's initial

1                    SWANK
2    asking me to relate --
3         Q.    Let me ask you another question.
4               Do you recall having any
5    communications with Mr. Ferrie concerning this
6    stolen credit card?
7         A.    No, I do not specifically recall
8    discussing this with him. He would refer to
9    the investigation to me via the phone when he
10   was out, and the extent of my conversation was
11   very nonspecific to the cash card.
12        Q.    I want to make sure I
13   understand, so you do recall some
14   communication with Mr. Ferrie concerning the
15   stolen credit card?
16        A.    The only conversation I recall
17   concerning the stolen credit card was Mr.
18   Ferrie's question to me as to the extent or of
19   the audit going on.
20        Q.    And this was when Mr. Ferrie was
21   out on his Workers' Comp injury?
22        A.    Yes.
23        Q.    Why don't you tell me everything
24   that you recall you saying during that
25   conversation and Mr. Ferrie saying during that

1  SWANK
2  conversation concerning this audit.
3      A.    I can recall speaking to Dan via
4  telephone for an update on when and if he
5  would be returning to work.
6           He questioned what was going on
7  with the audit, and I stated to the best of my
8  recollection I stated that I did not have the
9  details or could share the details of the
10 investigation with him at that time and that
11 my only condition was finding out when or if
12 he -- when or if he would be returning to
13 work.
14     Q.    Do you recall anything else from
15 that conversation?
16     A.    I can't recall specifically,
17 that's the general content of the
18 conversation.
19     Q.    Did you have any other
20 communications with Mr. Ferrie concerning the
21 issue of this audit?
22     A.    Not that I can recall.  The only
23 communications I had were several telephone
24 calls from Mr. Ferrie updating me to -- as
25 updating to me his extent of what was going on

1       SWANK
2  with him and if he would be back to work.
3       Q.      What do you recall of those
4  conversations?
5       A.      I recall that Dan couldn't
6  really give me a concrete answer as to that he
7  would be returning to work next week or next
8  month or if it would be longer. He just
9  specifically, if I do recall, he just would
10 state that he had another doctor's visit
11 coming up, et cetera, and would know more
12 after that.
13      Q.      Did this concern you?
14      A.      Aside from my personal concern
15 for an individual's health that I worked for
16 and knew for a period of time I had personal
17 concerns. And I also had concerns for the
18 running of the store that I was responsible
19 for. I would have based upon the length of
20 time that he would be out, I would possibly
21 have to make a decision to bring in a
22 temporary manager to oversee the location.
23      Q.      I will run through a few names
24 for you, sir?
25      A.      Yes.